1   Michele Floyd (SBN 163031)
    KILPATRICK TOWNSEND & STOCKTON LLP
2   2 Embarcadero Center, Suite 1900
    San Francisco, CA 94111
3   Telephone: (415) 273-4756
    Email: mfloyd@ktslaw.com
4
    Joseph R. Oliveri*
5   Steven J. Harrison*
    CLARE LOCKE LLP
6   10 Prince Street
    Alexandria, VA 22314
7   Telephone: (202) 628-7400
    Email: joe@clarelocke.com
8   Email: steven@clarelocke.com
    *Pro Hac Vice Application Forthcoming
9
    Attorneys for Applicant Gregory Gliner
10

11                  UNITED STATES DISTRICT COURT

12                 NORTHERN DISTRICT OF CALIFORNIA

13

14
    In re Ex Parte Application of          MISCELLANEOUS CASE NO.:
15
    Gregory Gliner,
16                                          DECLARATION OF ALEXANDRA
    Applicant,                              WHISTON-DEW IN SUPPORT OF
17                                          GREGORY GLINER'S EX PARTE
    For an Order Pursuant to 28 U.S.C. § 1782   APPLICATION FOR AN ORDER
18  Granting Leave to Obtain Discovery      PURSUANT TO 28 U.S.C. § 1782
    for Use in Foreign Proceedings          GRANTING LEAVE TO OBTAIN
19                                          DISCOVERY FOR USE IN FOREIGN
                                            PROCEEDINGS
20

21

22

23

24

25

26

27

28

**DECLARATION OF ALEXANDRA WHISTON-DEW**

I, Alexandra Whiston-Dew, declare:

1.     I am over the age of 18 and am not a party to this proceeding.  I have personal knowledge of the facts set forth below except as to those facts set forth upon information and believe.  As to those facts, I believe them to be true.  If called as a witness, I would and could testify competently to the matters set forth below.  I make this Declaration pursuant to 28 U.S.C. § 1746 in support of Gregory Gliner's *Ex Parte* Application for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings (the "Application") being filed contemporaneously herewith.

**My Qualifications and Experience**

2.     I am a solicitor of the Courts of England and Wales.  I was admitted to practise in England and Wales on 3 February 2014 and I have practised in England since then.  I am Partner of the law firm Mishcon de Reya LLP in London, England, where I practise as a litigator. A true and correct copy of my professional biography, as printed from the Mishcon de Reya LLP website, is attached hereto as **Exhibit 1**.

**My Retention by Gregory Gliner**

3.     Gregory D. Gliner ("Mr. Gliner") has retained my law firm and me to advise him on and to prosecute contemplated defamation proceedings in the Courts of England and Wales against the person or persons who operate the website PoliticalLore.com and/or authored and/or caused to be published on PoliticalLore.com the article headlined "Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale" (the "Article") that lists as its author an "Edward Swensson."[1]

4.     Without waiving privilege, Mr. Gliner has expressed to me that he intends to proceed with issuing defamation proceedings in the Courts of England and Wales after discovery is obtained pursuant to the Application, provided that the discovery reveals or leads to the identity

---

[1] Edward Swensson, *Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale*, Political Lore (June 2, 2023), https://www.politicallore.com/inheritance-of-billionaire-oleg-burlakov-a-battle-on-an-epic-scale/36294.

of the person or persons who operate the website PoliticalLore.com and/or authored, edited, and/or caused the Article to be published. Under English law, the author, editor, and publisher of the Article and the operators of PoliticalLore.com, the website on which it was published, are potentially responsible for any defamation arising from the Article. *See* Defamation Act 1996, § 1; Defamation Act 2013, §§ 5, 10.

**United Kingdom Courts Accept Evidence Obtained Under 28 U.S.C. § 1782**

5.     Based on my years of experience practicing law in England and review of the relevant caselaw, I am aware that English Courts are receptive to receiving evidence obtained from United States Courts under 28 U.S.C. § 1782, and I am not aware of any reason that the English Courts would not be receptive to receiving the evidence sought in the Application.

6.     Indeed, English Courts have repeatedly accepted evidence obtained from U.S. District Courts though applications made under 28 U.S.C. § 1782.

7.     The leading authority is the House of Lords decision in *South Carolina Co. v. Assurantie N.V.* [1987] 1 A.C. 24 (HL), in which the House of Lords overturned a finding by the Court of Appeal that use of the procedure under 28 U.S.C. § 1782 was inherently objectionable and an abuse of process by interfering with the Court's control of its own procedure. The House of Lords expressly rejected the argument that a party to English litigation, "by seeking to exercise a right potentially available to them under the Federal law of the United States [specifically 28 U.S.C. § 1782], has in any way departed from, or interfered with, the procedure of the English court." *Id.* at 40. Instead, the House of Lords explained that "[a]ll they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe that they need in order to prepare and present their case." *Id.* at 42. A true and correct copy of the decision in *South Carolina Co. v. Assurantie N.V.* [1987] 1 A.C. 24 (HL) is attached hereto as **Exhibit 2**.

8.     The approach in *South Carolina Co. v. Assurantie N.V.* [1987] 1 A.C. 24 (HL) has been affirmed in a number of subsequent decisions, where the English Courts have been receptive to evidence obtained from U.S. District Courts through applications made under 28 U.S.C. § 1782.

9.      For example, in *Nokia Corp. v. Interdigital Technology Corp.* [2004] EWHC 2920, the Court rejected an attempt to "restrain [a party] from pursuing applications made in US courts under 28 USC, section 1782 for documents and other evidence," holding that "it cannot be said a priori that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings." *Id.* ¶ 32.  The Court then explained that "the English court should not seek to circumscribe the discretion possessed by the [U.S.] district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in the proceedings as they stand." *Id.* ¶ 32(b). And the Court held that "[i]t is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary, after appropriate amendment." *Id.*  Indeed, the Court acknowledged that it "is generally indifferent as to the source of admissible material." *Id.* ¶ 23.  A true and correct copy of the decision in *Nokia Corp. v. Interdigital Technology Corp.* [2004] EWHC 2920 is attached hereto as **<u>Exhibit 3</u>**.

10.      More recently, in the case of *Soriano v Forensic News LLC and others* [2023] EWCA Civ 223, the English Court held that an application under 28 U.S.C. § 1782 is unlikely to be considered unconscionable simply because the U.S. Court may take a broader approach to discovery than the English Court may be prepared to order when faced with an application for third-party disclosure. A true and correct copy of the decision in *Soriano v Forensic News LLC and others* [2023] EWCA Civ 223 is attached hereto as **<u>Exhibit 4</u>**.

11.      While there are some cases in which an English Court has been prepared to exercise its jurisdiction to issue an anti-suit injunction to restrain a party pursuing an application under 28 U.S.C. § 1782, those decisions are not based on unreceptiveness or hostility to the process under 28 U.S.C. § 1782.  Instead, such injunctions were granted on the basis of the manner in which, effect of, or timing with which such applications were pursued.  For example, in *Bankers Trust International PLC v PT Dharmala Sakti Sejahtera* [1996] CLC 252, the application under 28 U.S.C. § 1782 was pursued *after* the trial in England had already ended, and in *Omega Group*

*Holdings Ltd v Kozeny* [2002] CLC 132, the effect of granting an application under 28 U.S.C. § 1782 would have been to subject a witness from whom evidence was sought to unwarranted double cross-examination.  Neither of these situations apply to this Application, because the anticipated claim is at an early stage and the respondent to this Application (Dynadot, Inc.) will not be a party to Mr. Gliner's intended English defamation lawsuit.  True and correct copies of the decisions in *Bankers Trust International PLC v PT Dharmala Sakti Sejahtera* [1996] CLC 252 and *Omega Group Holdings Ltd v Kozeny* [2002] CLC 132 are attached hereto as **Exhibit 5** and **Exhibit 6**.

12.     In sum, I conclude based on these and other authorities that the English Court will be receptive to the evidence sought in the Application.  I am unaware of any proof-gathering restrictions or policies under English law or civil procedure rules that would be circumvented by obtaining evidence pursuant to 28 U.S.C. § 1782.  Accordingly, I further do not consider the Application to be seeking to circumvent any such proof-gathering restrictions, nor do I consider it to be contrary to English law or civil procedure rules.

### Defamation Under English Law

13.     Under English law, a statement is defamatory if it contains an untrue imputation that tends to lower the reputation of the claimant in the estimation of right-thinking members of society.[2] To be defamatory, a statement must have also caused or be likely to cause serious harm to the claimant's reputation.[3]  Under English law, the author, editor, and/or publisher of a defamatory statement and/or the operator of a website may be held liable for harm or potential harm caused to the claimant's reputation.[4]

14.     The Article is defamatory of Mr. Gliner under English law because it contains serious accusations of criminal conduct by Mr. Gliner which are likely to cause serious harm to his reputation as a successful, ethical, and upstanding investment advisor and businessman.  Given that

---

[2] *Sim v Stretch* [1936] 2 All ER 1237 (attached hereto as **Exhibit 7**).

[3] Defamation Act of 2013, § 1.

[4] Defamation Act 1996, § 1; Defamation Act 2013, §§ 5, 10.

DECL. OF ALEXANDRA WHISTON-DEW IN SUPP. OF GREGORY GLINER'S 28 U.S.C. § 1782 APPL.

these allegations are entirely baseless, the usual defences run by publishers of "truth"[5] or "public interest"[6] would, in my view, inevitably fail (as would any other defences).

15.     The operator of PoliticalLore.com is the publisher of the Article, being a commercial publisher whose business is issuing material to the public and which published material containing defamatory statements about Mr. Gliner in the course of its business.[7]

16.     In the event that discovery reveals that the operator of PoliticalLore.com is domiciled in the United Kingdom, the Courts of England and Wales will almost certainly have jurisdiction over Mr. Gliner's intended defamation claim.  The Courts of England and Wales will also likely have jurisdiction over Mr. Gliner's intended defamation claim even if discovery reveals that the operator of PoliticalLore.com is not domiciled in the United Kingdom, because Mr. Gliner is a citizen of the United Kingdom with an established reputation in the jurisdiction such that there are grounds on which England and Wales is the most appropriate forum for Mr. Gliner to bring his claim irrespective of where the publisher is based.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 11th day of April, 2024, at London, England, United Kingdom.

DocuSigned by:

*Alexandra Whiston-Dew*
608895F6EA833420

Alexandra Whiston-Dew

---

[5] Defamation Act 2013, § 2.

[6] Defamation Act 2013, § 4.

[7] Defamation Act 1996, § 1(2).

# Exhibit 1

Mishcon de Reya LLP

**Main menu**



# Alexandra Whiston-Dew

PARTNER

## Contact Information

- +44 20 3321 7182 (tel:+44 20 3321 7182) 📞
- alexandra.whistondew@mishcon.com (mailto:alexandra.whistondew@mishcon.com) ✉

## Personal Profile

- Profile
- More Details

Alexandra has a broad range of experience advising both international and UK based individuals and companies. With expertise in matters bridging the specialisms of private client law and a focus on reputation protection, she is an experienced commercial litigator. Alexandra participates in the Data Protection, Extradition, Russia and Africa groups.

Managing the firm's engagement in the SPITE project - a pro bono partnership with Queen Mary University - she advises victims of revenge porn. Having written articles and presented lectures on the issue of sharing intimate images and personal data, she also delivers training to PR companies and publishers on developments in media law and data protection.

Alexandra is a trustee and Company Director of LHA London, a housing charity that caters for students and young people, and a trustee of Future Talent, a charity that provides support and

guidance to young musicians who demonstrate outstanding musical ability from low income backgrounds.

# Key Experience

- Taking legal action on behalf of a multimillionaire who was having difficulty obtaining a bank account due to false information and incorrect categorisation as a Politically Exposed Person ("PEP")
- Attaining a public and private apology and payment of legal costs for Agroherni Group, a well-known food producer, who came under attack by a Channel 4 and Daily Mail documentary that made false allegations concerning the organisation's treatment of their staff.
- Assisting an 80 year old British business man facing extradition charges from Greek authorities with his appeal against his convictions of fraud.
- Assisting the owning body of a successful football club to rebuild their reputation following ongoing scrutiny and defamation from the local supporters and media.
- Acting on behalf of a multi-million-pound oil broker who was caught in a scandal making false and serious allegations which were damaging to the client's reputation and prevented them from being able to pursue various commercial endeavours.
- Advising companies and high net worth individuals in reputation crisis on immediate and long term legal action.

# Career History

Partner, Mishcon de Reya LLP
Managing Associate, Mishcon de Reya LLP
Associate, Mishcon de Reya LLP
Legal Assistant, Mishcon de Reya
Business Development & Events Director, Brand Distillery
Lincolns Inn, Called to the Bar November 2011
BPP, BVC 2011
BPP, GDL 2009
University of Edinburgh, MA (Hons) Philosophy & Theology

## Services

- Private (/mishcon-private)
- Regulatory (/services/regulatory)
- Reputation Protection and Crisis Management (/services/reputation-protection)
- The Online Safety Act (/services/the-online-safety-act)

# Exhibit 2

24

Lord Mackay
of Clashfern

Reg. v. Shivpuri (H.L.(E.))

[1987]

with the Lord Chancellor's view. Otherwise I agree with the reasons given by my noble and learned friend, Lord Bridge.

A

*Appeal against conviction dismissed.*
*Costs of appellant and respondent to*
*be paid out of central funds.*

*Solicitors: Francis & Co., Cambridge; Solicitor, Customs and Excise.*

B

C. T. B.

———————

C

[HOUSE OF LORDS]

SOUTH CAROLINA INSURANCE CO.    .    .    .   RESPONDENTS

AND

D

ASSURANTIE MAATSCHAPPIJ "DE ZEVEN
PROVINCIEN" N.V.    .    .    .    .    .   APPELLANTS

SOUTH CAROLINA INSURANCE CO.    .    .   RESPONDENTS

AND

AL AHLIA INSURANCE CO. AND ANOTHER    .    .   APPELLANTS

E

1986   May 6, 7;        Lord Bridge of Harwich, Lord Brandon of Oakbrook,
      July 29              Lord Brightman, Lord Mackay of Clashfern and
                              Lord Goff of Chieveley

*Injunction—Jurisdiction   to   grant—Foreign   proceedings—Action*
*brought in England—Defendants lodging petition in United States*
*court for pre-trial discovery—Whether defendants to be restrained*
*from proceeding with petition under court's inherent jurisdiction*

F

The plaintiffs were an American insurance company, and, having reinsured the liability of another American insurance company, U.N.I., they reinsured the risk with the defendants in London. The plaintiffs claimed under the contract of reinsurance and, when the defendants disputed liability, they brought proceedings in the Commercial Court. Before the defence was served, the defendants lodged a petition in a United States district court seeking, inter alia, an order for pre-trial discovery of documents relevant to the claim and the plaintiffs' contract of reinsurance with U.N.I., against persons resident in the United States, who were not parties to the English action. On the plaintiffs' application in the Commercial Court, the judge made an order restraining the defendants from taking any further step in the American proceedings or enforcing any order made therein. On appeal by the defendants, the Court of Appeal dismissed the appeal.

G

H

A      On appeal by the defendants:—

*Held,* allowing the appeal, that although the power of the High Court to grant injunctions, which was a statutory power conferred by section 37(1) of the Supreme Court Act 1981, was very wide it was limited, save for two exceptions irrelevant to the present proceedings, to the situations (Lord Mackay of Clashfern and Lord Goff of Chieveley dubitante) (i) where one

B party to an action could show that the other party had either invaded, or threatened to invade, a legal or equitable right of the former for the enforcement of which the latter was amenable to the jurisdiction of the court, and (ii) where one party to an action had behaved, or threatened to behave, in an unconscionable manner; that in the circumstances the plaintiffs had failed to show either that the defendants' conduct towards the plaintiffs was amenable to the jurisdiction of the court, or that it was unconscionable in the sense that it interfered with the due

C process of the High Court's jurisdiction, and that, accordingly, the injunctions granted would be discharged (post, pp. 31c–d, 39h—40d, 41a–d, 44a–b, c–d, e, f).

*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210, H.L.(E.); *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, H.L.(E.) and *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58,

D H.L.(E.) applied.

*Per Lord Goff of Chieveley.* I am reluctant to accept the proposition that the power of the court to grant injunctions is restricted to certain exclusive categories. That power is unfettered by statute and it is impossible at the present time to foresee every circumstance in which it may be thought right to make the remedy available (post, p. 44g).

E      Decision of the Court of Appeal [1986] Q.B. 348; [1985] 3 W.L.R. 739; [1985] 2 All E.R. 1046 reversed.

The following cases are referred to in their Lordships' opinions:

*Bank of Tokyo Ltd. v. Karoon (Note),* post, p. 45; [1986] 3 W.L.R. 414; [1986] 3 All E.R. 468, C.A.

*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984] 3

F W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)

*Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; [1980] 3 W.L.R. 991; [1981] 1 All E.R. 143, H.L.(E.)

*Court of Commissioner of Patents for Republic of South Africa, In re* (1980) 88 F.R.D. 75

*Deere (John) Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F. 2d 132

G *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795; [1978] 2 W.L.R. 362; [1978] 1 All E.R. 625, H.L.(E.)

*Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; [1977] 3 W.L.R. 818; [1977] 3 All E.R. 803, H.L.(E.)

The following additional cases were cited in argument:

H *Armstrong v. Armstrong* [1892] P. 98

*Erhmann v. Ehrmann* [1896] 2 Ch. 611, C.A.

*Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)* [1980] 2 Lloyd's Rep. 546, C.A.

*North Carolina Estate Co. Ltd., In re* (1889) 5 T.L.R. 328

South Carolina Co. v. Assurantie N.V. (H.L.(E.))                    [1987]

*Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262                    A
*Westinghouse Electric Corporation Uranium Contract Litigation M.D.L.
   Docket No. 235 (Nos. 1 and 2), In re* [1978] A.C. 547; [1978] 2 W.L.R.
   81; [1978] 1 All E.R. 434, H.L.(E.)

APPEAL from the Court of Appeal.

This was an appeal by leave of the House of Lords (Lord Scarman,
Lord Templeman and Lord Mackay of Clashfern) dated 19 November    B
1985 by the defendants, Assurantie Maatschappij "De Zeven Provincien"
N.V., in the first action, and by the first defendants, Al Ahlia Insurance
Co., and by the second defendants, Arabian Seas Insurance Co. Ltd., in
the second action brought by the plaintiffs, South Carolina Insurance
Co. from the judgment dated 23 May 1985 of the Court of Appeal
(Griffiths, Slade and Lloyd L.JJ.) which affirmed orders made on 25    C
April 1985 by Hobhouse J., the effect of which was to restrain the
defendants from taking any further steps in proceedings before a Federal
District Court of the United States for production and inspection of
documents against a number of companies and individuals not party to
the present actions.

The facts are set out in the opinion of Lord Brandon of Oakbrook.
                                                                    D

*Robert Alexander Q.C.* and *Jonathan Sumption Q.C.* for the
defendants. The point raised by this appeal is novel. The question can
be stated in this way: in what circumstances (if any) may the English
courts restrain a party to an English action from availing himself of the
process of a foreign court for the purpose of obtaining evidence relevant
to the English action? The most authoritative decisions in this branch of    E
the law are those of this House in *Siskina (Owners of cargo lately laden
on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; *Castanho
v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557 and *British Airways
Board v. Laker Airways Ltd.* [1985] A.C. 58.

In the present case the defendants against whom injunctive relief is
sought availed themselves of a right open to them under the federal law    F
of the United States and applied to a United States district court for an
order requiring persons resident in the United States, but who were not
parties to the English proceedings, to give pre-trial discovery of
documents relevant to the English action. The particular issue, therefore,
in this appeal is whether in the present circumstances it is right for the
English court to restrain the defendants from prosecuting further the
proceedings in the United States district court.                    G

The rules of procedure in England provide a means whereby
discovery can be obtained between parties to an action and witnesses
can be subpoenaed to appear at the trial with relevant documents in
their possession. The rules of procedure do not provide an exhaustive or
exclusive code which prohibit a party from obtaining documents in any
way other than those provided by the rules. For example, if a stranger    H
to the action is prepared to give documents voluntarily to a party, that
party is entitled to receive them without obtaining a subpoena. Further,
a party may use the facilities of the courts of a friendly foreign state if
that state is willing for them so to do. The defendants concede that

A there are limits to this principle. Thus, it is inapplicable where it would be unconscionable for a party to obtain discovery, for example, of documents which in this country are subject to professional privilege.

The documents sought are relevant to the defences pleaded in the action which in turn reflect enquiries which were pursued before the action was brought. The plaintiffs obtained the injunction in spite of refusing the defendants consent to have access to the documents in question. Since then they have granted the defendants access but it is the view of the defendants' solicitors that the strangers to the action have not made proper disclosure. The documents are not in the power or possession or control of the plaintiffs; therefore it is difficult to see why they object to disclosure. If the strangers to the action were in this country they could be required to produce the documents by subpoena duces tecum. As to any suggestion that the defendants could have C applied for letters rogatory under R.S.C., Ord. 39, r. 2, the procedure is cumbersome and expensive and they can be issued only where other efforts have been made to obtain the documents in question.

As stated previously, after the Court of Appeal gave judgment the plaintiffs did arrange for the defendants to have controlled access to certain documents in the possession of certain third parties resident in D the United States. This was a facility which the defendants hoped would make the prosecution of the present appeal unnecessary. However, the restrictions imposed upon the defendants' inspection of documents made the facilities which were offered to them most unsatisfactory. They have therefore with regret concluded that certain documents have been withheld in a manner which can be remedied only by the compulsory E procedure of the United States district court.

28 United States Code, section 1782, is a clear provision enabling parties to an English action to obtain from the courts of the United States documents for use in proceedings in this country. That being the rule, the question then arises: on what principle should the English court prevent disclosure where the United States courts would allow disclosure directed to a company which is subject to the jurisdiction of the United F States courts? It is the plaintiffs' contention that in the circumstances it is unconscionable for the defendants to apply for disclosure of these documents. The Court of Appeal held that in principle a party to litigation in this country should not avail itself of 28 United States Code, section 1782, against non-parties resident in the United States.

Reliance is placed on the following propositions: (i) In principle it is G open to the defendants to seek material to enable them to conduct their case and to obtain that material as early as possible. A party can gather evidence for use in litigation either through the use of English procedures or through other means. (ii) There is no objection to these other means including means provided by United States proceedings. This does not, as the Court of Appeal suggested, deprive the English court of control over the proceedings. (iii) Caution is required before the conduct of any H foreign proceedings is restrained. (iv) The use of the United States processes could be restrained by injunction if it involved the breach of some legal or equitable right of the party claiming the injunction or was unjust or unconscionable to that other party but not otherwise. The

A

defendants dissent from the general approach of the Court of Appeal in the present case.

As to the authorities, reliance is placed on *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210, 211c–d, 255f–g, 256e–257, *per* Lord Diplock. As to *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, see *per* Lord Scarman, at pp. 572f–g, and 574d. It is to be noted that that was a forum conveniens case. In *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58, the observations of Lord Diplock at pp. 80a–b et seq., and Lord Scarman at p. 95c, show that the category of cases there under discussion have no relevance to the issue in the present case. The defendants would apply by analogy to the present case the observations of Dunn L.J. in *Mike Trading and Transport Ltd. v. R. Pagnan & Fratelli (The Lisboa)* [1980] 2 Lloyd's Rep. 546, 551.

B

C

On the facts of the present case it is not unreasonable or unjust for the defendants to apply for the documents in question. It is said that the documents would be obtained earlier than if they were obtained by subpoena in the English proceedings. But this is only a quirk of English procedure. The advantage of being able to obtain the documents at an earlier stage of the proceedings is in no way unconscionable to the plaintiffs. This is particularly so since otherwise they are not likely to be obtained at all. The defendants do not accept that the procedure by way of letters rogatory is open to them. Further, it is an expensive procedure. It cannot be unjust or unconscionable for the defendants to take the "direct route" for obtaining these documents.

D

As to the United States authorities cited by Griffiths L.J. [1986] Q.B. 348, 357, those authorities are not contemplating the situation which has arisen in the present case. The principles laid down by the Court of Appeal here it may be said to act unconscionably against the defendants rather than the plaintiffs. [Reference was also made to *In re North Carolina Estate Co. Ltd.* (1889) 5 T.L.R. 328; *Straker Brothers & Co. v. Reynolds* (1889) 22 Q.B.D. 262, and *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45.]

E

*Kenneth Rokison Q.C., Christopher Symons* and *Thomas Weitzman* for the plaintiffs. Attention is drawn to the width of the inquiry requested by the defendants in the United States proceedings. They are seeking third party discovery which would not be allowed at all in England. The United States court will not allow that which would not be allowed by the court hearing the substantive issue between the parties. The defendants are in effect seeking to take part of the English proceedings out of the jurisdiction and control of the English court. The difference between the disclosure of documents as a result of letters of request and the present case is that the defendants here have first gone to the foreign court and requested that court to make an order in English proceedings.

F

G

*In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, is the antithesis of the present case. The House there held that an English court will not, even when so requested by a foreign court, make an order in respect of an English person or company requiring that person or company to give

H

A     documentary or testamentary discovery for the purposes of the foreign proceedings. The present case is the reverse position since although the American court is being asked to assist the English court, the American court is being asked to admit a wider class of documents than is allowable under English procedure. It is thus an even stronger case than the *Westinghouse* case. The correct way for the defendants to proceed in the present issue is under R.S.C., Ord. 39, r. 1. Further, Ord. 38, r. 9

B     specifically relates to depositions in any cause or matter and links them to those under Ord. 39, r. 1.

    The approach of Griffiths L.J. in the Court of Appeal is adopted. The plaintiffs are prejudiced by the American procedure because the defendants can obtain documents which could not be obtained under English procedure. Further, the plaintiffs are necessarily prejudiced by

C     the costs and expense of the American proceedings for they are bound to take part in those proceedings to protect their interests. The question also arises whether, if the English court would not make an order for third party discovery as sought by the defendants, the American court would make any order at all. It is plain from the American decisions in *In re Court of Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D. 75, 77, and *John Deere Ltd. and Deere & Co. v.*

D     *Sperry Corporation* (1985) 754 F. 2d 132, 135, 136, that a United States court will only grant an applicant an order under 28 United States Code, section 1782, if it is satisfied that an order of the same nature would be made in like circumstances by the foreign court seised of the dispute at that stage of the proceedings. The effect of those decisions is that any American court properly advised as to English law on discovery would

E     deny the defendants' request as being for third party discovery which is not allowable under English procedure. If it be said that this question can be left for the United States district court to decide, the answer is that it is better for the English court to deal with the matter and "nip it in the bud." It may be that the United States court would not be properly advised as to the relevant English law.

    The English court has jurisdiction to restrain a party to proceedings

F     pending in England from seeking or continuing to seek interlocutory orders in a foreign jurisdiction for the purposes of those proceedings. The English court has an inherent jurisdiction to control its own proceedings. Further, it is well established that where proceedings are pending before the English court, and proceedings are brought in a foreign jurisdiction which concern the same issues, the English court has

G     a discretionary jurisdiction either to stay the English proceedings or to restrain by injunction a party to those proceedings from continuing to proceed in the foreign court. This jurisdiction was recognised by this House in *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58, 80D–F *per* Lord Diplock. This jurisdiction is commonly invoked in the so-called "forum conveniens" cases, where there is a choice of forum for determination of substantive issues between the parties. See *per* Lord

H     Scarman, at p. 95D. This jurisdiction must also exist where the foreign proceedings are of a purely interlocutory nature, but which overlap with the normal interlocutory processes before the English court. Indeed, it is an obvious and an "a fortiori" case. Thus here the United States

A

proceedings are only ancillary proceedings and therefore there is no reason why the English court should not have granted the injunction appealed against.

*The Lisboa* [1980] 2 Lloyd's Rep. 546 is distinguishable because that was a case where proceedings were started in Venice in order to obtain security if the action was subsequently instituted in Italy. That case cannot be described as one of a foreign court's interlocutory jurisdiction being invoked in English proceedings. It was not an interlocutory application for the purposes of English proceedings. The line of cases cited by Robert Goff L.J. in *Bank of Tokyo Ltd. v. Karoon (Note)* [1987] A.C. 45, is closer to the present case. The present case is one where it is proper to grant an injunction to protect the jurisdiction of the English court.

B

*Armstrong v. Armstrong* [1892] P. 98 lays down the correct approach to the present problem; the principles stated there are applicable to the present case. The essential question is: who should have control over the present matter? The true answer is that it should be the English court which should have control.

C

Suppose that in the present case the plaintiffs had attempted in the United States Court to obtain pre-trial depositions from the defendants' employees. Such an application would surely be restrained because it would be so alien to English procedure. So also third-party discovery is alien to English procedure. The matter can be tested by the following example. If a party went to an English court and asked it to issue letters rogatory in relation to third parties' documents under Order 39, such an application would be dismissed. If the party then went to the United States court and requested it under 28 United States Code, section 1782, the English court should intervene on the ground that it was vexatious; the party having failed before the English court, it cannot obtain the evidence by utilising a foreign jurisdiction. But the answer cannot be any different merely because the party in question goes to the United States court first as in the present case.

D

E

*Erhmann v. Ehrmann* [1896] 2 Ch. 611, shows that the English court will not grant letters rogatory except in relation to evidence which is directly relevant to the issues in the case. Wider "discovery" will not be made the subject of letters rogatory—let alone in respect of documents held by a third party.

F

In conclusion, it is the plaintiffs' contention that they have a legal or equitable right which it is appropriate for the English court to protect by injunction, namely the right, as parties to proceedings in the English court, to have those proceedings conducted in accordance with the procedural laws and practices of England, and of no other jurisdiction. Moreover, it is their contention that the defendants' application for interlocutory relief in the United States is unconscionable and unjust to the plaintiffs. If granted, it would allow the defendants to take advantage of procedural steps and remedies available under English procedural law, while at the same time avoiding some of the restrictions on those steps and remedies which would nevertheless continue to impinge upon the plaintiffs.

G

H

*Symons* followed.

A    *Alexander Q.C.* in reply. In the present case it is accepted that there is an advantage under the foreign proceedings which cannot be obtained in the English proceedings. It is this factor which distinguishes the present case from *Armstrong v. Armstrong* [1892] P. 98, as applied by Robert Goff L.J. in the *Tokyo Bank* case *(Note)* [1987] A.C. 45. The defendants rely on the principle on which they opened this appeal, namely, that the plaintiffs can only succeed if they can show that the

B    defendants' application before the United States court is unconscionable. As to the principle adumbrated by Griffiths L.J. below, the manner in which a party gathers evidence is for that party. It may gather it voluntarily or in pursuance of a contract. These methods do not deprive the English court in any way of control of its own proceedings.

     [Reference was also made to *In re Westinghouse Electric Corporation Uranium Contract Litigation M.D.L. Docket No. 235 (Nos. 1 and 2)* [1978] A.C. 547, 562B–F.]

C

     Their Lordships took time for consideration.


     29 July.  LORD BRIDGE OF HARWICH.  My Lords, for the reasons given in the speech of my noble and learned friend, Lord Brandon of
D    Oakbrook, with which I agree, I would allow this appeal.


     LORD BRANDON OF OAKBROOK.   My Lords, the question for decision in this appeal is a novel one and can be stated in this way. An action between A and B is pending before an English court. While it is pending B, exercising a statutory right potentially available to him under
E    the federal law of the United States, applies to a district court of the United States for an order that persons resident in the United States, who are not parties to the action before the English court, should give him pre-trial discovery of documents relevant to the issues in that action. In those circumstances, is it right for the English court, on the application of A, to grant an injunction against B prohibiting him from prosecuting further his proceedings in the United States district court?
F    Hobhouse J. at first instance, and the Court of Appeal (Griffiths, Slade and Lloyd L.JJ.) on appeal from him, have held that it is right for such an injunction to be granted. The parties enjoined (for in the instant case there are three of them) now bring a further appeal with the leave of your Lordships' House.

     The background of the case is to be found in what can conveniently
G    be described as a three-tier insurance arrangement. The company which first insured the relevant risks was a United States company, United National Insurance Co. ("United National"). United National re-insured the risks which it had insured with another United States company, South Carolina Insurance Co. ("South Carolina"). South Carolina in turn re-re-insured the risks which it had re-insured with a number of other insurance companies in the London market. These other insurance
H    companies included a Dutch company, Assurantie Maatschappij "De Zeven Provincien" (Seven Provinces) and two Middle or Far Eastern companies, Al Ahlia Insurance Co. ("Al Ahlia") and Arabian Seas Insurance Co. ("Arabian Seas"). In or about 1984 South Carolina called

32

Lord Brandon
of Oakbrook          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          [1987]

A  upon Seven Provinces, Al Ahlia and Arabian Seas to pay substantial sums which South Carolina claimed to be due from them under the contracts of re-re-insurance concerned. Seven Provinces, Al Ahlia and Arabian Seas refused to make the payments asked for, denying that they were liable to do so.

As a result South Carolina brought two actions in the Commercial Court here in order to recover the sums which they claimed to be B  payable, together with interest on such sums. In the first action, which was begun on 12 December 1984, Seven Provinces is the sole defendant. In the second action, which was begun on 28 February 1985, Al Ahlia is the first defendant and Arabian Seas is the second defendant. It was the original intention of the solicitors acting for South Carolina to seek summary judgment in both actions under R.S.C., Order 14. However, C  at an application to fix a date for the hearing of the Order 14 proceedings against Seven Provinces, counsel for the latter indicated that a number of substantial defences would be raised to South Carolina's claim. These defences included (1) misrepresentation or non-disclosure regarding the retention position on the part of South Carolina; (2) non-disclosure of a previous bad loss record on the business concerned; (3) excessive deductions from premiums; and (4) payment of claims outside D  the limits of the relevant treaty.

The underwriting agent for United National through whom business was placed with it was Pacific General Agency Inc. ("P.G.A."). The loss adjusters who investigated the claims made against United National were Arthur Campbell-Husted and Co. ("Campbell-Husted"). The principal place of business of both P.G.A. and Campbell-Husted is in the State of Washington. E

My Lords, Seven Provinces, Al Ahlia and Arabian Seas ("the re-re-insurers") are, by reasons of their position, remote from the facts in dispute, and obliged to rely for detailed information about them on such documents as they can obtain from South Carolina or P.G.A. and Campbell-Husted. The latter two, however, were not the agents of South Carolina in connection with the relevant transactions; it follows F  that discovery of documents by South Carolina in the two actions in England would not extend to relevant documents held by them. In this situation, if the re-re-insurers are to achieve their legitimate object of inspecting and copying where necessary, relevant documents held by P.G.A. and Campbell-Husted, some other means have to be found to enable them to do so.

G  In November 1984, after South Carolina had put forward its claims against the re-re-insurers, but before the two actions in England were begun, the latter had asked P.G.A. if they could inspect the documents in which they were interested at Seattle on 7 December 1984. P.G.A. referred the request to their principal, United National, which in turn consulted South Carolina. It appears that, on the advice of South Carolina's English solicitors, the request for inspection was, in effect, refused. The two actions in England were subsequently begun. H

My Lords, 28 United States Code, section 1782, provides:

"Assistance to foreign and international tribunals and to litigants before such tribunals. (a) The district court of the district in

1 A.C.          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Brandon
                                                                          of Oakbrook

A    which a person resides or is found may order him to give his
     testimony or statement or to produce a document or other thing
     for use in a foreign or international tribunal. The order may be
     made pursuant to a letter rogatory issued, or request made, by a
     foreign or international tribunal or upon the application of any
     interested person and may direct that the testimony or statement
     be given, or the document or other thing be produced, before a
B    person appointed by the court. By virtue of his appointment, the
     person appointed has power to administer any necessary oath and
     take the testimony or statement. The order may prescribe the
     practice and procedure, which may be in whole or in part the
     practice and procedure of the foreign country or the international
     tribunal, for taking the testimony or statement or producing the
C    document or other thing. To the extent that the order does not
     prescribe otherwise, the testimony or statement shall be taken,
     and the document or other thing produced, in accordance with
     the Federal Rules of Civil Procedure."

        On 28 March 1985, before the re-re-insurers had served their points
     of defence and counterclaim in the two actions against them in England,
D    they applied by motion to the district court of the United States,
     Western District of Washington, at Seattle, for an order under section
     1782 above. The motion, the title of which referred to the two actions in
     England, asked for an order against P.G.A. and Campbell-Husted
     involving two matters. The first matter was the production and inspection
     of numerous specified classes of documents of the kind which could
     reasonably be expected to have come into being in the course of the
E    transaction of the insurance business which had led to United National,
     having settled claims itself, to recover from South Carolina as its re-
     insurers, and to South Carolina then claiming to recover over from the
     re-re-insurers. The second matter was the appearance of three named
     persons from P.G.A. and Campbell-Husted to give testimony by
     deposition. The motion was supported by a memorandum and an
F    affidavit.
        Notice of the re-re-insurers' motion was served on P.G.A. and
     Campbell-Husted. South Carolina was also served with notice of the
     motion, or otherwise made aware of its having been lodged. Neither
     P.G.A. nor Campbell-Husted appeared before the district court to resist
     the application. South Carolina, however, did so appear, and having
     indicated their objection to it, was given until 29 April 1985 to file its
G    affidavit in opposition. It is to be inferred from the foregoing that
     neither P.G.A. nor Campbell-Husted objects to producing the documents
     listed in the motion for inspection, and where necessary for copying, by
     the re-re-insurers, and that it is only the objection of South Carolina
     that has stood in the way of their doing so.
        On 24 April 1985, before the date fixed for filing its affidavit in
H    opposition in the United States district court, South Carolina issued
     summonses in the two actions in England. By their summonses South
     Carolina sought (1) an order that the re-re-insurers should withdraw
     their application to the United States district court, (2) an injunction

restraining the re-re-insurers from proceeding further with such A application, and (3) a declaration that the application was an abuse of the process of the English court.

My Lords, the summonses were heard by Hobhouse J. on 25 April 1985. He declined to make the declaration asked for, but granted South Carolina injunctions restraining the re-re-insurers until further order from taking any further steps in their motion before the United States B district court and from enforcing any order made by that court on such motion. The main ground on which Hobhouse J. decided to grant such injunctions appears from pp. 10 and 11 in Appendix I to the printed case. Having set out what he called the framework of the matter, he said:

> "It involves a question of principle as to whether or not the English court should retain the control of its own procedure and the C proceedings that are before it. I have no doubt that the answer to be given to that question is that the English court should retain that control."

The decision of Hobhouse J. was, as I indicated earlier, affirmed by the Court of Appeal [1986] Q.B. 348. Griffiths L.J. gave the principal judgment, with which Slade and Lloyd L.JJ. both agreed. The main D reason which Griffiths L.J. gave for his decision was similar to that relied on by Hobhouse J. He said, at p. 358:

> "Once the parties have chosen or accepted the court in which their dispute is to be tried they must abide by the procedure of that country and that court must be master of its own procedure. Litigation is expensive enough as it is, and if a party fighting a case E in this country has to face the prospect of fighting procedural battles in whatever other jurisdiction his opponent may find a procedural advantage it may impose intolerable burdens, and encourage the worst and most oppressive form of procedural forum shopping. We should set our face against any such situation developing.

> "Severe dislocation to the timetable of the English litigation is a F readily foreseeable consequence of unrestrained access to foreign procedural remedies. This is likely to cause hardship or inconvenience not only to the other party to that litigation but will also affect other litigants whose cases are listed upon forecasts dependent upon litigation being conducted in accordance with our own rules of procedure. As the judge said, the court will lose control of its own G proceedings. Furthermore, one party might be able to gain a very unfair advantage in the English procedure if he was able to take the deposition of and cross-examine a witness whom he would never call on his own behalf at the trial, for example, the employees or business associates of his opponent. I think Mr. Sumption [counsel for the re-re-insurers] recognised this when he said he would be H content to accept the stay in respect of his application to take the depositions of the witnesses from P.G.A. and Arthur Campbell-Husted & Co. I am therefore satisfied that as a matter of principle the court must have an inherent jurisdiction to make any necessary

1 A.C.          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Brandon
                                                                          of Oakbrook

A    order to ensure that the litigation is conducted in accordance with
     its own procedures."

     My Lords, before examining the question whether Hobhouse J. and
     the Court of Appeal were right or wrong to grant the injunctions now
     appealed against, it is necessary to draw attention to a number of
     preliminary matters.

B    The first matter to which attention needs to be drawn is the existence
     of an essential difference between the civil procedures of the High Court
     in England on the one hand, and of courts of the United States on the
     other, with regard to what may be compendiously described as pre-trial
     discovery. Under the civil procedure of the High Court in England, pre-
     trial discovery may take two forms. The first form, which is far and
C    away the more common, is by way of disclosure and inspection of
     relevant documents under R.S.C., Ord. 24. The second form, which is
     comparatively rare, is by way of the asking and answering on oath of
     interrogatories under R.S.C., Ord. 26. Such discovery is, however,
     subject to two important limitations, one relating to its scope and the
     other to the stage of an action at which it normally takes place. So far as
     the scope of discovery is concerned, it is limited to the disclosure and
D    inspection of documents in the possession or power of the parties to the
     action, or to the asking and answering on oath of interrogatories as
     between such parties. So far as the stage of an action at which discovery
     normally takes place is concerned, it is the general rule that the two
     forms of discovery to which I have referred do not take place until the
     formal pleadings by both sides have been completed and the issues in
     disputes thereby fully and clearly defined. In this connection, however,
E    it is right to say that the court has power to order either form of
     discovery at any stage of an action, including a stage earlier than the
     completion of pleadings; but such power is rarely exercised and then
     only on special grounds, for instance when discovery is needed in order
     that justice may be done in interlocutory proceedings.

     Because of the first limitation to which I have referred, there is no
F    way in which a party to an action in the High Court in England can
     compel pre-trial discovery as against a person who is not a party to such
     action, either by way of the disclosure and inspection of documents in
     his possession or power, or by way of giving oral or written testimony. I
     would, however, stress the word "compel" which I have used in the
     preceding sentence, for there is nothing to prevent a person who is not a
G    party to an action from voluntarily giving to one or other or both parties
     to it either disclosure and inspection of documents in his possession or
     oral or written testimony.

     The procedure of the High Court in England, while not enabling
     parties to an action to compel pre-trial discovery as against a person
     who is not a party to such action, nevertheless affords ample means by
     which such a person, provided that he is within the jurisdiction of the
H    court, can be compelled either to give oral testimony, or to produce
     documents in his possession or power, at the trial of the action itself.
     Under R.S.C., Ord. 38, Part II, such a person may be compelled to give
     oral testimony at the trial by the issue and service on him of a subpoena

A

ad testificandum, or to produce documents in his power or possession (so long as they are adequately described and defined) by the issue and service on him of a subpoena duces tecum. The issue of such subpoenas is in the first instance a ministerial rather than a judicial act, and a party may therefore issue subpoenas of either kind as he thinks fit; the court, however, has power to set aside any subpoena on proper grounds, for instance, irregularity of form, irrelevance, oppressiveness or abuse of the process.

B

The procedure of the High Court in England includes a further power of the court, conferred on it by R.S.C., Ord. 38, r.13, to order any person to attend any proceedings in a cause or matter and produce any document to be specified or described in the order, the production of which appears to the court to be necessary for the purpose of that proceeding. It has, however, long been established that this rule is not intended to be used, and cannot properly be used, to enable a party to an action to obtain pre-trial disclosure and inspection of documents in the possession or power of a person who is not a party to such action. It is a rule of limited application, involving the production of a document or documents to the court itself rather than to either of the parties to an action.

C

My Lords, the civil procedure of courts in the United States differs essentially from that in the High Court in England in that under it parties to an action can compel, as against persons who are not parties to it, a full measure of pre-trial discovery, including both the disclosure and production for inspection and copying of documents, and also the giving of oral or written testimony. This power of compulsion can be, and regularly is, used at an early stage of an action.

D

The second matter to which attention needs to be drawn is that 28 United States Code, section 1782, as appears from its terms which I set out earlier, expressly provides that an order made under it may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing; and that, to the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Procedure.

E

F

Reference was made in the two courts below and again in your Lordships' House to certain United States authorities which bear on the exercise of a district court's powers under section 1782. In a decision of the United States District Court of Pennsylvania, *In re Court of the Commissioner of Patents for Republic of South Africa* (1980) 88 F.R.D. 75, 77, Judge Newcomer said:

G

"[1, 2] It is of great concern to this court that counsel for opponent has not been able to represent to this court that the documents and testimony for which opponents request a discovery order are discoverable under South African law. Indeed, *discussions with* counsel lead this court to suspect that these materials would *not* be available through South African procedures. Clearly, this court should not by its exercise of the discretion allowed it under section

H

A    1782 allow litigants to circumvent the restrictions imposed on discovery by foreign tribunals. Few actions could more significantly impede the development of international co-operation among courts than if the courts of the United States operated to give litigants in foreign cases processes of law to which they are not entitled in the appropriate foreign tribunals."

B    Further in *John Deere Ltd. and Deere & Co. v. Sperry Corporation* (1985) 754 F.2d 132, 135, Judge Garth, giving the judgment of the United States Court of Appeals for the Third Circuit, said:

     "As a co-operative measure, section 1782 cannot be said to ignore those considerations of comity and sovereignty that pervade international law. A grant of discovery that trenched upon the clearly established procedures of a foreign tribunal would not be
C    within section 1782."

     My Lords, it was contended for South Carolina, on the basis of these authorities, that the re-re-insurers' application to the district court of the United States was bound to fail. The ground relied on was that, since the procedure of the High Court in England did not enable parties to an action to compel pre-trial discovery against persons not parties to it, the
D    district court would not permit the re-re-insurers to circumvent that limitation by granting them an order for such discovery under section 1782.

     It appears to me that there may well be considerable force in this contention. It is not possible, however, for your Lordships, on the limited material before you, to decide for yourselves in advance how the
E    United States district court would see fit to exercise the discretion conferred on it by section 1782, in the particular circumstances of this case, and having regard to the characteristics of civil procedure in the High Court in England which I endeavoured to summarise earlier.

     The third matter to which attention needs to be drawn concerns certain changes in the positions of the parties which have occurred since the original hearing of South Carolina's two summonses before
F    Hobhouse J. The first change of position relates to the memorandum lodged in support of the re-re-insurers' application to the United States district court, in which they asserted:

     "As evidenced by the attached affidavit of Francis Otley Mackie the petitioners herein are seeking this court's assistance in obtaining information and documentation which is necessary, material and relevant to litigation pending in the courts of England for use in those proceedings. The affidavit further establishes that were all the parties residents of England, the requested discovery would be
G    permitted pursuant to the rules of procedure and discovery in England. Accordingly, the petitioners' motion for taking of testimony and the production of documents should be granted."

H    Mr. Mackie, whose affidavit is referred to at the beginning of the above passage, is a partner in the firm of solicitors acting for the re-re-insurers in the two actions in England. The relevant part of that affidavit is paragraph 12, in which Mr. Mackie deposed, inter alia, as follows:

38

Lord Brandon
of Oakbrook        South Carolina Co. v. Assurantie N.V. (H.L.(E.))        [1987]

"Discovery of such documentation and testimony is permitted    A
according to the English rules of procedure . . . . Petitioners would
be able to obtain writs of subpoena duces tecum issued by the High
Court of England . . . directing these entities to produce the
documents requested and directing them individually to appear and
give testimony at depositions."

These statements in the re-re-insurers' memorandum and Mr.    B
Mackie's affidavit were criticised by Hobhouse J. and by Griffiths L.J. in
the Court of Appeal as giving such an incomplete and inaccurate
account of the procedure of the High Court in England with regard to
discovery as seriously to mislead the United States district court. Griffiths
L.J., however, expressly acquitted Mr. Mackie of any deliberate intention
to mislead. Before your Lordships Mr. Robert Alexander, who appeared    C
as leading counsel for the appellant re-re-insurers, accepted unreservedly
that the passages in question were incomplete and inaccurate, and as a
consequence liable to mislead. The main error, as will be apparent, is
the failure to distinguish clearly between compelling a person not a party
to an action to give pre-trial discovery on the one hand, and compelling
him to give oral evidence and produce documents at the trial itself on
the other hand. I think that it is right for your Lordships to say that the    D
criticisms of that error made by the two courts below were fully justified
and that it is most unfortunate that it should ever have occurred. That
said, however, having regard to the admission of such error freely made
by Mr. Alexander for the re-re-insurers, and having regard further to
the summary which I endeavoured to give earlier of the relevant
procedure of the High Court in England, it seems to me that the error is    E
no longer of significance in the consideration of this appeal.

The second change of position concerns the scope of the re-re-
insurers' application to the United States district court. As I indicated
earlier, that application as originally framed covered two distinct matters:
first, the production and inspection of specified classes of documents;
and, secondly, the appearance of three named persons from P.G.A. and
Campbell-Husted to give testimony by depositions. On the face of the    F
motion it appeared that what the re-re-insurers were seeking in relation
to the second of these matters was the taking of oral evidence from the
persons named relevant to the issues in the English actions, such
evidence to be recorded in depositions. Before the Court of Appeal,
however, Mr. Sumption for the re-re-insurers expressly abandoned any
intention to achieve this end, and before your Lordships Mr. Alexander    G
made it clear that the appearance of the named persons was only sought
for the purpose of their producing and identifying the relevant documents
held by P.G.A. and Campbell-Husted, and in no way for the purpose of
their giving oral evidence to be recorded in depositions with regard to
issues of fact arising in the English actions.

The third change of position arises from the stage which the two
actions in England have now reached. At the time when South Carolina's    H
applications first came before Hobhouse J. the re-re-insurers had not yet
served their points of defence and counterclaim, so that the issues
between the parties had not yet been defined by pleadings and no

1 A.C.          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Brandon
                                                                         of Oakbrook

A   discovery of documents as between the parties had yet taken place.
    Hobhouse J. regarded this as a significant matter in exercising the
    discretion to grant injunctions which he held that he had. During the
    hearing before the Court of Appeal, however, the re-re-insurers served
    points of defence and counterclaim, and since then discovery of
    documents as between the parties has taken place. The actions in
    England are, therefore, much further advanced than they were when
B   South Carolina's applications first came before the judge.

        The fourth change of position is this. Following the decision of the
    Court of Appeal South Carolina arranged for the re-re-insurers to have
    controlled access to certain documents held by P.G.A. and Campbell-
    Husted. According to the re-re-insurers, however, substantial restrictions
    were imposed by South Carolina on the documents which they were
C   allowed to inspect under this arrangement. It is the re-re-insurers' case,
    therefore, that their application to the United States district court
    remains necessary in order to enable them to have inspection of other
    documents to which, by reason of the control exercised by South
    Carolina, they have not so far had access. Your Lordships were not
    asked to go into the details of these matters, which are in dispute
    between the parties, and it is right, I think, for the purposes of this
D   appeal for your Lordships to proceed on the basis that the re-re-insurers
    have at least an arguable case with regard to them.

        The fifth and final matter to which attention should be drawn is that
    the judge of the United States district court before whom the re-re-
    insurers' application under section 1782 is pending has helpfully directed
    that further proceedings in that application should be stayed until the
E   determination first of the re-re-insurers' appeal to the Court of Appeal,
    and then of their further appeal to your Lordships' House.

        My Lords, having drawn attention to these various preliminary
    matters, I turn to consider whether the injunctions granted by
    Hobhouse J. and affirmed by the Court of Appeal should be allowed to
    stand. I put the question in that form because of the various ways
    described by me above in which the positions of the parties have
F   changed since the original hearing before Hobhouse J.

        As appears from the passages from the judgments of Hobhouse J.
    and Griffiths L.J. which I set out earlier, both courts below treated
    South Carolina's applications for injunctions as raising matters of
    principle for decision. I have no doubt that they were right so to treat
    them. Putting the point differently, the question which your Lordships
G   have to decide is whether the circumstances of the case are such as to
    give the court power to grant the injunctions at all, and not whether,
    there being such power, it was a proper exercise of discretion to grant
    them rather than to refuse them.

        In considering the question which I have formulated, it will be
    helpful in the first place to state certain basic principles governing the
    grant of injunctions by the High Court. The first basic principle is that
H   the power of the High Court to grant injunctions is a statutory power
    conferred on it by section 37(1) of the Supreme Court Act 1981, which
    provides that "the High Court may by order (whether interlocutory or
    final) grant an injunction in all cases in which it appears to the court to

Lord Brandon
of Oakbrook          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          [1987]

A

be just and convenient to do so." That provision is similar to earlier provisions of which it is the successor, namely, section 45(1) of the Supreme Court of Judicature (Consolidation) Act 1925 and section 25(8) of the Supreme Court of Judicature Act 1873. The second basic principle is that, although the terms of section 37(1) of the Act of 1981 and its predecessors are very wide, the power conferred by them has been circumscribed by judicial authority dating back many years. The nature of the limitations to which the power is subject has been considered in a number of recent cases in your Lordships' House: *Siskina (Owners of cargo lately laden on board) v. Distos Compania Naviera S.A.* [1979] A.C. 210; *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557; and *British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58. The effect of these authorities, so far as material to the present case, can be summarised by saying that the power of the High Court to grant injunctions is, subject to two exceptions to which I shall refer shortly, limited to two situations. Situation (1) is when one party to an action can show that the other party has either invaded, or threatens to invade, a legal or equitable right of the former for the enforcement of which the latter is amenable to the jurisdiction of the court. Situation (2) is where one party to an action has behaved, or threatens to behave, in a manner which is unconscionable. The third basic principle is that, among the forms of injunction which the High Court has power to grant, is an injunction granted to one party to an action to restrain the other party to it from beginning, or if he has begun from continuing, proceedings against the former in a foreign court. Such jurisdiction is, however, to be exercised with caution because it involves indirect interference with the process of the foreign court concerned.

B

C

D

E

The latter form of injunction may be granted in such circumstances as to constitute an exception to the second basic principle stated above. This may occur where one party has brought proceedings against another party in a foreign court which is not the forum conveniens for the trial of the dispute between them, as that expression was defined and applied in *MacShannon v. Rockware Glass Ltd.* [1978] A.C. 795. In such a case the party who has brought the proceedings in the foreign court may not, by doing so, have invaded any legal or equitable right of the other party, nor acted in an unconscionable manner. The court nevertheless has power to restrain him from continuing his foreign proceedings on the ground that there is another forum in which it is more appropriate, in the interests of justice, that the dispute between the parties should be tried. The present case, however, is not concerned with a choice between two competing forums for the trial of a dispute, and the exception to which I have just referred is therefore not relevant to it.

F

G

The power of the court to grant *Mareva* injunctions may also, before it was statutorily recognised, have been a further exception to the second basic principle stated above. That power, however, has now been expressly recognised by section 37(3) of the Supreme Court Act 1981, and again the present case is in no way concerned with it.

H

Ignoring these exceptions, therefore, and applying the basic principles which I have stated to the present case, the first question for consideration is whether South Carolina has shown that what I have

A    described above as situation (1) exists. Has South Carolina shown that
the re-re-insurers, by beginning and intending to prosecute their
application to the United States district court, has invaded, or threatened
to invade, a legal or equitable right of South Carolina for the
enforcement of which the re-re-insurers are amenable to the jurisdiction
of the court? It was contended by Mr. Rokison on behalf of South
Carolina that South Carolina did indeed have such a legal or equitable

B    right, but it appeared to me that he had great difficulty in formulating
the legal or equitable right on which he relied. Neither of the courts
below decided as they did on the basis that the re-re-insurers had by
their conduct invaded a legal or equitable right of South Carolina, and I
cannot see how such a case can be made out. I would therefore hold
that South Carolina has not shown that situation (1) exists.

C    The second question for consideration is whether South Carolina has
shown that what I have described above as situation (2) exists. Has
South Carolina shown that the re-re-insurers, by beginning and intending
to prosecute their application to the United States district court, have
acted in a manner which is unconscionable? It is difficult, and would
probably be unwise, to seek to define the expression "unconscionable
conduct" in anything like an exhaustive manner. In my opinion, however,

D    it includes, at any rate, conduct which is oppressive or vexatious or
which interferes with the due process of the court.

   Although neither Hobhouse J. at first instance, nor Griffiths L.J. in
the Court of Appeal, stated in terms that they thought it right to grant
injunctions on the ground that the conduct of the re-re-insurers in
making their application to the United States district court was

E    unconscionable, it seems to me to be implicit in their reasons that they
regarded it as being so. Hobhouse J. based his decision expressly on the
need for the court to retain control of its own process, with the
necessary implication that the re-re-insurers' conduct was an interference
with such control and therefore an interference with the due process of
the court. Griffiths L.J. based his decision on three grounds: first (like
Hobhouse J.), that the court must retain control of its own process;

F    secondly, that the civil procedure of United States courts is significantly
different from that of English courts, and the parties, by submitting to
the jurisdiction of an English court, must be taken to have accepted its
procedure; and, thirdly, that unrestricted access to foreign procedural
remedies was liable to produce hardship in the form of increased costs
and inconvenience. I shall consider each of these grounds in turn.

G    I consider, first, the ground that the re-re-insurers' conduct was an
interference with the court's control of its own process. It is not clear to
me why this should be so. Under the civil procedure of the High Court
the court does not, in general, exercise any control over the manner in
which a party obtains the evidence which he needs to support his case.
The court may give him help, certainly; for instance by discovery of
documents inter partes under R.S.C., Ord. 24; by allowing evidence to

H    be obtained or presented at the trial in various ways under Orders 38
and 39; and by the issue of subpoenas under Part II of Order 38, to
which I referred earlier. Subject, however, to the help of the court in
these various ways, the basic principle underlying the preparation and

**Lord Brandon
of Oakbrook**      South Carolina Co. v. Assurantie N.V. (H.L.(E.))      **[1987]**

presentation of a party's case in the High Court in England is that it is      A
for that party to obtain and present the evidence which he needs by his
own means, provided always that such means are lawful in the country
in which they are used. It was not in dispute that, if P.G.A. and
Campbell-Husted, uninfluenced by the control exercised over them by
South Carolina on the advice of the latter's English solicitors, had freely
and voluntarily allowed the re-re-insurers to inspect, and where necessary      B
to copy, all the documents referred to in the latter's application, it could
not possibly have been said that there had been any interference with
the English court's control of its own process. That being so, I cannot
see why, since the Federal law of the United States authorises an
application of the kind made by the re-re-insurers in this case, the
making of such application, which may or may not succeed in whole or
in part, should be regarded as being such an interference either. I      C
cannot, therefore, agree with the first ground of decision relied on by
the Court of Appeal.

I consider, secondly, the ground that the procedure of United States
courts is significantly different from that of English courts, and the
parties, by submitting to the jurisdiction of an English court, must be
taken to have accepted its procedure. It is, no doubt, true that the re-re-
insurers, by entering unconditional appearances in the two English      D
actions, can be said in a certain sense to have accepted the procedure of
that court. Your Lordships were not, however, informed of any ground
on which the re-re-insurers could, with any prospect of success, have
contested the jurisdiction of the High Court in England in respect of the
disputes which are the subject matter of the two actions concerned. Be
that as it may, I cannot see that the re-re-insurers, by seeking to      E
exercise a right potentially available to them under the Federal law of
the United States, have in any way departed from, or interfered with,
the procedure of the English court. All they have done is what any party
preparing his case in the High Court here is entitled to do, namely to try
to obtain in a foreign country, by means lawful in that country,
documentary evidence which they believe that they need in order to
prepare and present their case. It was said that the re-re-insurers could      F
have applied to the High Court under R.S.C., Ord. 39, r. 2, for letters
of request to issue to the proper judicial authorities in the United States.
But 28 United States Code, section 1782, allows an application to be
made either indirectly by the foreign court concerned or directly by an
interested party, and I can see no good reason why the re-re-insurers
should not have chosen whichever of these two alternatives they      G
preferred. It is, I think, of the utmost importance to appreciate that the
reason why English procedure does not permit pre-trial discovery of
documents against persons who are not parties to an action is for the
protection of those third parties, and not for the protection of either of
the persons who are parties to the action. I cannot, therefore, agree
with the second ground of decision relied on by the Court of Appeal.

I consider, thirdly, the ground that unrestrained access to foreign      H
procedural remedies was liable to cause hardship in the form of increased
costs and inconvenience. So far as increased costs are concerned,
Griffiths L.J. was referring to increased costs incurred or to be incurred

A
by South Carolina in contesting the proceedings in the United States district court. If, however, the re-re-insurers are right in their contention that they have not yet, by reason of the control exercised by South Carolina, had access to all the documents to which they believe that they need access in order to prepare their case in the two English actions, it can reasonably be said that any liability for increased costs incurred by South Carolina is in a sense self-imposed. If they had been

B
willing to permit P.G.A. and Campbell-Husted to allow the re-re-insurers to inspect, and where necessary copy, all the documents to which the latter had sought access, the making or prosecution of the re-re-insurers' application to the United States district court would not have been necessary. In this connection it is right to stress what I have already stated earlier, that P.G.A. and Campbell-Husted, left to

C
themselves, would voluntarily have given the re-re-insurers permission to inspect, and where necessary copy, all the documents to which the latter sought access. It was said for South Carolina that the documents not so far disclosed were not relevant to the issues in the two English actions. If that is so, I cannot help asking myself why South Carolina has gone to such lengths to prevent the disclosure of such documents. So far as inconvenience is concerned, it is apparent that Griffiths L.J. had two

D
kinds of inconvenience in mind: first inconvenience in relation to the two actions immediately concerned in the form of delay in getting them tried and possible prolongation of the trial when it took place; and, secondly, inconvenience to other litigants by reason of the consequent dislocation of the time-table for the trial of other cases in the congested list of the Commercial Court. So far as delay is concerned, it is perhaps

E
ironical that the only result of South Carolina seeking to obtain injunctions against the re-re-insurers has been to increase greatly whatever delay the re-re-insurers' application, if allowed to proceed unopposed, might otherwise have caused. I recognise that the re-re-insurers' application may result in some increased costs to South Carolina, but these could, as I indicated earlier, have easily been avoided by a different attitude on South Carolina's part. I recognise also

F
that some inconvenience of the two kinds to which I have referred may arise from the re-re-insurers' application; but, if there is a reasonable possibility that such inconvenience is the price of justice being fully done at the trial of the two English actions, then it seems to me to be a price which must necessarily be paid. In any event, I cannot see how the re-re-insurers' application, made in what may prove to be a just cause, can,

G
solely on the ground that it occasions the extra costs and inconvenience under discussion, be categorised as an interference with the court's control of its own process. The court can control any excessive delay by fixing such date for the trial of the two actions as may be just, and nothing which the re-re-insurers can do can take away or interfere with the court's control in this respect. As to increased costs these will, no doubt, be a matter for the consideration of the Commercial judge at the

H
conclusion of the trial, and I do not think it would be right for your Lordships to express any views, one way or the other, about such matter. For these reasons I cannot agree with the third ground of decision relied on by the Court of Appeal.

My Lords, the result of the views which I have expressed is that there was, in my opinion, no such interference with the procedure of the English High Court by the re-re-insurers as would amount to unconscionable conduct on their part, and so justify, in accordance with the basic principles which I stated earlier, the exercise of the court's power to grant injunctions against them. It follows that I would allow the appeal and set aside the orders of Hobhouse J. dated 25 April 1985 and of the Court of Appeal dated 23 May 1985. As regards costs in your Lordships' House, I have no doubt that South Carolina should pay the costs of the re-re-insurers. As regards costs in the two courts below, different considerations may apply, first, because of the breadth of the re-re-insurers' application to the United States district court as originally framed, and, secondly, because of the misleading nature, in the respect to which I referred earlier, of the memorandum and affidavit lodged in support of such application. I therefore think it desirable that, in relation to those costs, your Lordships should have the assistance of further argument from counsel on either side.

LORD BRIGHTMAN. My Lords, in this appeal I respectfully differ from the conclusion reached by the Court of Appeal. I have had the privilege of studying in advance the speech of my noble and learned friend, Lord Brandon of Oakbrook, and I find myself wholly convinced by his reasons for moving that this appeal should be allowed. I agree with the orders that he proposes should be made.

LORD MACKAY OF CLASHFERN. My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Brandon of Oakbrook and Lord Goff of Chieveley. I agree that it would be wise to make the reservation on the matter to which Lord Goff of Chieveley has drawn attention but, like him, I agree with the conclusion reached by Lord Brandon of Oakbrook and with the reasons he has given for reaching that conclusion.

LORD GOFF OF CHIEVELEY. My Lords, I find myself to be in respectful agreement with the conclusion reached by my noble and learned friend, Lord Brandon of Oakbrook, on this appeal, and with the reasons given by him for reaching that conclusion. I wish, however, to draw attention to one matter upon which I have certain reservations, and to which I attach importance.

I am reluctant to accept the proposition that the power of the court to grant injunctions is restricted to certain exclusive categories. That power is unfettered by statute; and it is impossible for us now to foresee every circumstance in which it may be thought right to make the remedy available. In particular, I do not regard the exercise of the power to restrain a person from commencing or continuing proceedings in a foreign forum as constituting an exception to certain limited categories of case in which it has been said that the power may alone be exercised. In my opinion, restraint of proceedings in a foreign forum simply provides one example of circumstances in which, in the interests of justice, the power to grant an injunction may be exercised. I have

1 A.C.          South Carolina Co. v. Assurantie N.V. (H.L.(E.))          Lord Goff
                                                                          of Chieveley

A    elsewhere explained in detail, for reasons which it is unnecessary for me
     to repeat in the present case, why, on the basis of a line of established
     authority, I am at present inclined to the opinion that an injunction has
     generally been granted in such circumstances for the purpose of
     protecting the English jurisdiction, and why I doubt, with all respect,
     whether the speech of my noble and learned friend, Lord Scarman, in
     *Castanho v. Brown & Root (U.K.) Ltd.* [1981] A.C. 557, contains the
B    last word on the subject. I refer, in this connection, to my judgment in
     *Bank of Tokyo Ltd. v. Karoon* (Note) [1987] A.C. 45.
          Even so, I can see no basis for the grant of an injunction in the
     present case. In particular, in agreement with my noble and learned
     friend Lord Brandon of Oakbrook, and respectfully differing from
     Hobhouse J. and the Court of Appeal, I do not consider that the grant
C    of the injunction can be justified as necessary to protect the English
     jurisdiction on the facts of the present case. In this, I find myself
     entirely in agreement with the reasons expressed in the speech of my
     noble and learned friend, Lord Brandon of Oakbrook. I therefore agree
     that the appeal should be allowed.

                                                       *Appeal allowed with costs.*
D
          *Solicitors: Clyde & Co.; Herbert Smith & Co.*

                                                                      J. A. G.

E

                              ─────────

                                NOTE
F
                          [COURT OF APPEAL]

               BANK OF TOKYO LTD. v. KAROON AND ANOTHER

     1984   April 3, 4, 5;                      Ackner and Robert Goff L.JJ.
G           May 24

     *Injunction—Jurisdiction to grant—Foreign proceedings—Interpleader
        proceedings to determine ownership of money held by bank in
        England—Bank's subsidiary in New York providing information
        concerning claimant and his accounts—Claimant bringing pro-
        ceedings in New York against subsidiary—Whether bank entitled
        to injunction to restrain proceedings in New York*
H
     APPEAL from Bingham J.
          In 1983 Mr. Majid Karoon started proceedings in New York against the
     Bank of Tokyo Ltd., a Japanese bank carrying on business in London, and also
     against a wholly-owned subsidiary of that bank, the Bank of Tokyo Trust Co.

# Exhibit 3

Case No: HC 04 C01952

**Neutral Citation Number: [2004] EWHC 2920 (Pat)**
**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**
**PATENTS COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: Wednesday, 8th December 2004

B e f o r e :

**THE HONOURABLE MR. JUSTICE PUMFREY**

- - - - - - - - - - - - - - - - - - - -

**NOKIA CORPORATION**                                      **Claimant**
**(a company incorporated under the laws of Finland)**
**- and -**
**INTERDIGITAL TECHNOLOGY CORPORATION**                    **Defendant**
**(a company incorporated under the laws of the State of**
**Delaware, USA)**

- - - - - - - - - - - - - - - - - - -

Transcript of the Stenographic Notes of Marten Walsh Cherer Ltd.,
Midway House, 27/29 Cursitor Street, London EC4A 1LT.
Telephone No: 020 7405 5010.  Fax No: 020 7405 5026

- - - - - - - - - - - - - - - - - - - -

**MR. MICHAEL SILVERLEAF QC, MR. HENRY WHITTLE and MR. BRIAN NICHOLSON**
(instructed by Messrs. Bird & Bird) for the Claimant
**MR. GUY BURKILL QC and MR. COLIN BIRSS** (instructed by Messrs. Milbank, Tweed, Hadley
& McCloy) for the Defendant

- - - - - - - - - - - - - - - - - - - -

# Judgment

**Mr. Justice Pumfrey:**

1. In this action Nokia seek revocation of three United Kingdom patents owned by InterDigital Technology Corporation ("InterDigital"). InterDigital is a patent holding and licensing company for InterDigital Communications Corporation ("ICC"). The patents in suit are 2,174,571 ("571"), 2,208,774 ("774") and 2,224,114 ("414"). They relate to aspects of the transmission of telephony signals over a wireless loop using time-division multiplexing techniques.

2. The significance of these patents to Nokia is that at least two of them are alleged by InterDigital to be not only relevant but actually "essential" to the practice of the GSM standards for digital cellular mobile telephones and infrastructure. Nokia are leading manufacturers in this field. These are international standards with which all manufacturers of GSM mobile telephones and associated infrastructure must necessarily comply. ETSI (the European Telecommunication Standards Institute) requires notification to it of any patents believed to be essential for compliance with its standards or proposed standards. InterDigital notified the three patents in suit in 2001 (long after the standard was formulated) but had been asserting them to be essential from about 1993.

3. The three patents in suit have equivalents in numerous territories throughout the world, all of which have been notified by InterDigital to ETSI as essential to GSM. The claimants say that the patents in suit are representative of over 140 corresponding patents (or pending applications) worldwide, which are the core patents of those said to be essential to GSM.

4. There are before me two applications. The first is the case management conference sought by Nokia. The second is an application by InterDigital seeking four heads of relief as set out in the notice of application dated 27th October 2004. The relief sought is:

     (a) an injunction to restrain Nokia from pursuing applications made in the US courts under 28 USC, section 1782 for documents and other evidence from Ericsson Inc. and Sony Ericsson Mobile Communications AB;

     (b) a declaration that the discovery sought in the above applications is irrelevant to any issue in the present proceedings;

     (c) an order striking out parts of the claimant's pleadings which relate to construction of the claims of the patents in suit;

     (d) a stay of the proceedings until after the outcome of an ICC arbitration presently taking place between the parties to this action in New York.

5. The background to the action and the present applications may be briefly outlined as follows. As I have indicated, since the early 1990s, InterDigital have been representing

to the mobile communications industry that they require licences under InterDigital's patent portfolio for GSM. InterDigital has pursued an aggressive licensing policy, threatening litigation if licences are not taken and making it clear that its portfolio of patents is so geographically and technically extensive that it is uneconomic to resist.

6.   After several years of negotiation with InterDigital, Nokia took a lump sum licence in 1999, but is allowed by the terms of the licence to bring this action. The licence is split into two periods - 1 and 2. Period 1 ran up to the end of 2001 and Nokia paid a royalty of $31.5 million for that period. For period 2 (from the beginning of 2002, until the expiry of the licence) no royalty is payable unless certain conditions are satisfied. One of those is that a "major competitor" of Nokia has taken a licence. There is a dispute between the parties as too whether further royalties have become due for period 2 under the licence, and if so what royalties are payable. InterDigital relies, as I understand it, upon a licence taken by Ericsson and a joint venture company, Sony-Ericsson, in settlement of a ten-year long action originally commenced in 1993 between InterDigital and Ericsson in the United States for infringement of a number of InterDigital's patents. One of the terms of the settlement between InterDigital and Ericsson was that Ericsson and its joint venture company took a licence under InterDigital's patent portfolio. This dispute, that is to say the dispute between Nokia and InterDigital as to the payability of royalty, is the subject of an ICC arbitration in New York.

7.   Some of InterDigital's patents have been the subject of litigation. Action was brought against Motorola who was largely successful in its resistance to the claims. Nokia's contention is that the basket of patents under which a licence is available contains a number that are either invalid or not infringed by a manufacturer who seeks to comply with the GSM standards. Part of the motive for these proceedings is to obtain a judgment on validity which can be deployed in the arbitration; although if the timetable for the arbitration remains as it is, then any use of a putative judgment on invalidity will be impossible. The arbitration is due to be heard in January 2005.

8.   Surprisingly, perhaps, for patents of the age of those in suit that have been licensed, the patentee's response to this action is to apply to amend all three. Some of the amendments are not mere deletion of claims accepted to be invalid but involve the rewriting of new claims. Nokia plead a number of grounds they say would justify the court in holding that the amendments should not be allowed in the exercise of the court's discretion. They plead, inter alia, that the patents have been known by InterDigital to be invalid and that the licence with Ericsson (which is, with all the negotiations leading up to it, entirely secret until disclosure in this action) was entered into at least in part in bad faith and with a view to putting Nokia at a disadvantage in the setting of the period 2 royalties which InterDigital publicly estimate to be about $130 million year on the basis of the Ericsson settlement.

**The application for a stay**

9.   With that brief introduction, I can turn to InterDigital's application for a stay. I can discern no basis for a stay of these proceedings whatever. It is not suggested that these proceedings are subject to a mandatory stay under the Arbitration Act 1996. It is also

accepted that by section 72 of the Patents Act 1977, any person may bring proceedings to revoke a patent.  But it is said that the underlying motive of these proceedings is to produce what InterDigital call an advisory opinion on the validity of the patents, that the court should encourage alternative dispute resolution, and that the arbitration already on foot involves alternative resolution of this dispute without a disproportionately expensive recourse to the court, whose decision cannot much affect the outcome of what is said to be the "real" or "commercial" dispute between the parties. InterDigital rely also upon the fact that Nokia decided to take a licence in 1999, albeit one which permitted them to challenge the validity of the patents.

10.  There is no dispute that there is a wide power to stay proceedings whenever the court thinks fit.  Of course, an action which is an abuse of process will be stayed or struck out. Multiplicity of proceedings will be discouraged if possible and there are numerous specific statutory provisions providing for the staying of proceedings in certain defined circumstances.  There is also a long list of specific circumstances in which the Civil Procedure Rules provide for a staying of proceedings.

11.  The case management powers contained in CPR 3.1(1)(f) apply generally, and these powers must be exercised with a view to achieving the so-called overriding objective. However, when in a properly-constituted action the claimant seeks appropriate relief, the dispute is not the subject to an arbitration agreement and the action itself cannot be said to be an abuse of process, it seems to me that the primary duty of the court is to bring it on for trial as fairly and  as quickly as the circumstances permit and not to stay it.

12.  Validity and infringement of the three patents in suit were removed from purview of the arbitrators by the agreement of Nokia and InterDigital.  Indeed, this appears to have been the result of an objection by InterDigital (see clause 4(vi) of the terms of reference in the arbitration.

13.  Having objected to the issues of infringement and validity being considered by the arbitrators in the existing arbitration, InterDigital could not, before me, identify any form of alternative dispute resolution that could even dispose of the issues of infringement and validity inter partes.  It goes without saying that in the absence of an agreement to surrender a patent or consent to its revocation, no private dispute resolution could result in revocation of one or more of the patents if it were found to be invalid.  There is no offer of any such agreement; so the arguments relating to proportionality and alternative dispute resolution have no foundation and must fail.  There is no other basis advanced for a stay.

**The Section 1782 application**

14.  The application which is made in the appropriate district court in the United States is said to relate to these proceedings.  It seeks both evidence on deposition and discovery of documents in specified classes as follows.  The application after formal matters proceeds as follows:

"Nokia is a party to a court proceeding in England before the High Court of Justice, Chancery Division, Patents Court, in which Nokia seeks to revoke certain United Kingdom patents that have been granted to InterDigital Technology Corporation ('InterDigital'). These UK patents are the counterparts of certain US patents that are presently at issue in an arbitration between InterDigital and Nokia in the United States. Nokia believes that Ericsson, a Delaware corporation that is found in this district [the East District of Texas, Sherman Division] has evidence relevant to the validity and scope of the patents that are at issue in the English patent proceeding. Nokia submits this application to obtain this evidence from Ericsson by means of an order for discovery from this Court."

15.   Without reading through the whole of the application, it is difficult to give a proper flavour of the basis upon which the application is brought, but it is necessary to pay attention first to the description of the Ericsson and InterDigital lawsuit on printed page 3, which is as follows:

"The Ericsson/InterDigital lawsuit continued following the Motorola verdict. Ericsson and InterDigital eventually settled their dispute, but only after ten years of litigation. During the course of the litigation, the parties extensively litigated the scope of InterDigital's US patents and exchanged evidence regarding the prior art."

16.   On printed page 4:

"InterDigital's patent portfolio includes patents granted by the United Kingdom Patent Office, of which two are counterparts of the US patents involved in the Ericsson/InterDigital litigation. On June 14, 2004, Nokia initiated a proceeding before the High Court of Justice, Chancery Division, Patents Court, to revoke these UK patents, together with a third InterDigital patent, the Swedish equivalent of which Ericsson opposed in the Swedish Patent Office. The UK proceeding will address many of the same issues addressed in the litigation and opposition between Ericsson and InterDigital, and in the licensing discussions between Ericsson and InterDigital, namely the scope and validity of InterDigital's patents. InterDigital may try to place some reliance upon the fact that other companies have taken licenses to its patents."

17.   Then the application seeks to justify the request on the basis of the terms of section 1782. On page 12 it says this:

"Allowing Nokia to obtain discovery from Ericsson would equitably and efficiently assist Nokia's efforts in the English proceeding. Nokia seeks to revoke certain of InterDigital's patents that InterDigital contends covered Nokia's technology. During the course of Ericsson's ten years of United States litigation with InterDigital over the validity and scope of InterDigital's US patents together with many years of opposing InterDigital's Swedish patents, and during the licensing discussions with InterDigital, it amassed a universe of knowledge and evidence relevant to the validity and scope of InterDigital's

patents.  It is undisputable that during the protracted litigation, opposition and licensing discussions with InterDigital, Ericsson either provided or received evidence pertinent to the scope and validity of InterDigital's patents.  The patents that were at issue in the Ericsson/InterDigital litigation are the counterparts of the patents Nokia seeks to revoke in the UK revocation proceeding.  The third patent at issue in the UK revocation proceeding was opposed by Ericsson in Sweden.  Moreover, when the litigation ended in early 2003, Ericsson agreed to licence InterDigital's entire patent portfolio.  Ericsson's decision to take a licence to InterDigital's portfolio is, and of itself, a source of evidence material to Nokia's revocation proceeding.  Therefore, for all these reasons, Nokia believes that Ericsson has evidence that can assist Nokia.

Nokia's discovery of this evidence will assist Nokia's efforts in the United Kingdom proceeding.  Many of the same issues present in the Ericsson/InterDigital lawsuit, or close corollaries, may arise in the context of the UK proceeding.  Allowing Nokia's requested discovery will allow the English court, and the parties to that proceeding, to benefit from the ten year effort spent in resolving such issues in the US litigation, the Swedish opposition and from any evidence arising in connection with the licensing discussions.  This request also obviates the need for letters rogatory, or other lengthy and cumbersome procedures, to obtain this evidence from Ericsson, a US resident and a non-participant to the UK proceeding."

18.  The relief sought in the district court against Ericsson is set out in two exhibits to the application, exhibit A and exhibit B.  Exhibit A seeks depositions on certain specified deposition topics in a manner which I understand to be usual in the ordinary United States litigation.  As always, it is necessary to read what is already a very broad order with regard to exhibit C, which contains the definitions which render terms which, on their face, are broad into terms which are very wide indeed.  The order is to Ericsson to designate one or more officers, directors, or managing agents, or other persons who consent to testify on Ericsson's behalf, with respect to the following matters.  Four classes of matter are set out.

"1.  Prior art to UK Patent No. 2,174,571, UK Patent No.  2,208,774 or UK Patent 2,224,414 or any prior art to any counterparts within the same patent families of these patents in other jurisdictions, including information concerning the publication date of the said prior art.

2.  Ericsson's claim construction and invalidity contentions in the Ericsson/InterDigital lawsuit and any oppositions carried out by Ericsson against the counterparts of the UK Patents referred to in paragraph 1 above, and the identity of relevant prior art and factual support for all those contentions.

3.  The negotiation of the 2003 Patent Licences including efforts by Ericsson, Sony-Ericsson, or InterDigital to negotiate, execute, or structure any agreements that were made in connection with, at the time of, or as part of, the resolution of the Ericsson/InterDigital Lawsuit or the execution of the 2003 Patent Licences.

4.  The performance under the 2003 Patent Licences, including of any amendments or modifications (whether oral, written or by conduct) to the 2003

Patent Licences, to the agreements resolving the Ericsson/InterDigital Lawsuit, or to any other agreements within the scope of topic 3 above."

19. The request for documents, which is contained in exhibit B, is that upon which the discussion before me principally turned, but in fact the documents are complimentary to the depositions which are sought in exhibit A.  I need not read paragraph 1, which again seeks prior art in relation to the patents in suit, counterparts of the patents in suit within the same patent families and documents relative to publication dates.  Then paragraph 2 specifies certain classes of documents in relation to the Ericsson/InterDigital lawsuit, including witness expert reports and declarations, affidavits or witness statements relating to construction.  Paragraph 3 relates to the negotiation and execution of the Ericsson settlement agreement, and paragraph 4 relates to any amendments or modifications, rather surprisingly, whether, oral, written or by conduct, which were made to the patents licences and the agreements resolving the Ericsson lawsuit.

20. I am asked to restrain the claimants from further continuing with this application against Ericsson and Sony Ericsson, or in the alternative for the declaratory relief, which I have already set out, indicating that the classes of documents in question are irrelevant in this action.  There is no doubt that I have jurisdiction to restrain the section 1782 proceedings and this jurisdiction is described in the decision of the House of Lords in **South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien NV"** [1987] AC 24.  The speech of Lord Brandon, with whom the remainder of their Lordships largely concurred, sets out the principles upon which the English court will interfere by injunction with an application made under the United States provision by a party to litigation in this country, and I am bound by it.  Before turning to the principles established by this decision, however, I should briefly refer both to Title 28 section 1782 and to the leading case on the exercise of power arising under section 1782, the recent decision of the United States Supreme Court in a case called **Intel Corporation v. AMD**.

21. In its present form, what I will call subsection (a) of section 1782, which has the cross-head "Assistance to foreign and international tribunals and to litigants before such tribunals" is as follows:

"The district court of the district in which a person resides are is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation.  The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court.  By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement.  The order may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing.  To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the

document or other thing produced, in accordance with the Federal Rules of Civil Procedure".

22. **Intel v. AMD** itself concerned an application under section 1782 for documents with a view to providing them to the European Commission for the purpose of a complaint under Articles 81 and 82 of the EC Treaty. Justice Ginsburg delivered the majority opinion. I believe that the following propositions may be derived from that opinion that are directly relevant to the issues which arise before me today.

(a) Section 1782 authorizes but does not require the federal district court to grant discovery in aid of the foreign proceedings.

(b) The proceeding in question must be within reasonable contemplation, but need not be pending or imminent. I infer from this that the provision may be used to obtain evidence prior to issue of proceedings in this country.

(c) There is no requirement that the discovery sought in section 1782 proceedings be discoverable in the foreign jurisdiction if located there.

(d) Considerations of comity between jurisdictions and parity between litigants may be legitimate touchstones for the district court's exercise of discretion in a particular case, but that is no reason for imposing a general foreign-discoverability rule. For example, a foreign court's reluctance to order discovery of particular documents may be no indication at all of a reluctance to receive them in evidence -- the example given by Justice Ginsburg is the **South Carolina** case itself. The foreign tribunal may itself place such limitations as it thinks appropriate on the admission of material obtained pursuant to section 1782.

(e) In exercising the discretion, a number of factors need to be borne in mind:

 (i) Where the parties to the section 1782 proceedings are the same as those in the foreign proceedings, the need for aid is not as apparent as it is when evidence is sought from a non-participant in the matter arising abroad, when the foreign tribunal can itself decide whether to order the parties to produce evidence.

(ii) The stature of the foreign tribunal, the character of the proceedings underway abroad and the receptivity of the foreign court to federal court judicial assistance must also be considered.

(iii) Whether the section 1782 request "conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or of the United States is also relevant.

(iv) (iv) Unduly burdensome requests may be rejected or trimmed.

23. It is clear that the jurisdiction will be exercised having regard to the attitude that the foreign court will take to the material produced by the section 1782 request. As is well known, the attitude of this court, that is to say the English court, towards disclosure is

regulated by the Civil Procedure Rules and the scope of disclosure is essentially circumscribed by the pleaded issues. At the same time, the court is generally indifferent as to the source of admissible material. Let me give a simple example. In a patent action, the validity of the patent is challenged on the grounds of anticipation or obviousness on the basis of a single prior publication. The scope of disclosure is limited to documents advancing the parties' respective cases, including their attacks on the other's case, within the time window of four years around the priority date:  see paragraph 5.1(2) of the Practice Direction under Part 63 of the CPR.

24. This means there will be no disclosure relating to other grounds of invalidity, for example, prior use by the patentee, and the defendant must himself uncover at least the possible existence of such prior uses by the patentee for himself before he can obtain the court's assistance in compelling disclosure from the patentee. On the other hand, if he does obtain evidence of prior use by the patentee, the court is not generally concerned as to how that evidence was obtained. As I understand the decision of the House of Lords in the **South Carolina** case, to which I now turn, one possible route is by way of a section 1782 request.

25. Mr. Silverleaf QC, who appears on behalf of Nokia, submits that the following propositions may be derived from Lord Brandon's speech in the **South Carolina** case.

> (a) The English courts do not, in general, exercise any control over the way in which a party obtains the evidence it wishes to present to support its case:  See [1987] AC 41 G-H.

> (b) If a third party voluntarily assists a party by providing evidence, there can be no objection to that evidence being used by the party. The provision of material in this way does not interfere with the court's control of its own process.  (Page 42 A).

> (c) Consequently, by exercising a right potentially available to it under US law to obtain documents or evidence from a third party, a party to litigation is not departing from or interfering with the procedure of the English court.  (Page 42 C).

> (d) Accordingly, a party should normally be permitted to exercise its rights under Title 28 of the US Code section 1782.

> (e) It is for the US court hearing the section 1782 application to decide upon the merits of the application under US law and to determine the nature and scope of the relief to be granted. The fact that a party is enabled by exercising those rights to obtain documents and evidence which would not otherwise be available to it is not a ground for interference by the English court.

> (f) Before the court should restrain a party's use of the section 1782 procedure, it has to be satisfied that the use being made is either a breach of some legal or equitable right of the objecting party (page 41, B to C) or is vexatious or oppressive or is in some other way unconscionable.  (Page 41 D).

26. This summary seems to me to be correct and it shows why the decision whether or not to restrain section 1782 proceedings is not a mere case management decision. There can be no doubt that leaving express or implied obligations aside, the jurisdiction to interfere is based on the need to show that the application is abusive in its context in the English proceedings. This is confirmed by **Banker's Trust international PLC v PT Dharmala** (unreported, 1st December 1995, Mance J, as he then was) and **Omega v Viktor Kozeny** [2002] CLC 132 (Mr. Peter Gross QC, as he then was). In the former case, the application under section 1782 was made after trial but before judgment, no doubt with a view to improving the evidence in the proceedings and making an application to re-open the trial. Mance J appears to have found little difficulty in concluding that such an application was abusive. In the latter case, Mr. Gross QC was confronted by an application to depose individuals who would be giving evidence in this country, thereby exposing them twice to the burden of cross-examination, which he considered to be abusive in the context of the English proceedings.

27. Mr. Burkill's submission on behalf of InterDigital is that the depositions sought on the present application and the classes of documents sought are of undue width and purely fishing. The definitions of the classes make no attempt to distinguish that which is relevant from that which is not, and are for that reason objectionable. The fact that the second, third and fourth classes closely mirror the terms of a subpoena issued by the arbitrators against Ericsson reveals, he submits, that the real purpose of the section 1782 application is to produce documents in aid of the arbitration and that this is confirmed by the unwillingness of Nokia's advisers to agree to protective orders preventing the employment of the documents in the arbitration.

28. Accordingly, he says that the application is oppressive and is an abuse of process and should be restrained by this court.

29. It is necessary to make a number of elementary observations before turning to Mr. Burkill's contentions. First, the issues in the English proceedings are defined by the pleadings. Second, documents and other evidence are not admissible unless either relevant to an issue so defined or (although relevant to the issues in the case) as tending to go impugn the credit of a witness. The court will not compel production of documents going only to credit. Third, disclosure will only be ordered on the basis set out in the Civil Procedure Rules, which is to say, that a party will only be required to make a search ultimately as is reasonable and proportionate.

30. I agree with Mr. Burkill that the classes of documents as drawn would not be ordered by way of disclosure in the present proceedings. As he correctly observes, the first class (all prior art to the three patents) covers prior art that has not pleaded and this class is, from the perspective of this court, too broad. I am equally satisfied, however, that any new prior art discovered could, in principle, be introduced by amendment of the pleadings into the action.

31. If any document obtained in the second, third and fourth categories could be relevant to these proceedings, in the sense that it would be disclosable if in the possession, custody

or power of InterDigital, it could only be because it related to Nokia's contention that the court should not exercise its discretion to permit the amendments sought to the three patents in suit. InterDigital is under a duty to disclose documents in its power (a term defined in the relevant provisions of the Civil Procedure Rules) that are disclosable in the light of the pleaded case. While I might be privately sceptical as to the likelihood that the discovery by Ericsson will turn up material in addition to that which must be disclosed in these proceedings in any event, I certainly cannot say that it will not do so.

32.   It follows that it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings. This approach, which is quite different from the approach which I would take to a request for specific disclosure of class of documents in the context of English proceedings, is appropriate for the following reasons:

(a) Subject to the restrictions placed on the jurisdiction by Federal law, the request is not circumscribed by the issues at stake in the foreign proceedings. There do not even have to be any proceedings on foot for the request to be considered. It is therefore in part investigatory in nature.

(b) It follows that the English court should not seek to circumscribe the discretion possessed by the district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary, after appropriate amendment.

(c) The question of the extent to which the district court should accede to the request is a matter for it alone, on the evidence made available, and the English court should only interfere if the invocation of the jurisdiction is either contrary to some legal or equitable right of the other party to the English litigation or is otherwise oppressive or vexatious or tends to interfere with the due process of the English court. In my judgment it should also, if possible, express a view as to the likely deployability of the documents sought if that is possible and if such an expression will be of assistance to the district court.

(d) The final decision on admissibility will be in any event for the English court, in the light of the issues as defined in the pleadings, and the English court should not, subject to the caveat set out above, concern itself with the manner in which the material sought matters sought to be admitted is obtained.

(e) This is a different problem from the problem of ordering disclosure of a class of documents of which it can be said that a substantial proportion are irrelevant. The court will not order disclosure of such a class because the English court will not exercise its coercive powers to compel the production of material irrelevant on the pleadings as they stand. But it is for the district court to form its own view in the United States, having regard to the nature of the jurisdiction and to the fact that it is not circumscribed by the pleaded issues in pending litigation, as to the material the production of which should be compelled.

33.  The position in respect of the depositions is more difficult.  Experience of the use of transcripts of deposition evidence in other cases suggests that it is most unusual for deposition evidence which is not focused on the issues in the English proceedings to be of any practical utility at all.  Again, it is possible, but the possibility is a remote one.  In this connection I say nothing about depositions ancillary to the document request whose only purpose is to locate relevant documents.

34.  On the whole, I conclude that while it does not seem likely that the material requested in the 1782 proceedings will be of utility in this action, that possibility cannot in any circumstances be excluded.  If I am to restrain Nokia from pursuing their request, InterDigital must satisfy me that in the context of these proceedings the request is not merely an of doubtful utility but an abuse of process.  If it were the case that the request would be automatically complied with by the district court in the United States, then I would be prepared to confer a wide ambit on the term "abuse of process".  But it is clear from the **Intel** case that the district court is required to exercise a judicial consideration in considering the request and the factors urged on me are equally considerations which can be, and in fact are being, urged upon it as reasons for not exceeding to the request or, in the words of the Supreme Court, trimming it.

35.  Accordingly, it seems to me that I must be able to identify abusive behaviour in the sense that the request is intended to, or at least will have the effect of, causing unfair prejudice to the opposing party in the present proceedings.  This I cannot do.  In this connection, I have not overlooked the question whether the real purpose of the request is to assist in the arbitration.  This, it seems to me, is preeminently a matter for the district court.  The extent to which a collateral purpose is an objection to a section 1782 request is a matter for the district court in the light of the guidance provided to it by **Intel** and other cases.  It is not a matter for me.

36.  Since there is nothing in the request that could be described as abusive in the context of the English proceedings, I must refuse the injunction sought.

37.  Finally, I should mention the question of costs of the section 1782 request.  Dr. Laakkonen from Nokia suggests in his evidence (for some reason) that if successful Nokia will seek its costs of the section 1782 proceedings from InterDigital.  I cannot pre-empt the exercise of this discretion by the judge who ultimately deals with the question, and for present purposes I should only say that this risk is not of itself oppressive of InterDigital and is not enough to justify me in restraining the section 1782 application by injunction.

**Declaratory relief**

38.  While pressing his application for injunctive relief, Mr. Burkill QC submits that in the alternative I should declare that the classes of documents specified in the 1782 request are irrelevant to the action as presently constituted.  For the reasons that I have set out, I agree that the great majority of the documents falling within the second, third and fourth classes are, or are likely to be, irrelevant.  But for the reasons I have also stated, I cannot say that they all are.  For this reason, I cannot make a declaration in the categorical terms that Mr. Burkill requests.  I accept that, as I have indicated, I would not have made an order for disclosure in the current proceedings on the present state of the pleadings of the classes of documents which are specified in the request under section 1782, but for the reasons that I have also stated, that consideration seems to me to be irrelevant to the present question.

**Amendment**

39.  I turn, finally, to an application to amend the pleadings which is made by Nokia.  As pleaded, it is clear that Nokia's case on invalidity of the patents is in part contingent on the allegation that lies at the commercial heart of this dispute, which is that use of the inventions of the patents in suit, among others, is essential at least to G2 and G2.5 mobile digital cellular telephony.  The patents have been notified to ETSI on the basis that the "proprietor believes that the [patents] may be considered essential" to the specified standards.  InterDigital say most emphatically that a notification is not an assertion of essentiality, but only of possible or potential essentiality.  In my view, something is only possibly or potentially essential to compliance with the standard during the period before the question of essentiality has been determined, whereafter it is either optional or essential.

40.  Before me, InterDigital were initially unwilling to state whether they considered that use of any of the inventions the subject matter of the patents in suit was in fact essential to compliance with the relevant standards.  In response to a direct question from me, Mr. Burkill QC took instructions and then informed me that essentiality was not asserted in relation to 571, use of which was therefore optional, but was asserted in relation to 774 and 414.

41.  Once the assertion of essentiality is made, it seems to me that it is open to Nokia to argue that the contents of the standard will force a particular construction of the claims on the patentee if the invention is to be essential to compliance.  Whether the argument is compelling is not for me to say at this stage, but it is clearly possible without the need for examination of any particular embodiment.  Where the employment of the invention is alleged to be optional, then if there is an assertion of infringement sufficient to support a prayer for a declaration of non-infringement under the inherent jurisdiction of the court, that may also be sufficient.  It depends upon the terms of the assertion

42.  Conscious of the difficulties of merely applying to revoke the patents on the basis of a construction which may be disputed in respect of a standard which may or may not be relevant, Nokia seek to amend their claim by adding a declaration of non-infringement in respect (put shortly) of equipment complying with the standards.  InterDigital object on the basis that the claims relate to apparatus; that the specifications do not describe

apparatus; and that to grant a declaration of non-infringement (or, I suppose, non-essentiality) in respect of the standard is potentially embarrassing

43. The draft pleading is as follows.  Passing over the matters which are merely common form, I can pick it up as amended at paragraph 4.

"4.  The Defendant's publicly stated position is that the manufacturer of and commercial dealing in mobile telephone equipment which complies with GSM standards infringes the Patents (and corresponding patents worldwide).  'GSM standards' refers to the standards issued by the European Telecommunications Standards Institute (ETSI) relating to the European digital cellular telecommunications systems, known as Global System for Mobile Communications (GSM).

(i) The Defendant has notified ETSI in accordance with the ETSI IPR Policy, that the Patents are 'Essential IPR' in respect of the GSM standards.  A copy of the relevant entries in the database maintained and published by ETSI is attached hereto as Annex 1.

(ii) The Defendant has licensed the Patents (and corresponding patents elsewhere in the world) to manufacturers of equipment falling within the GSM standards, on the basis that such licences are necessary for compliance with those standards.  The Claimant, amongst others, has entered into such a licence.

(iii) 'Essential IPR' under the ETSI IPR Policy, a copy of which is attached as Annex 2 hereto, is defined by clause 15(6) thereof in the following terms:

'ESSENTIAL' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardisation, to make, sell, lease, otherwise dispose of, repair, use or operate equipment or methods which comply with a standards without infringing that IPR.  For the avoidance of doubt in exceptional cases where a standard can only be implemented by technical solutions, all of which are infringements of IPR, all such IPRs shall be considered ESSENTIAL.'"

44. The particular (iii) under paragraph 4 which is sought to be added by amendment pleads the meaning of the word "essential" upon which Nokia rely, and paragraph 6, which is added by amendment, seeks in the alternative, or in any event, a declaration of non-infringement in relation to all Nokia equipment complying with the relevant standards. It is claimed that InterDigital have made a general assertion of infringement in relation to all three patents in relation to the handsets and other infrastructure manufactured by Nokia, and it is sought to add to the prayer for relief a declaration that importation, manufacture, sales, supply, offer for sale or supply, and keeping of the relevant hardware in compliance with the specified standards without the consent of the defendant, InterDigital does not require infringement of the identified patents and that the patents in each of them are not essential IPR for GSM Release 4.

45. That in terms is not a declaration of non-infringement:  it is a declaration of non-essentiality.  What Nokia are seeking to do is to keep open the possibility which I think Mr. Silverleaf articulated by saying if they are not saying it is essential, we are not worried.

46. I have been in two minds as to whether this is a possible approach to a patent action. However, having regard to the assertion of essentiality which was made to me by Mr. Burkill, I am satisfied, for the reasons that I have endeavoured to express, that the court should, if at all possible, resolve the commercial issue in the terms that it is understood by the parties.  The position is far more difficult in relation to the patent whose use is said to be optional.  It does seem to me that on ordinary principles the question of non-infringement becomes an entirely theoretical one.  Non-essentiality is accepted, and in those circumstances it seems to me that either there must be a clear assertion of infringement identified or a specimen hardware in respect of which InterDigital seek royalty should be identified.

47. It is not clear to me, as at present, whether that has happened and for this reason I will hear further submissions in the light of these observations in relation to the patent whose use is said to be optional.  Subject as aforesaid, however, InterDigital's applications fail.

# Exhibit 4



Neutral Citation Number: [2023] EWCA Civ 223

Case No: CA-2023-000292

**IN THE COURT OF APPEAL (CIVIL DIVISION)**
**ON APPEAL FROM THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**MEDIA AND COMMUNICATIONS LIST**
**MR JUSTICE MURRAY**
**[2023] EWHC 262 (KB)**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 01/03/2023

**Before:**

**SIR GEOFFREY VOS, MASTER OF THE ROLLS**
**LADY JUSTICE CARR**
and
**LORD JUSTICE WARBY**

Between:

**WALTER TZVI SORIANO**

**Claimant/Appellant**

**- and –**

**(1) FORENSIC NEWS LLC**
**(2) SCOTT STEDMAN**

**Defendants/Respondents**

**(3) ERIC LEVAI**

**Defendant**

**Andrew Fulton KC** (instructed by **Rechtschaffen Law**) for the **claimant/appellant** (Mr Soriano)

**Lord Falconer of Thoroton KC** (instructed by **Gibson, Dunn & Crutcher UK LLP**) for the **respondents** (the defendants)

Hearing date: 21 February 2023
- - - - - - - - - - - - - - - - - - - -

# JUDGMENT

**SIR GEOFFREY VOS MR, LADY JUSTICE CARR, and LORD JUSTICE WARBY:**

<u>Introduction</u>

1.      This case has been brought on quickly as a rolled-up hearing for permission to appeal and, if permission is granted, the substantive hearing of that appeal. It raises one important issue as to this court's proper approach to defendants, who seek to use foreign court procedures to gather evidence to support their defence to litigation here. This is a defamation case, but it is for consideration whether the same principles apply to all types of litigation.

2.      Mr Soriano, an Anglo-Israeli claimant, has sued the two US based defendants claiming that they libelled Mr Soriano in 8 online publications (the publications). The defendants contested the jurisdiction of the English court, but Jay J and the Court of Appeal ([2021] EWCA Civ 1952) held that Mr Soriano had shown that the English court was clearly the most suitable forum in which to bring the claim (see section 9 of the Defamation Act 2013).

3.      The defendants filed a defence to Mr Soriano's claim on 22 March 2022, but disclosure has not yet occurred. This hearing was urgent because a preliminary hearing was fixed for 2 and 3 March 2023 to determine the meaning of the words complained of and to deal with Mr Soriano's application to strike out the defence contending that what was said was true and in the public interest.

4.      In the build up to the preliminary hearing, the defendants applied to the District Court for the Southern District of New York (the DCSDNY) on 6 December 2022 for an order requiring HSBC Bank USA NA (HSBC USA) to produce two very broad categories of banking documents relating to Mr Soriano's companies in reliance on 28 USC §1782 (the 1782 application). That is a provision allowing a US court to provide assistance to an applicant in gathering evidence in support of legal proceedings in a foreign court. It provides that: "[t]he district court … may order [a person] to … produce a document or other thing for use in a proceeding in a foreign … tribunal", and "[t]he order may be made … upon the application of any interested person".

5.      Once Mr Soriano had found out about the 1782 application: (i) he applied on 19 January 2023 in this jurisdiction for an anti-suit injunction on the grounds that it was vexatious, oppressive and unconscionable and would interfere with the efficient conduct of these proceedings, and (ii) on 20 January 2023, he sought to intervene before the DCSDNY in the 1782 application.

6.      Murray J (the judge) dismissed Mr Soriano's application for an anti-suit injunction on 9 February 2023. He held, in essence, that the defendants were not guilty of "conduct which [was] oppressive or vexatious or which [interfered] with the due process of the court" (in reliance on Lord Brandon at page 41C-D in *South Carolina Insurance Co v. Assurantie Maatschappij "De Zeven Provincien" NV* [1987] 1 AC 24 (*South Carolina*)).

7.      Mr Soriano raised five grounds of appeal. He contended that the 1782 application:

i)      Was an inherently abusive fishing expedition which sought to circumvent English disclosure rules in general and *Yorkshire Provident Life Assurance Co v. Gilbert* [1895] 2 QB 148 (*Yorkshire Provident*) in particular. Lindley LJ had held at page 152 in *Yorkshire Provident* that the defendant to a libel action was only entitled to discovery "of all matters relating to the questions in issue as narrowed by the particulars" (the abusive ground).

ii)     Involved abusive re-litigation in the DCSDNY of an issue already decided against the defendants in relation to jurisdiction, namely whether Mr Soriano was engaging in "libel tourism" (the libel tourism ground).

iii)    Was vexatious and oppressive insofar as it caused the parties to run up costs when a substantial costs award was overdue from the defendants to Mr Soriano (the costs ground).

iv)     Was an interference with due process in this jurisdiction as a matter of fact (the due process ground).

v)      Should have allowed the judge to provide "helpful instructions" to the DCSDNY (as referred to in *Bankers Trust International Plc v. PT Dharmala Sakti Sejahtera* [1996] CLC 252 (*Bankers Trust*) at page 273) to the effect that the nature and scope of what was sought by way of discovery was oppressive (the helpful instructions ground).

8.   At the end of Mr Soriano's opening argument, we indicated that, subject to further argument, we were minded to grant permission to appeal on all grounds except the libel tourism ground. We confirm that indication in this judgment.

9.   Mr Andrew Fulton KC, leading counsel for Mr Soriano, argued orally that the cardinal principle was that English law regarded it as wrong for a libel defendant to be given the opportunity to scour the books and records of the person he has defamed before particularising a defence. The order sought from the DCSDNY was too broad and sought oppressively to penetrate a confidential banker customer relationship. This was a case just like *Yorkshire Provident*, where A.L. Smith LJ had said at page 155 that "the defendants want … to go roving through the whole of the [claimant's] books to find out something if they can". As Lindley LJ said also in that case at page 152: "it would be a very bad precedent to suggest that a person can simply by libelling another obtain access to all his books and see whether he can justify what he has said or not". The defendants support the judge's decision.

10.  For the reasons that appear below, we have decided to dismiss the appeal. In the broadest outline, the principles applicable to a 1782 application made by a defendant to English proceedings were clearly stated in *South Carolina*, where Lord Brandon explained at page 40D that the court could grant an injunction restraining foreign proceedings where "one party to an action has behaved, or threatens to behave, in a manner which is unconscionable". Lord Brandon did not, however, (at page 42) think that the defendants had so behaved, nor did he think that they had in any way departed from, or interfered with, the procedure of the English court "by seeking to exercise a right potentially available to them under the Federal law of the United States". All they had done was "what any party preparing his case in the High Court here [was] entitled to do, namely to try to obtain in a foreign country, by means lawful in that country,

documentary evidence which they believe that they need in order to prepare and present their case". It seems to us that the judge was entitled to reach the same conclusion here. The principles applicable to libel proceedings in this context are no different from those applicable to other civil proceedings; of course, the burden of proving truth is on the defendant in a libel action, but that should not mean that the defendant is disabled from evidence gathering in any lawful manner. The apparently undesirable breadth of the order sought is a matter for the DCSDNY applying its own principles. It will, however, realise from this judgment that such a broad order would be unlikely to be granted here.

11.     We shall now proceed to provide a brief summary of the factual background and of the judge's reasoning, before addressing each of the 5 grounds of appeal in turn.

Factual background

12.     Mr Soriano's business interests include involvement with a company called USG Security Limited (USG).  The first defendant (founded by the second defendant) is a Californian company which operates an online news platform.

13.     Mr Soriano's case, in summary, is that the publications alleged that he was guilty of corrupt dealings: (a) with the Russian state in connection with security at Sochi airport at the time of the 2014 Olympics, (b) with the Israeli President, Benjamin Netanyahu, and (c) in Monaco. They also alleged that Mr Soriano was guilty of multiple homicide, of money laundering, and of being the middleman for a network of illegal Israeli hackers. The publications further alleged that there were grounds for thinking that Mr Soriano was involved in a conspiracy to interfere with the 2016 US presidential election, involved with the Russian mafia, and in the embezzlement of Russian state funds.

14.     The defendants rely, amongst other things, on substantive defences of truth and public interest. The meanings defended as true include that there are "grounds to investigate whether the relationship between the [c]laimant and his firm [USG] on the one hand and Deripaska-Sberbank LLC on the other, in respect of services provided to Sochi Airport involved any corrupt payments", and that there are "grounds to investigate whether the [c]laimant had knowledge of improper foreign interference into US politics". These meanings do not, as is obvious, cover the whole subject-area of Mr Soriano's claims nor do they reach the same level of gravity as the meanings which Mr Soriano places on the words complained of.

15.     The main issues in the libel claim are, therefore: (i) the meanings of the statements complained of, (ii) whether the publication of those statements caused serious harm to Mr Soriano's reputation, and if so, (iii) whether a defence of truth is available in respect of the imputations conveyed by the statements, or (iv) whether a public interest defence is available in respect of the publications. The first issue and the strike out we have already referred to are, as we have said, soon to be determined.

16.     The 1782 application sought two broad categories of documents from HSBC USA covering the period from 1 January 2007 to date, as follows:

> 1. All documents and communications relating to USG, including but not limited to any and all account information,

> information relating to any financial transactions, Wire Transfers, and/or CHIPs or SWIFT payment messages regarding any Wire Transfer.
>
> 2. All documents and communications relating to Walter Soriano including but not limited to any and all account information, information relating to any financial transactions, Wire Transfers, and/or CHIPs or SWIFT payment messages regarding any Wire Transfer concerning [USG], an English company, and a wide range of others related to USG [broadly defined to include associated entities].

17.     On 13 February 2023, Mr Soriano applied for permission to appeal the judge's refusal to injunct the 1782 application, seeking expedition. On the defendants' undertaking not to accept disclosure from HSBC USA in the meantime, the application was adjourned to this hearing with the appeal to follow if permission were granted.

The judge's judgment

18.     The judge concluded that:

i)      The *Yorkshire Provident* principle was no bar to the 1782 application. It meant simply that an English court would not order disclosure of documents that were not relevant to the pleaded case. It was compatible with the general principle that a party "should otherwise be free to gather evidence in any other way that is legitimately available to it" ([44]).

ii)     The 1782 application did not involve any unwarranted interference with the efficient case management of the English proceedings.

iii)    The individual criticisms of the 1782 application, such as excessive breadth and impact on third parties, were matters for the DCSDNY, which had procedures that allowed for proper objections to be addressed.

iv)     Although the pursuit of the 1782 application might cause Mr Soriano to incur costs in the US without the protection that would be available here, that was not, on its own, a reason to prevent the defendants seeing, via legitimate means, evidence to assist their defence "whether as it is currently pleaded or as it might in the future be pleaded" ([53]).

1. The abusive ground

19.     We were referred to only two occasions on which the English court had restrained a 1782 application on the grounds that it was abusive, unconscionable or vexatious. The first was in *Bankers Trust*, where Mance J took into account all the circumstances including the fact that costs could not be recovered in the New York court, the speculative nature of a proposed large-scale investigation into the claimant's business, and the fact that, if new material were found, the English trial, which had already concluded, would have to be reopened. In that case, Mance J thought that the English court was better placed to assess the background, implications and propriety of the 1782

proceedings, and that this court should not be hesitant about giving effect to its conclusions if it thought the 1782 application abusive (see page 263).

20.     In *Omega Group Holdings Ltd v. Kozeny* [2002] CLC 132, Peter Gross QC injuncted the defendant from seeking orders under 1782 to depose the claimant's employee witnesses in the US, on the ground that those witnesses would be subjected to unwarranted double cross-examination and the prospective English trial would suffer from unnecessary duplication.

21.     These two cases demonstrate the factual nature of the evaluation that the English court will undertake on an application such as this. The facts of those cases were very different from those in this case. The judge had here to determine whether, in all the circumstances of this case, the 1782 application was unconscionable, abusive or vexatious on one of several grounds including specifically whether it would interfere with the proper conduct of these proceedings. He decided that it was not. This court will always be slow to interfere with such a factual assessment unless the judge has made a legal error. That is no doubt why Mr Soriano seeks to elevate the decision in *Yorkshire Provident* into a principle that is generally applicable at least to all libel actions.

22.     As we have said, we do not think that evidence gathering in libel actions is affected by legal principles that are different from any other actions. It may be abusive to bring 1782 proceedings and it may not. It will depend on all the circumstances. It may depend also on the purpose for which the 1782 application is brought.

23.     Against this background, there are five reasons why we do not think the judge fell into error.

24.     First, the decisions in *Yorkshire Provident* and the similar, but later, case of *Arnold & Butler v. Bottomley* [1908] 2 KB 151 say nothing about evidence gathering. They go to the narrower question of what disclosure is available in libel actions in support of a defence of truth.

25.     Secondly, whilst it is true that the 1782 application as presently framed is far broader than any third-party disclosure order this court would make, its breadth is primarily a matter for the DCSDNY. In *Intel Corp v. Advanced Micro Devices, Inc* (2004) 542 U.S. 241, Justice Ruth Bader Ginsburg, giving the opinion of the majority of the US Supreme Court, acknowledged that the 1782 procedure was to assist the foreign court (as section 1782 itself implies by saying that the order is to produce documents for use in the foreign court – see [4] above). She said at [9]-[10] that "a court presented with a §1782(a) request may take into account the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign … court … to U.S. federal-court judicial assistance". Moreover, she said specifically that "a district court could consider whether the §1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions", that "unduly intrusive or burdensome requests may be rejected or trimmed", and that the district court might consider "appropriate measures, if needed, to protect the confidentiality of materials". No reasons have been advanced as to why the DCSDNY is, in this case, unable to apply these principles appropriately.

26.     Thirdly, there is nothing inherently objectionable from a domestic perspective, as Mr
        Soriano seems to suggest by calling the application an intrusion, about seeking evidence
        in an appropriate case from a party's bankers or from the bankers to the corporate
        entities in which the party has an interest. The Bankers' Books Evidence Act 1879 is a
        relevant comparator.

27.     Fourthly, the cases on which Mr Soriano relies (*Flood v. Times Newspapers Ltd* [2009]
        EWHC 411 (QB), [2009] EMLR 18 and *Taranissi v. BBC* [2008] EWHC 2486 (QB))
        to support a general principle prohibiting "fishing expeditions" relate to the scope of
        disclosure available from parties or third parties in an English libel action. They do not
        purport to restrict a defendant's lawful evidence gathering activities more generally.
        Indeed, the general rule is that the defences of truth and honest opinion "form part of
        the framework by which free speech is protected. It is therefore important that no
        unnecessary barriers to the use of these defences are erected" (see *McDonald's Corp v.
        Steel* [1995] EMLR 527 at page 535 per Neill LJ).

28.     Fifthly, in our judgment, in this case the judge considered all the relevant facts before
        concluding at [56] that the 1782 application was not "oppressive, vexatious or otherwise
        unconscionable".

29.     In these circumstances, we do not think it appropriate to interfere with the judge's
        evaluation that the 1782 application was not abusive, and we will dismiss this ground
        of appeal.

## 2. The libel tourism ground

30.     Mr Soriano relies under this heading on passages in the defendants' reply brief in the
        DCSDNY, describing this claim as "libel tourism". Mr Soriano says that the judge
        should not have allowed the defendants to advance that argument in the DCSDNY
        "when Jay J and the Court of Appeal in England had specifically rejected such
        complaints". Mr Soriano argues that the judge's reference to "different principles,
        policies and cultural norms" in the US cannot justify the renewed reference to libel
        tourism.

31.     In our view, this contention is misconceived. The simple reference to a label, however
        unhelpful, cannot justify an injunction in this case. The existence of different principles
        and cultural norms in the USA is nothing to the point. All these courts did in their earlier
        judgments was to confirm that Mr Soriano was not a "libel tourist" in the sense that he
        overcame the jurisdictional hurdle in section 9 of the Defamation Act 2013. The
        defendants are not disputing that proposition in the DCSDNY.

32.     We do not regard the libel tourism ground as being properly arguable and we decline
        permission to appeal based upon it.

## 3. The costs ground

33.     The argument in support of the costs ground is that it was vexatious and abusive for the
        defendants to cause Mr Soriano to incur costs in the US courts when the defendants
        have failed, for a year, to pay a costs award due to Mr Soriano in the sum of £85,000
        plus VAT and interest. The judge held that this was not of itself sufficient to justify an

injunction. Mr Soriano had remedies available to him domestically in respect of the failure to pay costs.

34.    In our judgment, the non-payment of costs was one of the circumstances that the judge could properly have taken into account in determining the application. For that reason, we grant permission to appeal on this ground. We do not, however think that the judge made any error in his evaluation, and in his determination that the outstanding costs order did not justify an injunction in this case. As the judge said, the non-payment of a costs order gives rise to domestic remedies that Mr Soriano can pursue. It does not make it unconscionable for the defendants to pursue their 1782 application.

### 4. The due process ground

35.    This ground is, in effect, part and parcel of the abusive ground and we have dealt with it under that heading. In short, the judge was justified in finding that there was no unconscionable interference with the due process of the English court.

### 5. The helpful instructions ground

36.    This is not properly regarded as a ground of appeal at all since it does not challenge the essence of the order made by the judge, but we do nonetheless think it was worthy of consideration as part of the appeal. Even though we will be dismissing the appeal, we can see that the DCSDNY may find some assistance from this judgment. We accept, as we have already noted at [25], that the purpose of the 1782 process is to assist the foreign court, so that the US court will in all probability be interested in the English court's view of it.

37.    In our view, however, the DCSDNY is well capable in this case of deciding whether to make an order and, if so, the appropriate scope of that order. Mr Soriano has had and taken the opportunity to put in full and robust submissions objecting both to the order sought itself and to its breadth. There is, as we have explained under the abusive ground, nothing unconscionable in the circumstances of this case in the defendants seeking to gather evidence as to allegedly suspicious payments made by USG, when that entity is owned or operated by Mr Soriano. It is noteworthy in this respect that the evidence demonstrated that the defendants' lawyers have seen legitimately obtained records connected to HSBC USA, which lead them to believe that there was a commercial relationship between USG and a Mr Aviram Azari, a convicted Israeli computer hacker, and that payments were made by USG, through HSBC USA, to Panolos Limited, a St Vincent and Grenadines company associated with Mr Azari.

38.    We would dismiss this ground too.

### Conclusions

39.    For the reasons we have given, we will grant permission to appeal on the first, third, fourth and fifth grounds, and dismiss Mr Soriano's appeal.

# Exhibit 5

Bankers Trust International v PT Dharmala Sakti Sejahtera..., [1996] C.L.C. 252 (1995)

# *252 Bankers Trust International plc v PT Dharmala Sakti Sejahtera and counterclaim

 Positive/Neutral Judicial Consideration

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
19 October 1995

**Report Citation**
[1996] C.L.C. 252

Queen's Bench Division (Commercial Court)

Mance J.

Judgment delivered 19 October 1995

*Discovery—Foreign proceedings—Order for discovery overseas—Action tried in England—Judgment reserved—Plaintiffs commenced US proceedings—Application in US court for discovery in order to obtain evidence for production in English proceedings—US orders for disclosure in relation to defendants' transactions with other clients—Whether foreign proceedings abusive and oppressive—Whether costs to be taken into account—Whether English or US court to judge whether US proceedings oppressive.*

This was an application for an order requiring the plaintiffs to apply to the US District Court to discontinue the proceedings commenced there, to set aside its ex parte orders for discovery and to restrain further proceedings.

In this action the plaintiffs, Bankers Trust International plc ('BTI') claimed that the defendant, PT Dharmala Sakti Sejahtera ('DSS') owed nearly $65m in relation to transactions in derivatives which the parties had entered into. BTI had acted through Bankers Trust Co ('BTCo'). DSS counterclaimed for rescission of the transactions, and damages for deceit and negligence. The proceedings were commenced in England. DSS made interlocutory applications, which were largely unsuccessful, for discovery in relation to BTI's transactions with other clients. The applications were based on a claim that BTCo had been fraudulent. The trial of the claim and counterclaim took place in July 1995 and judgment was reserved.

In August, DSS obtained a copy of an article published in the 'Washington Post' relating to an action in America against BTCo and BTI. DSS believed it showed that a fraudulent 'system' of conduct had been operated by BTCo in relation other clients as well as themselves. DSS also believed that there were a number of other actions which endorsed their belief. As a result DSS applied, unsuccessfully, to the trial judge for leave to amend its pleadings to include a claim of systematic fraud. DSS then applied to the US District Court for an ex parte order for disclosure directed to BTCo and its parent and associated company. The US court granted the orders. DSS hoped that as a result new and relevant information would emerge that would enable them to reapply to the trial judge for leave to amend in order to assert systematic fraud.

BTI and BTCo applied for an order that DSS apply to the US District Court to discontinue the proceedings there and for the setting aside of the US District Court's orders.

*Held*, allowing the application and making the appropriate order to restrain the US proceedings:

1. Although in principle foreign proceedings could be used to gather evidence in a foreign jurisdiction for use in English proceedings, the court had jurisdiction to restrain a party to English proceedings from pursuing foreign proceedings where they were oppressive or vexatious. DSS had produced insufficient new evidence of a systematic fraud to warrant pursuing US proceedings in order to adduce fresh evidence or amend in England at a time when the English actions had already been tried.

2. It was for an English court to judge whether foreign proceedings in a US court constituted an abuse or were otherwise oppressive in the context of English proceedings. Taking into consideration all the circumstances, including the fact that costs could not be recovered in the New York court, and the speculative nature of the proposed large-scale investigation into the plaintiffs' business which, if it produced material to support the fraud  *\*253* allegations would require the reopening of the English trial, the US proceedings were both abusive and oppressive and ought to be restrained. ( *South Carolina Insurance Co v Assurantie Maatschappij 'de Zeven Provicien' NV [1987] AC 24 distinguished* )

The following cases were referred to in the judgment:

> *Euromepa SA v R Esmerian Inc 51 F 3d 1095* (2nd Cir 1995).
> *Ketteman v Hansel Properties Ltd [1987] AC 189* .
> *Societe Nationale Industrielle Aerospatiale v Lee Kui Jak [l987] AC 871* .
> *South Carolina Insurance Co v Assurantie Maatschappij 'de Zeven Provicien' NV [1987] AC 24* .

Representation

> Ian Milligan QC and David Owen (instructed by Linklaters & Paines ) for the plaintiffs.
> Stuart Isaacs QC (instructed by Ince & Co ) for the defendant DSS.

JUDGMENT

Mance J:

These actions relate to transactions in derivatives-entered into by PT Darmala Sakti Sejahtera ('DSS') with Bankers Trust International plc ('BTI') acting through Bankers Trust Company ('BTCo'). BTI claims that DSS owes it nearly $65m. DSS counterclaims for rescission of the transactions and/or for damages for deceit and/ or. negligence and/or negligent misstatement. An expedited: trial was ordered by Waller J on 5 May 1995. Applications by DSS for discovery were determined by Longmore J on 9 June 1995 and by myself on 4 July 1995. The trial took place between 10-and 28 July 1995 when I reserved judgment. Judgment has not yet been given.

On 14 September 1995 DSS applied ex parte to the US District Court, Southern District of New York for, and on 20 September 1995 they were granted orders for the taking of depositions and production of documents directed to (a) BTCo

and (b) BTCo's ultimate parent company, Bankers Trust New York Corp ('BTNYC') and another subsidiary of BTNYC, BT Securities Corp ('BTSC'). On 21 September 1995 they served three subpoenas addressed to each of these Bankers Trust companies. The subpoenas identify as persons sought to be deposed seven named witnesses, from the chairman and president down, together with a custodian of records in relation to, the documentary requests and:

> 'a witness designated pursuant to Fed.R.Civ.P 30(b)(6) with knowledge of: (a) policies and practices of Bankers Trust in 1994 with respect to marketing and selling derivatives; (b) complaints and/or claims asserted by Bankers Trust customers arising out of or relating to the marketing and sale of derivatives; and (c) investigations by regulatory authorities relating to the marketing and sale of derivatives by Bankers Trust.'

BTI and BTCo now apply by summons dated 27 September 1995 for an order requiring DSS to apply to the US District Court to discontinue the proceedings and to set aside its orders dated 20 September 1995 arid restraining DSS from seeking to enforce the orders or to commence or continue any further like application. The summons also seeks declarations that any application by DSS for leave to re-amend its pleadings in the present actions to allege facts founded on evidence obtained in the New York proceedings would be refused and that the evidence to which the New York orders and subpoenas relate would not be admitted. I do not consider that this court can make any such prospective declarations in respect of applications for leave to re-amend not yet formulated or made and evidence not yet identified. I say no more therefore about the claim to these declarations. It was and is the claims requiring withdrawal of the US proceedings and restraining further such proceedings which are central to this application.

That there is jurisdiction to restrain a party to English proceedings from pursuing foreign proceedings in certain circumstances is beyond question. The nature of the *254 jurisdiction and of the circumstances in which it may be exercised was considered in the House of Lords and Privy Council in *South Carolina Insurance Co v Assurantie Maatschappij 'de Zeven Provincien' NF [1987] AC 24* and *Societe Nationale Industrielle Aerospatiale v Lee Kui Jak [1987] AC 871* . The present is not a case where BTI or BTCo can or do suggest that DSS by its proceedings in New York has invaded or is invading any legal or equitable right of any Bankers Trust company. These two cases show that, at least generally speaking, the only other circumstances in which an English court will restrain a party from pursuing foreign proceedings are when to do so would be 'unconscionable', a term which 'includes, at any rate, conduct which is oppressive or vexatious or which interferes with the due process of the court' (see per Lord Brandon in the *South Carolina* case at pp. 40F and 41D and per Lord Goff in the *Aerospatiale* case at p. 896F–G). In judging whether this is the case, the court must take into account not only the potential injustice to the one party if the other is allowed to pursue the foreign proceedings, but also the potential injustice to the latter if he is not so allowed ( *Aerospatiale* at p. 896G).

The most common situation in which these principles come before the court for consideration is when there are two competing sets of proceedings, in both of which one or other party claims determination of the substantive dispute. An example occurred in the present case when BTI and BTCo applied unsuccessfully to Waller J in May 1995 for an injunction restraining the pursuit by DSS of concurrent Indonesian proceedings against them. The present situation is different in that the avowed aim of the New York proceedings is to complement and provide material 'for use in' the present English proceedings. This was also the situation in the *South Carolina* case. The House of Lords decision there shows that there is nothing axiomatically unacceptable about the use of s. 1782 to gather evidence in the US for use in English proceedings, although the means by which such evidence is gathered would not be available under English law and might involve the taking of depositions from and pre-trial discovery against third parties who were not parties to the English proceedings. To use s. 1782 was not to interfere with the English court's control of its own process: see per Lord

Brandon at p. 41G. The defendants who were making use of s. 1782 were simply trying to obtain in a foreign country, by means there lawful, evidence which they believed that they needed for their case. Whether they applied to this court under RSC, O. 39, r. 2 for letters rogatory or to an American court under s. 1782 was also a matter for them. The rule precluding the obtaining of pre-trial discovery against third parties under English law is for the protection of third parties, not of either of the parties to English litigation: see per Lord Brandon at p. 42E–G. In so far as the plaintiffs in the *South Carolina* case had incurred extra costs in resisting the orders sought under s. 1782, that was their choice. The third parties were willing to supply the material sought: see pp. 42H-43C. In so far as the steps taken under s. 1782 caused inconvenience in terms of delay, part of such delay arose from the plaintiffs' attempt to injunct the defendants from pursuing their s. 1782 applications and any further delay in trial of the English proceedings was the price of justice being fully done in such proceedings and could also be controlled by the court fixing a date: see p. 43F and 43H.8

Distinctions exist however between the circumstances in the present case and the *South Carolina* case. There the defendants were retrocessionaires and their application under s. 1782 was against the agents who had accepted and the adjusters who had investigated claims on the original insurance business written on behalf of the original insurers. The agents and adjusters were not agents of the plaintiffs who were the reinsurers. A request to the agents for voluntary disclosure had been refused, after being referred to the original insurers as well as the plaintiffs who were their reinsurers. However, neither the agents nor the adjusters resisted disclosure when sought under s. 1782. Later, despite an English injunction obtained in the meanwhile to restrain pursuit of the s. 1782 application, certain *255 disclosure by the agents and adjusters was permitted by the plaintiffs. But it was in issue whether this was full or adequate. The present case differs in that the relief sought under s. 1782 is directed to the other party to the English action (BTCo) as well as its parent (BTNYC) and an associated company (BTSC). Mr Isaacs QC for DSS pointed out that the latter two companies are as third parties in a parallel position to that of the agents and adjusters against whom s. 1782 relief was sought in the *South Carolina* case. That is so in form. In substance, however, the corporate connection between the three Bankers Trust companies may put a different complexion on the matter. Precisely the same relief is sought against all three Bankers Trust companies under s. 1782. The evidence filed by DSS to obtain s. 1782 relief in New York consists of affidavits of Mr Sesser, a partner in their New York attorneys, and an accompanying declaration by Mr Thillagaratnam, a partner in their Singapore lawyers, which do not differentiate between the three companies or explain why all three were sued. On the contrary Mr Thillagaratnam's declaration asserts that the information in the *Washington Post* article, which is relied on as providing the basis of the s. 1782 application:

> 'is limited to an allegation that BTI and [BTCo] would not allow a customer to get out of a swap with losses less than the bank's reckoning'.

This suggests that the article is viewed as demonstrating systematic fraud on the part of the two Bankers Trust companies which are parties to the English proceedings, and does not explain why the other companies have been involved, save perhaps out of major caution.

A second important distinction lies in the different stages at which the applications were made. In *South Carolina* the application was at an early stage, with a view to providing evidence at trial, which would not have been delayed much, if at all, had it not been for the plaintiffs' unjustified attempts to stop the s. 1782 proceedings. In the present case, the trial is over, and judgment is awaited. I should however add that DSS do not seek to suggest that the date when I give judgment should be in any way delayed or affected by the existence of the s. 1782 proceedings. Mr Isaacs simply submits that DSS should be allowed to carry on with their pursuit of further evidence in the hope that it will produce further material justifying an application before judgment, or, if not, after judgment.

© 2023 Thomson Reuters.

Bankers Trust International v PT Dharmala Sakti Sejahtera..., [1996] C.L.C. 252 (1995)

A third distinction is that many of the precise categories of documents now sought to be obtained under s. 1782 have in the course of the present actions been the subject of applications for discovery, in which DSS were largely unsuccessful before Longmore J and myself. To the extent that discovery was ordered, no complaint has been made in the present actions that it was not properly given. I was given a schedule of the suggested overlap between the documents identified in the New York subpoenas and the previous applications to this court in the present proceedings. Having examined the material to which this schedule refers, I say no more than that the overlap, even though not quite as complete as the schedule might superficially suggest, is very considerable, as for example in the areas of procedures and standards in the conduct of derivatives business, problems with customers and regulatory authorities experienced in that regard, any changes resulting from such problems, the 'orderly withdrawal in the first quarter of 1994 from substantial market positions in [BTNYC's] trading and positioning function' referred to in an annual report and the fees, profits and any other benefits received by Bankers Trust companies and Mr Hyun from such business. The documents now sought also include documents in specific areas (such as the termination of Mr Hyun's employment) where there was cross-examination at trial, but no request for discovery was pursued. It is also to be noted that the blanket request now made for discovery of 'all documents relating to Indonesian companies to whom Bankers Trust sold derivative products from January 1993 to the present' is made in circumstances where (a) the fact that BTCo did derivatives *256 business in Indonesia was well known (it is indeed one of DSS's pleaded allegations that Mr Nurjadin represented to DSS that none of BTCo's customers in Indonesia had ever lost money on BTCo's products) and (b) Mr Hyun was asked questions in cross-examination about problems with one such customer, PT Adimitra Rayapratamo ('Adimitra') without any specific request for discovery of documents in relation to Adimitra being pursued. I shall return to Adimitra later.

The plaintiffs suggest further distinctions. In the *South Carolina* case, there was no suggestion that the material sought under s. 1782 would be irrelevant or incapable of use in the English proceedings. In the present case, the plaintiffs submit, the material sought will not be admissible and will not enable any application to amend. Moreover, if the s. 1782 subpoenas are allowed to be enforced, they threaten to involve very wide oral depositions as well as very onerous discovery, which will involve large costs and take up much time, in relation to an action in which the plaintiffs were entitled to assume that the next step was a judgment, followed by a possible appeal by one side or the other. For these and other reasons to which I will come, the plaintiffs submit that the *South Carolina* case can and should be distinguished and that DSS's present attempt to reopen evidential matters should be restrained as abusive and/or oppressive.

DSS's justification of the proceedings under s. 1782 is set out in the declaration of Mr Thillagaratnam. That declaration, inter alia, recounts as background DSS's case in the English proceedings, and both the course of certain Indonesian proceedings begun by DSS against BTI and BTCo and of the present English proceedings. It ascribes the application under s. 1782 to the obtaining by Mr Thillagaratnam on 2 August 1995 of a faxed copy of an article published in the *Washington Post* on 11 June 1995. To avoid a possible adjournment of their present applications, the plaintiffs agreed not to pursue any suggestion that DSS could or should have obtained notice of the *Washington Post* article prior to 2 August 1995 or have taken earlier steps thereafter to invoke s. 1782, if it was appropriate for them to invoke it at all. Mr Thillagaratnam says in para. 18ff:

> '(18)  … If the material in this article had been made available earlier to DSS, it would have been able to plead the existence of a "system" of conduct operated by Bankers Trust in relation to other clients and DSS. The information in the *Washington Post* is limited to an allegation that BTI and Bankers Trust [defined elsewhere in the declaration as a reference to BTCo] would not allow a customer to get out of a swap with losses less than the bank's reckoning. At the bottom of p. 7 of the article, it says:

>> "At the same time, the bank did not want a customer to pull out of a derivative based on a quoted value that was higher than the true value … So, salespeople would attempt to convince a customer to hang on."

This is precisely what Bankers Trust did immediately after the US Federal Reserve Board raised Federal Fund Rates on February 4,1994.

(19)  There may well be other examples of systematic conduct that may be discovered when enquiries are made in the USA, but the material in the *Washington Post* article is the starting point. DSS clearly did not have the benefit of the material stated in the *Washington Post* article at the time when the discovery applications were heard in the English proceedings.

(20)  The allegation would have greatly strengthened the case on the relevance of the matters on which DSS sought discovery in the English proceedings, which discovery was refused …'

Mr Thillagaratnam then summarised Longmore J's ruling on 9 June 1995 ordering that discovery need not be given in respect of issues raised by para. 35(iv) of DSS's points of defence and counterclaim in the present proceedings. Paragraph 35 pleads that BTCo *257* as agent for BTI made the alleged representations- deceitfully or recklessly. Sub-paragraph (iv) refers in support to para. 35–40 of an affidavit of Mr Thio sworn 22 April 1995. Mr Thio there refers to suits brought by a number of American companies, including Gibson Greetings Inc and the Proctor & Gamble Co ('P & G'), against BTCo and other associated companies alleging misconduct in respect of derivatives transactions and leading in the case of Gibson Greetings, to a finding by the Securities and Exchange Commission ('SEC') of fraud by BTSC and to disciplinary action and a fine of $ 10m in respect of such misconduct. Longmore J held that it was impossible to go into a whole series of different transactions in New York on the basis of similar fact evidence in a trial fixed for 10 July 1995 and estimated to last eight days, that if discovery was given it would inevitably result in a mini-trial in England of all that went on in New York, undermining both the eight day estimate and Waller J's order for expedition and, further, that it was not necessary for there to be such discovery and that, since DSS had not thought it necessary to make any similar allegation in the Indonesian proceedings, it was in that light also not necessary for the just disposal of the English proceedings to order the discovery sought. I would add that Longmore J also pointed out, firstly, that what DSS were seeking to do was to infer from allegedly fraudulent conduct in America that there were similar frauds in relation to the conversations which took place with DSS involving Mr Hyun and Mr Nurjadin in the Far East, and, secondly, that he was not deciding that DSS could not at trial cross-examine and argue and make submissions about what happened in New York if they felt that assisted their case, subject always to any ruling by the trial judge. In the event, after a brief allusion in opening, the allegations in para. 35(iv) of the pleading and para. 35–40 of Mr Thio's affidavit really played no part in the trial. Mr Williams, a Bankers Trust economist, was asked whether his reports had also played a part in relation to any of the American deals which became the subject of litigation, to which he answered, not to his knowledge; otherwise there were only a few tangential references to the American problems in evidence and submissions. It was not suggested to Mr Hyun or Mr Nurjadin that their conduct was in any way connected with or part of any policy or practice evidenced by the American problems experienced by any Bankers Trust company.

Mr Thillagaratnam also mentioned the discovery application which I decided on 4 July 1995, saying that, on the issue whether DSS was entitled to discovery of New York documents as to whether BTCo used DSS's transactions to. hedge other unprofitable commitments, I considered that:

'documents in this area are unlikely to carry matters very far therefore, although some further documentation may be able to be provided. It is clear on the evidence and because of the complexity of the Bankers Trust Group internationally that any detailed investigation of profitability or of hedging …: is unlikely to be either simple or, in the context of the issues in this action, justified.'

In fact this does not appear to be a wholly accurate summary of the relevant part of my judgment, where 'the area' referred to in the first sentence was the possible self-interest of the plaintiffs or their salesman in the form of profits and/or remuneration to be earned. The reference to hedging in the second sentence was (as the passage omitted from the quotation shows) to hedging of the DSS transactions conducted after they were effected. I had in the previous paragraph accepted the plaintiffs' evidence that there was no question of the DSS transactions being entered into to hedge previous unprofitable transactions. My judgment also dealt with a large number of other aspects of discovery not summarised by Mr Thillagaratnam. In particular, in relation to an application for discovery relating to the agreements made with the Federal Reserve Bank, I applied what had been said by Longmore J and added this, at p. 32: *258

> 'It is impossible to dive sensibly into one aspect — the culmination — of problems involving other clients without a full investigation of the position vis-a-vis the other clients and it would, it seems to me, be intolerable to overload this action with discovery going to the plaintiffs' relationship with other clients. Assuming, as Longmore J did, that this could be admissible, it still seems to me unlikely to be particularly helpful to investigate or consider, in relation to this action, what were no doubt substantial relationships, which have evidently given rise to substantial problems in the US between different arms of the plaintiffs and different clients. That seems to me to apply both in relation to the issue whether there was negligence in this case and also in relation to the issue whether there was fraud. As to fraud there is no suggestion of any overlap between the relevant personnel dealing with those different clients and dealing with DSS. The matters the subject of the agreement with the Federal Reserve Bank appear to have occurred in a different part of the world. Once again it seems to me that this request suffers from being far too diffusely spread.'

I then went on to make a qualification in relation to any specific video tape or document describing the particular type of derivative contracts represented by either of the swap transactions the subject of this action, which I held should be disclosed, especially if it reached Mr Hyun or Mr Nurjadin, but also even if it did not.

Mr Thillagaratnam's declaration next said that he has been advised by Mr Isaacs QC that, if the evidence of the material in the *Washington Post* article was now to be obtained, DSS would have quite a strong case for applying to me, as the trial judge, before any judgment for leave to amend its pleadings to assert systematic fraud. He then referred to RSC, O.20, r. 5 and said that he has been advised that it permits amendment of pleadings even after the trial or even after judgment or on appeal. He referred to O. 59, r. 10 . He also made reference to the *South Carolina* case.

The hearing took place before me on 2 and 3 October 1995. Mr Isaacs did not then support Mr Thillagaratnam's suggestion that, had the material in the article been available, DSS 'would have been able to plead the existence of a "system" of conduct operated by [BTCo] in relation to other customers and DSS'. He also accepted that the passage quoted by Mr Thillagaratnam from the article related to the particular facts of the Gibson Greetings case, but he said that DSS's contention was that this was only one of the plaintiffs' practices and that the article indicated that there were others, though DSS was not in a position to identify them. DSS simply 'do not know what further evidence of a fraudulent system may be thrown up by material discovered in New York' and the article was 'just the starting point'. In my judgment this is all extremely speculative.

Bankers Trust International v PT Dharmala Sakti Sejahtera..., [1996] C.L.C. 252 (1995)

Subsequently, on 9 October 1995 DSS's solicitors, Ince & Co, indicated a wish to rely on certain newspaper articles in the Wall Street Journal of 3–4 October, the Independent and Financial Times of 5 October and Business Week for 16 [sic] October 1995. I required the matter to be restored for further submissions and on 10 October 1995 DSS applied without objection to introduce an affidavit of Mr S P Knight of Ince & Co, exhibiting their letter dated 9 October with accompanying articles, together with a letter from Mr Sesser of DSS's New York attorneys dated 9 October 1995 attaching pp. 1–47 of an unsealed second amended complaint by P & G against BTCo and BTSC. Mr Sesser asserts in his letter that:

> 'it is now known that at least ten Bankers Trust customers, including Proctor & Gamble and DSS, may have suffered from serious misconduct of Bankers Trust in connection with its sale of derivatives in the 1993–94 time frame, resulting in losses of many millions of dollars to each of those customers. Moreover, the misconduct *259 in each case reflects a pattern of activity fully consistent with the allegations of DSS.'

He then summarises P & G's second amended complaint and goes on:

> 'We believe that this new information amply supports DSS's position that the harm it suffered at the hands of Bankers Trust was not conduct to be judged in isolation, but rather was part of a pattern of systematic conduct tolerated and perhaps even encouraged at the highest levels of management. The Business Week article makes it clear that Proctor & Gamble's amended complaint is not based upon unsubstantiated allegations, but rather is based upon "a mountain of evidence" — including 6,500 tape recordings of Bankers Trust employees. These recent revelations — most of which came to light only after our application to the court in New York — clearly reinforce the justification for Judge Patterson's discovery order and our subpoenas.'

The matter was not put before me so high in Ince & Co's letter of 9 October 1995 or by Mr Isaacs in his further submissions on 10 October 1995. The letter says this:

'In essence, the particular points which DSS make on the press cuttings are;
 (i)  [P & G] have succeeded in adding to its claim against BT the US civil racketeering charges. The P & G filing, in support of its new charges, identifies eight customers of BT other than P & G itself, of whom five (including Gibson Bros) have not previously been mentioned in any public document. The remaining seven have now been identified and they include Adimitra, which featured in evidence to the trial judge before Mr Justice Mance and on which Mr Hogi Hyun was a material witness.
 (ii)  The civil racketeering charges allege a pattern of wrongdoing on the part of BT which is not confined to understatement of the value of a customer's losses. They involve the allegations summarised on p. 1 of the *Business Week* article.
 (iii)  BT's description of P & G on p. 4 of the *Business Week* article as "sophisticated, experienced and knowledgeable about the use of interest-rate derivative contracts and the risks presented by those contracts" are closely mirrored in the present actions.
 (iv)  The allegations, as in the present actions, concern inter alia BT's conduct in the period after 4 February 1994 US dollar interest rate rise.
 (v)  BT's bid to block *Business Week* from publishing the article based on sealed documents from the P & G dispute failed.'

© 2023 Thomson Reuters.

Mr Isaacs made it clear that there was in the material attached to Mr Knight's affidavit no basis upon which he could properly make any application either to introduce fresh evidence or to amend DSS's pleadings. DSS were, he said, simply seeking to obtain fresh evidence in New York which might enable them in the future to make such an application. He accepted also that there is, so far as presently known, nothing in the contents of the trading or training tapes to which the press articles refer, which links with Mr Hyun. He submits, however, that the 'tenor' of the material appears to undermine the plaintiffs' case in general and Mr Hyun in particular. He points out that P & G's complaint identifies a number of companies as allegedly defrauded or deceived by, and in some cases as involved in consequent litigation with, BTCo and/or BTSC. Among these is Adimitra. Mr Isaacs said that, if these transactions, with Adimitra in particular, were established as part of a pattern or system of fraud falling within the Racketeer Influenced and Corrupt Organisations Act ('RICO') as P & G assert, then DSS could hope to show (a) that Mr Hyun was aware of the fraudulent selling techniques which P & G has alleged against the Bankers Trust group and/or (b) that Mr Hyun applied such *260* techniques or acted fraudulently in other ways vis-a-vis DSS in the course of the transactions the subject of this case.

The bulk of pp. 1–47 of P & G's complaint deals in detail with the transactions with P & G and others which appear to have little resemblance to and no connection with the present. The transactions with P & G are first set out (pp. 1–31), with references to the agreement with the Federal Reserve Bank of 4 December 1994 and the consent order made by the SEC on 22 December 1994 (pp. 31–33), with references to the problem with Gibson Greetings (pp. 33–37) and then with a summary of various, now disputatious transactions with other American companies (pp. 37–45 and 46–47). None of these involves or indicates any link with the present transactions or the persons handling them. Looking at some of the points made in Ince & Co's letter of 9 October 1995, the present case cannot be allowed to turn into a general investigation of derivatives transactions entered into, varied or terminated by Bankers Trust employees after 4 February 1994 interest rate rise. The fact that P & G may have been described by Bankers Trust as 'sophisticated, experienced and knowledgeable about the use of interest-rate derivative contracts' and that it is part of BTI's and BTCo's case in the present litigation that DSS were also 'sophisticated, experienced and knowledgeable', even if not to the same extent as P & G, does not carry DSS anywhere. The level of sophistication, experience and knowledge actually or apparently held in any case must depend on the circumstances and can only be assessed on a case by case basis. It would be quite inappropriate to attempt in the course of the present case to determine whether some unknown Bankers Trust employee may in some other case or context have misdescribed Bankers Trust's understanding of P & G's expertise, with a view to arguing that BTI or BTCo, or Mr Hyun in particular, has also misdescribed BTCo's understanding of DSS's expertise in the context of the present litigation. The attempt to block publication by Business Week , which I am told was anyway a joint attempt by Bankers Trust and P & G, is patently irrelevant.

As to Adimitra, Mr Hyun accepted in cross-examination during the trial of the present action that he had on behalf of one or other Bankers Trust company (quite probably BTCo) entered into, firstly, in October 1993 a time dependent swap and, secondly, on 1 March 1994, a LIBOR barrier swap with a potential 22.22 fold leverage factor, similar to respectively swaps 1 and 2 with DSS in this case. As summarised in P & G's complaint, Adimitra are alleging that BTCo and BTSC 'misrepresented or omitted material information in their dealings with [Adimitra] during the course of [Adimitra's] transactions in complex, leveraged derivatives'. This is not, in terms, necessarily a plea of fraud, but I will assume that fraud in an English sense is in fact alleged by Adimitra, although Mr Isaacs accepted that fraud may have a more extended meaning and usage in US law and litigation than in this country. P & G's complaint says that:

> 'Based on [Adimitra's allegations, P & G expects discovery to reveal additional fraudulent acts committed by [BTSC] and [BTCo] as part of transactions with [Adimitra].'

I accept that there are parallels between the initial and replacement swaps entered into by or through BTCo with DSS and Adimitra. The parallels extend to an allegation by Adimitra that BTCo represented that swap 2 was 'less risky' than swap 1 (said to be false because of the absence of a cap and the potential 22.22 fold leverage factor) and that converting to swap 2 would improve Adimitra's position. But such parallels prove nothing. One would expect BTCo through Mr Hyun to be marketing the same type of transactions to different customers at the same time in broadly the same terms. It might be more a matter of comment if they were not doing so.

P & G's complaint also records the inclusion in Adimitra's complaint against BTCo and BTSC of an allegation summarised as follows: *261

> 'The payment by Bankers Trust to [Adimitra] on the day that [Adimitra] unwound the swap and entered into the LIBOR barrier swap was accompanied by language suggesting that [Adimitra's] position, as a result of making the change to swap 2 was a gain of $638,000, the amount of Banker's Trust payment. In fact; at that date, [Adimitra's] position was a loss of $16m.'

This allegation focuses on the alleged difference between the amount paid over by BTCo on entry into swap 2 and the value of swap 2 as assessed internally by BTCo. Again it has a limited (although On its faceless prominent) parallel in the present action in so far as DSS have alleged that the current market values to BTI of swaps 1 and 2 were, respectively, minus $2m and minus $8m on the dates when they were entered into and that these values were not disclosed by BTCo to DSS, and have relied upon these matters in support of their allegations of fraud. The fact that there was non-disclosure of current market values in two transactions, as opposed to one, does not appear to me by itself to assist on the question whether there was fraud in either. BTI and BTCo say that it was simply not the practice to disclose such values. The further suggestion, by P & G that it expects discovery in respect of Adimitra to reveal that BTCo or BTSC 'used language suggesting that [Adimitra's] position, as a result of making the change, was a gain of $638,000', whereas in fact it was a loss of $ 16m, is largely unspecific, and does hot appear to carry the matter much, if at all, beyond an allegation that the value to BTCo or BTSC was not disclosed. Viewing the position in respect of Adimitra generally, nothing in the summary given by P & G or in any other material before this court suggests that any easy conclusions, about matters such as fraudulent, system or intention, could be drawn from a closer examination of the, Adimitra transactions or of the documentation involved in it. The Adimitra case may well raise similar issues to the present, but, if so, they would require a full trial to resolve, and, as I have said, the fact that they arise in two cases rather than one does not appear to me by itself to carry DSS anywhere.

In general terms, the exercise upon which DSS wish to embark in the light of pp. 1–47 of P &.G's complaint appears to me to be, once again, essentially speculative. The (part of) P & G's complaint now available does however highlight the ambit of the proposed exercise. I regard this too as a factor of major weight on this application. The depositions and discovery proposed in New York would extend potentially to the whole subject matter of the numerous transactions with P & G and all of the other customers identified in P & G's complaint, including Adimitra. The likelihood that any material which DSS might thereby gather would be admissible in the present proceedings, even leaving aside the fact that the trial has taken place, is also a relevant factor. Mere matters of disposition or credit are unlikely to be admissible at all. It is on the other hand common ground that evidence of similar frauds may go to prove the commission of a fraud or of a fraudulent state of mind. The material in the press articles, if correctly stated, certainly puts certain aspects of the plaintiffs' business in a bad light, and allows speculation about the 'culture' and attitude to clients and business transactions prevalent within the plaintiffs at the relevant times. It does not however contain any material which directly connects the present transactions or Mr Hyun or anyone else involved in them to any such attitudes or misconduct. Apart from Adimitra, the transactions referred to appear to be purely American, and the nature of the misconduct which is suggested in relation to them finds no exact parallel in the present proceedings. The information now available about the transactions and litigation relating to Adimitra also appears to me of no real significance for reasons already indicated.

In summary, there is nothing in my judgment in any of the material now available, which appears to lend independent, weight to a suggestion that Mr Hyun's or Mr Nurjadin's conduct towards DSS in this case was fraudulent or part of any 'system' of fraud. There is also nothing in my judgment to affect the general conclusions of both Longmore J and myself that it would not, in any event, be appropriate to burden this *262 case with a full investigation involving discovery in relation to the American problems affecting Bankers Trust companies. I do not consider that the material now available, would, if it had been available at the time of the rulings made by Longmore J and myself, would have led then to any different outcome. It can even be regarded as fortifying the conclusion that the case would become unmanageable if it was necessary to investigate with full discovery (and, as now suggested, depositions) up to seven or nine other complex relationships in order to decide the rights and wrongs of the particular relationship with DSS. Be that as it may, the present applications must anyway be viewed in the context of litigation which has gone to trial where DSS have already had the opportunity of cross-examining witnesses (including Mr Hyun), producing documents and presenting their own case.

I would add, although it simply reinforces the conclusion to which I would anyway have come, that the existence of disputes relating to transactions with other clients of Bankers Trust companies was referred to in some detail in Mr Thio's affidavit of 22 April 1995, where he suggested specifically that the transactions with P & G, Gibson Greetings and others were:

> 'strikingly similar and raise the issue of the possible existence of instructions given by BT Co by
> its principals as to how derivative products are to be marketed and sold.'

Mr Thio also identified and summarised the December 1994 agreement with the Federal Reserve Bank and the consent order by the SEC (even though copies may only have been received later). DSS on the face of it had the opportunity to investigate these matters further in America. They also discovered the existence of the Adimitra litigation, and knew that it was continuing, before Mr Hyun was cross-examined — although Mr Isaacs informed me only shortly before. Mr Isaacs then asked Mr Hyun various questions about that dispute. DSS did not seek further details or an adjournment or apparently even obtain a copy of the New York complaint. It cannot in all these circumstances be said that the new material now available relates to a wholly new area which was outside DSS's knowledge at the time of trial or which they had no opportunity whatever to investigate whether by making enquiries or by seeking discovery in America prior to trial here. They did of course seek considerable discovery here with the result which I have indicated.

Mr Isaacs submitted that I should nonetheless follow the approach of the House of Lords in *South Carolina* case. DSS should be allowed the freedom to make any enquiry and take any legal action which New York or any other foreign law may permit. As regards enquiries, no-one challenges DSS's right to make any enquiries they wish of anyone. What is in issue is DSS's entitlement to continue, after the trial of the action in England but before judgment, to pursue BTCo and its associate companies for depositions and discovery in New York in the hope of and with a view to obtaining useful material to facilitate an application to adduce fresh evidence or to amend in England. Mr Isaacs submits that, if this is objectionable at all, then the right course is for the plaintiffs or their parent and associate company to raise the objection in New York. The order expressly gives them such a right in respect of discovery and there is no doubt also an inherent common law right to apply to discharge or vary such an ex parte order. This submission merits close consideration. However, the suggested course would itself mean a substantial application to the New York court, which would start with the disadvantage that it was considerably less familiar both with the English proceedings and with English procedure than is this court. The problems of conveying, even to the experienced US District Court for the Southern District of New York, the effect of what has happened to date in England, as well as, I add, the implications of English rules of court relating to the production and use of fresh evidence after trial or on appeal, are I think apparent from a reading of Mr Thillagaratnam's declaration. I understand moreover that there *263 would be no right to recover costs in New York. The

*South Carolina* case is not authority that costs must always be irrelevant, although they were there, largely because they were self-inflicted or could be dealt with by the English court.

I am, further, assisted at this point by the US courts' own attitude. In *Euromepa SA v R Esmerian Inc 51 F 3d 1095* (2nd Cir 1995) the US Court of Appeals for the Second Circuit, on appeal from the District Court for the Southern District of New York, refused to limit depositions and discovery Under s. 1782 to cases where similar relief could be obtained in the relevant foreign court, preferring the issue of closely tailored discovery orders in such cases to outright refusal of relief. It acknowledged an exception to this approach in a case where there was 'authoritative proof that a foreign tribunal would reject evidence obtained with the aid of s. 1782' and cited the *South Carolina* case in a footnote as a useful example of authoritative guidance in an opposite sense from England. The court pointed out:

> 'Because the French court can always enjoin [the applicant] from pursuing discovery in a manner which violates the judicial policies of [the foreign country], or can simply refuse to consider any evidence that [it] gathers by what might be-under French procedures- an unacceptable practice, we do not think that the district court's concern for trespassing upon the prerogatives of French sovereignty should have weighed so heavily in its decision.'

It went on to say:

> 'After all, a foreign tribunal's corrective response to a well-intentioned but unwelcome grant of discovery could bar the evidence gathered in the given case, and it could also constitute the kind of authoritative declaration mentioned earlier that would provide helpful instruction to American courts in handling future cases.'

After a further reference to the *South Carolina* case, the court said:

> 'Since section 1782 contemplates international cooperation, and such cooperation presupposes an on-going dialogue between the adjudicative bodies of the world community, such a result would be far from undesirable.'

Thus, in the first passage, the US court expressly contemplates the possibility of specific intervention in the particular case. There seems to be no reason why such specific intervention should be any less welcome than the general guidance which it might afford for future cases.

I have already indicated why in my opinion the English court is better placed to assess the background, implications and propriety of the present s. 1782 proceedings than is any US court. Further, the English court will not exercise any jurisdiction to restrain foreign proceedings unless satisfied that they constitute an abuse in the context of English proceedings or are otherwise oppressive. But, whether they are so abusive or oppressive, is pre-eminently a matter for the

English court to judge, and, if they are, I do not think that this court should then be hesitant about giving effect to its conclusions. If the proceedings are abusive or oppressive, then intervention by this court now will also avoid any future problem. It must be assumed, indeed Mr Isaacs positively confirmed, that DSS will comply with any English injunction so that the s. 1782 proceedings would be withdrawn. By contrast, if this court simply steps back, as Mr Isaacs invited, on the basis that the plaintiffs' first course should be to apply in New York, there is at least an increased risk of conflicting attitudes, quite possibly because of the difficulty which may exist in putting the full picture before the New York court.

In the present circumstances, I consider that the applications made under s. 1782 are, on the basis on which they are now sought to be justified, both abusive and oppressive. There must be some end to litigation. The trial in this action has taken place. Even *264 corporate litigants have a 'legitimate expectation that the trial [of the action}  will determine the issues one way or the other', to quote Lord Griffiths in *Ketteman v Hansel Properties Ltd [1987] AC 189* at p. 220F. There have been extensive interlocutory rulings on the scope of discovery. I would fully acknowledge the value of properly controlled discovery both in cross-examination and as an aid to ascertaining the truth. Nonetheless, the scope of discovery, even of a purely documentary nature, is recognised as a potential problem in English proceedings. Mr Isaacs openly accepts that the material now available is but a starting point for the further investigation thereby intended. Moreover, what is proposed includes compulsory examination of large numbers of the plaintiffs and their associate companies' officers, including an unidentified deponent on practices and procedures, whom the plaintiffs are required to nominate for the purpose, in respect of a large number of other cases, which have hitherto played no significant part whatever in the trial. Volumes of documents are also sought, many of which, I should add, would seem to be capable of bearing only the most indirect relationship to any suggestion of any systematic conduct which DSS might hope to establish by anyone. The course of action now proposed in New York, purportedly in aid of the present proceedings, could itself well involve, and could certainly lead, to something more than the 'mini' trial which Longmore J feared would arise in the present action if discovery were ordered of material relating to Bankers Trust problems with clients and regulatory authorities in New York. It would represent a large scale investigation of the general conduct of the plaintiffs' derivatives business conducted on a speculative basis with a view to discovering material to enable or support allegations which, if they could properly be made at all, would doubtless be highly contentious, would require the reopening of the trial and would involve examination of other transactions entered into with other clients.

In my judgment, drawing all the matters which I have identified together, the new material constitutes a wholly inadequate foundation for the course of conduct now proposed at the present stage in these proceedings. In my judgment what is proposed in New York under s. 1782 is abusive and oppressive in the context of the present proceedings which provide its purported justification. In this connection I draw no distinction between BTCo on the one hand and BTNYC and BTSC on the other hand. No separate need for involving BTNYC and BTSC in New York has been suggested or shown. DSS themselves have drawn no distinction between the three companies in the New York proceedings, claiming the same relief in the same terms against each. To treat the three companies as one for present purposes reflects the substance of the matter. It would be unrealistic and unjust if this court were to restrain the pursuit of abusive and oppressive action against BTCo on the ground that it is the other party to the English litigation, but were at the same time to allow duplicate proceedings addressed to BTCo's associate companies in America which would appear to produce precisely the same abusive and oppressive effect for BTCo (and for the Bankers Trust group as a whole), for those handling this litigation on BTCo's behalf and for the conduct of the trial. I shall accordingly restrain the pursuit by DSS of all three sets of s. 1782 proceedings and subpoenas.

*(Order accordingly) *265*

# Exhibit 6

<u>No: 1999 Folio 1515 & 2000 Folio No 199</u>

<u>IN THE HIGH COURT OF JUSTICE</u>
<u>IN THE QUEEN'S BENCH DIVISION</u>
<u>COMMERCIAL COURT</u>

– – – – – – –

<u>OMEGA GROUP HOLDINGS LTD & OTHERS</u>
<u>& MARLWOOD COMMERCIAL INC</u>

Claimants

– v –

<u>(1) VIKTOR KOZENY</u>
<u>(2) CHARLES TOWERS−CLARK</u>
<u>(3) OILY ROCK GROUP LTD</u>
<u>(4) THE MINARET GROUP LTD</u>

Defendants

– – – – – – – –

J U D G M E N T

## INTRODUCTION AND OVERVIEW

1.      The Claimants are investment vehicles of various investment funds.  In proceedings in this country, they claim damages against the Defendants for fraudulent misrepresentation, breach of fiduciary duty, breach of contract and conspiracy relating to an investment in the privatisation process in the Republic of Azerbaijan; they further claim an account of what the Defendants have done with their moneys.  In essence, the Claimants' case is that in March to June 1988 they were defrauded by the Defendants into investing some US$182 million into privatisation vouchers and options issued by the Republic of Azerbaijan; they allege that moneys paid by them were misappropriated by the Defendants for their own purposes.

2.      As is apparent, the First Defendant is an individual ("Mr. Kozeny").  He, together with the Third and Fourth Defendants (collectively, "the Kozeny Defendants") allege, amongst other defences, that the Claimants' investments were accompanied by substantial corrupt payments, totalling over US$50 million, to the President of Azerbaijan and other Azeri officials.  The Kozeny Defendants say that these arrangements were known to and agreed by the Claimants; accordingly, the Claimants' claims are tainted with illegality and corruption and must fail.  I shall refer to this as the "illegality and corruption" defence.

3.      It follows from this briefest of factual summaries in litigation replete with factual controversy, that the parties are advancing grave allegations against each other.  Moreover, it is at once plain that Mr. Kozeny faces claims of a most substantial nature.

4.      Against this background, which is all or virtually all that needs be said concerning the underlying issues in the English litigation, the Claimants make the present application.  In summary, the Claimants apply for an injunction restraining Mr. Kozeny from pursuing various proceedings commenced by him in the United States.  Again in summary, those

proceedings, in the Courts of New York and Connecticut, were brought by Mr. Kozeny pursuant to Section 1782 of Title 28 of the United States Code ("s.1782"), for the purpose of deposing certain individuals in accordance with the well−known US procedure and in order to obtain documents from them.   As I understand it, in each case the s.1782 applications were made without prior warning to the witnesses or the Claimants and in each case the District Court made the orders sought.

5.      In the event and following the hearing before me, the parties have helpfully agreed that the question of documentary disclosure from the individuals in question can be stood over for the time being.  I am therefore concerned only with the deposition aspect of the US proceedings brought by Mr. Kozeny and the Claimants' application to injunct him from pursuing those proceedings in that regard.

6.      S.1782 provides, insofar as material, as follows:

"   **Assistance to foreign and international tribunals and to litigants before such tribunals:**  (a) The district court of the district in which a person resides or is found may order him to give his testimony or statement ...for use in a foreign or international tribunal.  The order may be made ... upon the application of any interested person and may direct that the testimony or statement be given ... before a person appointed by the court...To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken. ... in accordance with the Federal Rules of Civil Procedure."

7.      The Claimants object to the proposed deposition of witnesses who may be identified and categorised as follows ("the relevant witnesses"):

(1)      Employees:

(i)      Mr. Leon Cooperman, Chairman and Chief Executive Officer of Omega Advisors Inc (the parent of Claimants 1 to 5 in the Omega action);

(ii)     Mr. Clayton Lewis, a former employee of Omega Advisors Inc and managing principal of Pharos Capital, whose funds were invested through the sixth Claimant in the Omega action;

(iii)    Messrs. Maurice Greenberg, Ed Matthews, Frank Wisner and David Pinkerton, AIG (whose subsidiary Marlwood Commercial Inc is the Claimant in the Marlwood action).


(2)      Ex−employees:

Mr. Eric Vincent and Mr. Paul Swigart, both former employees of Omega Advisors Inc.


(3)      Investors:

Mr. Aaron Fleck and Mr. Frederick Bourke, both investors in the Third Defendant, Oily Rock Group Limited.


8.       In a nutshell, the Claimants object to the proposed deposition of the relevant witnesses because they intend to produce witness statements from them and to call them to give oral evidence at the trial of the English proceedings in London (save that it is intended that Mr. Greenberg should give his evidence by way of video−link).  Each of the relevant witnesses, save for Mr. Greenberg, has confirmed in writing his willingness to "submit a witness statement and to attend to give evidence at trial in London" in the English proceedings; it has been confirmed in writing on behalf of Mr. Greenberg that he intends to submit a witness statement and to attend through video−link to give evidence at the London trial.  In these circumstances, the Claimants say that Mr. Kozeny's use of s.1782, so far as concerns the relevant witnesses, is unconscionable and an abuse of the process of this Court and should be restrained by injunction accordingly.

9.     It may be noted that the Claimants do not object to Mr. Kozeny's use of s.1782 to depose other individuals, including notably Senator George Mitchell, whom the Claimants do not intend to call to give evidence at the London trial.

10.     Again in a nutshell, Mr. Kozeny submits that there is jurisdiction to grant an injunction to restrain the taking of the proposed depositions if and only if it is held that to do so would be unconscionable in the sense of abuse of process; here it would not be unconscionable.  To the contrary, his case is that he is, as he is entitled to do, gathering evidence to defend himself, utilising means lawful in the country in which they are being invoked, namely the US.  He also has a "short answer" as to why an injunction should in any event not be granted;  namely, that the Claimants are resiling from a position previously adopted both in obtaining a stay of proceedings in the USA and in resisting a stay here and for that reason alone should be barred from obtaining the injunctive relief sought.

11.     Later, I shall revert to the rival cases in a little more detail.  Before proceeding further, it is, however, convenient to "clear the decks" so to speak, in order to clarify and focus on the real issues in dispute.

    (1)     For the purposes of the present application, the Claimants accept that the illegality and corruption defence is arguable.

    (2)     The Claimants likewise accept that the relevant witnesses have relevant evidence to give; indeed such acceptance on the part of the Claimants is inevitable, given that they intend to call those witnesses to give evidence at the trial in London.

(3)     Certain of the witnesses, it may be noted, are individuals of considerable eminence, obvious examples being Mr. Greenberg and Senator Mitchell.  I mention this matter because it has been touched on in the affidavit evidence. Eminence does not, of course, confer immunity from the taking of depositions.  Nor do the Claimants in fact contend otherwise, as their approach to the proposed deposition of Senator Mitchell makes clear.  The eminence of any witness is accordingly an irrelevance and I put it to one side.

(4)     Further and for completeness, many of the matters canvassed, in particular by the Claimants, in the vigorous exchanges between the parties in their affidavit or statement evidence were, rightly, not pursued before me.  I need say no more of them.

(5)     The application before me is brought by the Claimants for an injunction.  The Claimants must satisfy the relevant test for an injunction in this context, or fail.  This is not an application by Mr. Kozeny for the grant of letters rogatory or any relief.

12.     With these considerations in mind, I can state the question of principle which arises on this application:

> Given the intention on the part of the Claimants to call the relevant witnesses to give oral evidence at the trial in London, is it unconscionable for Mr. Kozeny to pursue the s.1782 applications in the USA?

If the answer is "no", then the Claimants' application must fail.  If the answer is "yes", then it is common ground that there is jurisdiction to grant the injunction sought by the Claimants but (i) I would still need to be satisfied as a matter of discretion that I should do so and (ii) Mr. Kozeny's "short answer" would remain to be considered.

**THE RIVAL CASES**

13.    Mr. Mortimore QC's argument for the Claimants may be summarised as follows:

(1)    The conduct of Mr. Kozeny in pursuing the s.1782 applications in the USA is unconscionable, in the sense of being oppressive, vexatious and interfering with the due process of the court.  Whether conduct is oppressive must be judged by English standards in the context of litigation being pursued here under English procedure; what is normal in the USA is irrelevant.  Mr. Kozeny's conduct is unconscionable (in the relevant sense) because the witnesses will be subjected to double cross−examination; once in the USA by way of deposition and once here at the trial. There is, further, a risk that such conduct will interfere with and prejudice preparation for the trial or the trial itself, not least in that a witness or witnesses might be discouraged by the deposition cross−examination from attending at the trial to be cross−examined again.  South Carolina Co. v Assurantie N.V. [1987] 1 AC 24 was not in the event concerned with depositions (as opposed to documentary disclosure), let alone depositions of witnesses who are coming to give evidence at an English trial; its reasoning either supports the Claimants' case or is at least not adverse to it.

(2)    As to the balance of convenience, that favours the grant of an injunction. Building on the arguments as to unconscionability, the grant of an injunction avoids duplication and the risk of prejudice to preparation for the trial and the trial itself.  The Claimants do not wish and should not be obliged to prepare for trial under two different legal systems.  Conversely, the evidence which it is the avowed intention of Mr. Kozeny to secure and preserve by way of the s.1782 applications, will be available for the trial by way of witness statements and the attendance of the witnesses to give oral evidence at the trial.  The witnesses are key witnesses so the Claimants will or will do all in their power to produce them; if witness statements are not forthcoming, Mr. Kozeny could renew his application;   as to non−attendance of a witness or witnesses at the trial, the Claimants would be foolhardy to permit such a situation to develop; it would risk aborting or postponing the trial which is the last thing the Claimants want; the risk of non−attendance is accordingly negligible.

Further, the exercise contemplated by Mr. Kozeny will be costly, in circumstances where Mr. Kozeny has himself asserted that he does not have the resources to defend the English proceedings; accordingly, even if the Claimants in due course obtained an order for costs against Mr. Kozeny in respect of the s.1782 applications, there is serious doubt as to recoverability.  Mr. Kozeny, it is said, is adopting a "scorched earth" policy.

(3)     Mr. Kozeny's "short answer" will not bear the weight sought to be put on it. The Claimants have not resiled from any previous position.  Neither in seeking a stay of the Colorado proceedings nor in resisting a stay of the English proceedings have the Claimants ever agreed to anything more than that Mr. Kozeny will be free in English proceedings to make proper use of s.1782.  That he may do with regard to witnesses whom it is not intended to call in the English proceedings; conversely, the Claimants have never agreed, to a hybrid procedure involving witness statements under English rules and depositions under the US system, in respect of the same witnesses.  Moreover, as a matter of perspective, the English proceedings have always been intended as the substantive proceedings; it is here that worldwide freezing orders have been obtained in both actions.  Other proceedings, in the Bahamas, the British Virgin Islands and Colorado have been satellite proceedings launched to protect assets in those jurisdictions and, thereby, to ensure the effectiveness of the English proceedings. Mr. Kozeny's attempt to stay the English proceedings and to proceed with the Colorado proceedings should be seen in this context.

(4)     For completeness, it is appropriate to make the application once, before this Court, rather than in the individual US Courts, seized of the s.1782 applications; such an application should be brought before the Court which is, effectively, the "seat" of the substantive proceedings.  An injunction granted by the English Court would assist not interfere with the US Courts.  It is to be remembered that the s.1782 procedure is designed to assist foreign courts and litigants before such courts; the US Courts have

no "selfish" interest in s.1782; as the US authorities to which I was referred (but which are unnecessary to list here) make clear, the US Courts contemplate that parties may be enjoined by foreign courts from invoking s.1782.

14.     Again, in summary, Mr. Eder QC put the case for Mr. Kozeny as follows:

(1)     First and as foreshadowed, Mr. Eder underlined that this was an application for an injunction.  The application must fail, unless, on the question of principle, the Claimants satisfied me that Mr. Kozeny's pursuit of the s.1782 applications in the US was unconscionable.  Having regard to the unconscionability test, the determination of this threshold inquiry may well substantially dispose of the second question as to the balance of convenience; at all events, here, the question of jurisdiction and balance of convenience did not fall into watertight compartments.

(2)     Both the outcome of and the reasoning in South Carolina (*supra* ) before the House of Lords assisted Mr. Kozeny.  A party was free to obtain and present the evidence which he needs in English proceedings by his own means provided that such means are lawful in the country in which they are used.  To the contrary, the Claimants' submissions contained echoes of the approach adopted at first instance and in the Court of Appeal in the South Carolina litigation, overturned in the House of Lords.

(3)     Viewed in the light of South Carolina, there was nothing unconscionable in Mr. Kozeny utilising s.1782.  This was so whether or not the relevant witnesses were coming to give evidence here.  All Mr. Kozeny was doing was obtaining evidence which, as was common ground, was relevant to the English proceedings.  Mr. Kozeny, it was to be remembered, had not chosen England as a forum for these proceedings.

(4)      As to the position of the relevant witnesses, they were all perfectly familiar with the US procedure of pre−trial depositions.  It should not be assumed that they would regard it as anything out of the ordinary still less oppressive.

(5)      Importantly, the highest the Claimants could put the matter was that they intended that the relevant witnesses should attend and give evidence.  They did not however control the witnesses or all of them.  The risk of their not producing  witness statements or not attending at trial could not in any way be dismissed as fanciful.  It was a real risk, if anything, emphasised by the Claimants' concerns that the experience of pre−trial deposition might put the witnesses off attending.  As the trial date approached, witnesses might well become reluctant to attend.  If one or two important witnesses did not attend at the last minute, there would be real difficulties in curing prejudice to Mr. Kozeny, if indeed it was possible to cure it at all.

(6)      Pre−trial depositions would "not necessarily" be co−extensive with cross−examination at the trial.  It was possible that the deposition procedure might generate answers leading to a further train of inquiry.

(7)      As to costs, these would be comparatively small indeed in the context of the litigation as a whole; in any event, however, it would be unconscionable to enjoin Mr. Kozeny from defending himself as he sees fit, faced as he is with a claim for nearly US$200 million.

(8)      For all these reasons, the application for an injunction should be refused as a matter of principle.  Additionally, the Claimants had no answer to Mr. Kozeny's "short answer".  In order to obtain the stay of the Colorado proceedings and resist the stay of the English proceedings, the Claimants had asserted that Mr. Kozeny would not be prejudiced.  Had the proceedings continued in Colorado, Mr. Kozeny could have invoked the US pre−trial deposition procedure as of right.  It was not, by whatever

legal route, open to the Claimants now to resist Mr. Kozeny's pursuit of his s.1782 applications on grounds which would not have been available to them had the matter proceeded before the Colorado Court.

15.     As will be apparent, the arguments on both sides were formidable and, if I may say so, formidably presented.  I am very grateful to both Mr. Mortimer QC and Mr. Eder QC for their respective submissions.

16.     For completeness, I record that both parties approached the application on an "all or nothing" basis.  Understandably, neither party promoted a solution involving an injunction in respect of some but not all of the relevant witnesses.  When I asked as to the possibility of a "halfway house" there was distinctly muted enthusiasm from both sides.  On reflection, I shall deal with the application on an "all or nothing" basis and say no more of any "halfway house".

## THE SOUTH CAROLINA CASE

17.     It is next appropriate to turn to the <u>South Carolina</u> case (*supra* ), from which both parties sought to derive assistance.  The facts were these.  South Carolina, an American insurance company, reinsured the liability of another American insurance company, UNI.  In turn, South Carolina reinsured (or retroceded) this risk in the London market with Dutch, Middle Eastern and Far Eastern companies (for brevity, "the retrocessionnaires").  South Carolina commenced proceedings in London against the retrocessionnaires, advancing a claim under the contract between them.  The retrocessionnaires were (as noted by Lord Brandon, [1987] 1 AC, at p.32 E−F) remote from the facts in dispute.  Before service of a defence in the English action the retrocessionaires lodged a petition in a United States district court seeking, inter alia, an order for pre−trial discovery of documents relevant to the claim and South Carolina's contract of reinsurance with UNI, against persons resident in the United States who were not parties to the English action, or agents of any party to the English action

("the American third parties").   There was no other way in which the retrocessionnaires could obtain the documents in question (save by agreement from South Carolina, which was not forthcoming);   discovery was not available as the documents were not in the possession or control of South Carolina; nor could the documents be obtained by subpoena because their possessors, the American third parties, were not within the jurisdiction of the English Court.

18.    South Carolina applied to the Commercial Court for an injunction restraining the retrocessionnaires from taking any further step in the American proceedings or enforcing any order made therein.   Hobhouse,J. (as he then was) granted the injunction.   The retrocessionnaires appealed to the Court of Appeal:  [1986] 1 QB 349;  at this stage, the retrocessionnaires abandoned that part of their original application which had sought the pre−trial deposition of witnesses from the American third parties:  [1986] 1 QB, at p.358 D−E.  The application continued as one for discovery of documents alone.  The Court of Appeal dismissed the retrocessionnaires' appeal.   The retrocessionnaires appealed to the House of Lords (*supra* ) who allowed their appeal.

19.    There can be no doubt that if the <u>South Carolina</u> litigation had rested with the decisions of Hobhouse, J. and the Court of Appeal, it would have been at the very least strongly supportive (indeed, probably decisive) of this case in favour of the Claimants.  The flavour of the judgment of Hobhouse,J. (unreported) can be taken to appear from a short passage cited by Lord Brandon ([1987] 1 AC, at p.34C):

> ... [the matter] involves a question of principle as to whether or not the English court should retain the control of its own procedure and the proceedings that are before it. I have no doubt that the answer ... to that question is that the English court should retain that control."

In the Court of Appeal, Griffiths, LJ (as he then was), with whom Slade, LJ and Lloyd, LJ (as he then was) agreed, said this ([1986] 1 QB, at p. 358B−E:

  Once the parties have chosen or accepted the court in which their dispute is to be tried they must abide by the procedure of that country and that court must be master of its own procedure. Litigation is expensive enough as it is, and if a party fighting a case in this country has to face the prospect of fighting procedural battles in whatever other jurisdiction his opponent may find a procedural advantage it may impose intolerable burdens, and encourage the worst and most oppressive form of procedural forum shopping.  We should set our face against any such situation developing. Severe dislocation to the timetable of the English litigation is a readily foreseeable consequence of unrestrained access to foreign procedural remedies.  This is likely to cause hardship or inconvenience not only to the other party to that litigation but will also affect other litigants ....As the judge said, the court will lose control of its own proceedings. Furthermore, one party might be able to gain a very unfair advantage in the English procedure if he was able to take the deposition of and cross−examine a witness whom he would never call on his own behalf at the trial, for example, the employees or business associates of his opponent.  I think Mr. Sumption [counsel for the retrocessionnaires] recognised this when he said he would be content to accept the stay in respect of his application to take the depositions of the witnesses from ...[the American third parties]..

I am therefore satisfied that as a matter of principle the court must have an inherent jurisdiction to make any necessary order to ensure that the litigation is conducted in accordance with its own procedures."


20.    As already noted, matters did not, of course, rest with the decision of the Court of Appeal.  The House of Lords allowed the retrocessionnaires' appeal, dealing with the matter as did the Courts below, as a matter of principle: p.39G.   The leading speech was delivered by Lord Brandon; for present purposes, I would respectfully seek to summarise his reasoning as follows:

(1)     The relevant test for the grant of an injunction was whether the conduct complained of was unconscionable.   No exhaustive definition of "unconscionable" should be attempted but it included conduct which was oppressive, vexatious or which interfered with the due process of the court.

[See, pp. 40 C−E, 41D].

For completeness and interposing here, it may be noted that Lord Goff of Chieveley expressed certain reservations as to the proposition that the power of the Court to grant injunctions is restricted to certain categories: pp. 44−45.   As, with respect, nothing in this case turns on these reservations, it is unnecessary to say  more of them here.

(2)     The retrocessionaires' conduct did not constitute an interference with the (English) court's control of its own process; in general, the court does not exercise any control over the manner in which a party obtains the evidence which he needs to support his case. The basic principle:

"... . underlying the preparation and presentation of a party's case in the High Court in England is that it is for that party to obtain and present the evidence which he needs by his own means, provided always that such means are lawful in the country in which they are used."

The application to the US court did not constitute an interference with the English court's control of its own process.

[See, pp. 41G − 42C]

(3)     Further, by utilising a right potentially available to them under US law, albeit significantly different from that available in the English Court, the retrocessionnaires had not interfered with the procedure of the English Court:

"....All that they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that

country, documentary evidence which they believe that they need in order to prepare and present their case."

[See, p. 42D−H].

(4)    Finally, Lord Brandon addressed questions of costs and convenience but in terms related to the facts of that case and which (as I understood it) did not assist one way or the other on the argument in the present case.

[See, pp. 42H - 43H].

(5)    In the result, Lord Brandon concluded that there was no such interference by the retrocessionnaires with the procedure of the English Court as would amount to unconscionable conduct and so justify the grant of an injunction: p.44A−B.

21.    In these circumstances, the guidance for the present case which I respectfully derive from <u>South Carolina</u> is as follows:

(1)    No injunctive relief is to be granted unless the applicant satisfies the threshold test of unconscionability.

(2)    In general, the English Court leaves it to the parties to obtain the evidence they think necessary for the advancement of their case by the means of their choosing, provided such means are lawful in the country where they are deployed.

(3)    The fact that a party to English litigation is able to obtain evidence by means of a right available in a foreign country significantly different from that available in the English system does not, by itself, constitute unconscionable conduct.

Essentially, this is a corollary of proposition (2) above.

(4)      It follows that there is no blanket ban on a party to English litigation seeking to utilise the US procedure for pre−trial deposition in order to obtain evidence for his case.

(5)      That said, I do not read <u>South Carolina</u> as constituting authority for the proposition that it can never be unconscionable for a party to English litigation to apply for US pre−trial depositions by way of s.1782.  I do not think that <u>South Carolina</u> goes or could go that far, essentially for the following reasons:

(i)      The decision in <u>South Carolina</u> was confined to documentary disclosure; on the facts as outlined by Lord Brandon, it might be thought that there was a strong case for permitting the retrocessionaires to obtain such disclosure.

(ii)      As noted, the application for pre−trial depositions had been abandoned. While I do not think that it is permissible to read into the decision of the House of Lords the inference that the result would have been different had it not been abandoned, such abandonment was regarded as a factor of note: see, per Lord Brandon, at p.38 E−H.  It follows that the decision as such does not address the considerations raised specifically by pre−trial depositions, still less by a s.1782 application in respect of witnesses whom it is intended to call to give oral evidence in English proceedings.

(iii)      In the present context, blanket permissions are, perhaps, inherently unlikely.

(6)      Accordingly, it remains open to an applicant to demonstrate on the facts of the case that a particular application for US pre−trial depositions by way of s.1782 is unconscionable.  I am fortified in reaching this conclusion by a consideration of the views expressed, albeit briefly, in <u>"Documentary Evidence"</u>, Hollander & Adam (7th ed.), at pp. 266−267.

**DECISION − THE QUESTION OF PRINCIPLE**

22.    With <u>South Carolina</u> very much in mind, I turn to answer the question of principle, outlined in paragraph 12 above.  Notwithstanding the force of Mr. Eder's arguments, I have come to the conclusion that Mr. Mortimore's are to be preferred and that the answer should be "yes".  That answer is subject to an undertaking to be given by the Claimants, as dealt with below.  In the light of the discussion so far, my reasons can be expressed relatively shortly and are these.

23.    I do think that it would be unconscionable, in the sense that it would be oppressive, vexatious and constitute an interference with the due process of this Court, for Mr. Kozeny to pursue the s.1782 applications in the United States in respect of witnesses, whom it is intended to be called to give oral evidence at the trial in this country.   As it seems to me, in the case of such witnesses and as a matter of practical justice and good sense, the hybrid procedure produces the worst of all worlds:

(1)    If the relevant witnesses (i) give English witness statements (ii) are then deposed in the United States (iii) thereafter attend to be cross−examined in the English trial, they will have been subjected to unwarranted double cross−examination and the trial will suffer from unnecessary duplication.  I am not persuaded to reach a contrary view by the fact that the witnesses are or may be familiar with US deposition procedures in the context of United States litigation.  In any event, I accept Mr. Mortimore's submission in this regard that, here, oppression must be judged by English standards.

(2)    Conversely, accepting as I do that there is a real, if unquantifiable, risk that a witness once deposed in the United States may be discouraged from attending the trial

in England in order to be cross−examined a second time, the s.1782 applications pose a risk of interference with the trial itself. It would be most unsatisfactory for the trial court to be left with depositions from witnesses in such circumstances and to be deprived of their live testimony at the trial itself.

(3)      For the reasons already discussed, I do not think that South Carolina precludes the conclusion which I have reached.  In this case and in respect of witnesses who are intended to come and give oral evidence at trial here, depositions are different − and unconscionable.  I should add that each party addressed me on the apprehended consequences of a ruling adverse to its case; the Claimants submitted that if I was against them, the use of pre−trial depositions would become commonplace whenever witnesses were located in the United States;   for Mr. Kozeny, it was argued that an unfavourable decision would render s.1782 of little use.  I am not sure that it is right to view the matter in this way:   individual cases ultimately turn on their own facts. So far, however, as a decision of this Court, necessarily subject to South Carolina, may have wider policy ramifications, then I do not shrink from saying that the use of s.1782 to depose the selfsame witnesses who will give witness statements and attend to give oral evidence here, has, in general, little to commend it.

(4)      The conclusion that the pursuit of the s.1782 applications is unconscionable is not displaced by Mr. Kozeny's concerns, to which I have given anxious consideration.  These concerns are addressed more fully in paragraph 24 below; to the extent that they go to the threshold inquiry of unconscionability rather than the balance of convenience, then my reasoning in paragraph 24 is applicable here.

I accordingly conclude that there is jurisdiction to grant the injunction sought by the Claimants.

24.     While accepting, as I do, from Mr. Eder that in this case there is no watertight compartment dividing questions of jurisdiction and balance of convenience, I turn next and separately to the balance of convenience.  Sometimes, it will not be appropriate to enjoin even unconscionable conduct.  But this is not such a case.  I am satisfied that on the question of principle the balance of convenience tells in favour of the grant of an injunction:

(1)     For the same reasons which render the pursuit of the s.1782 applications unconscionable.

(2)     Because I am satisfied that Mr. Kozeny's understandable concerns can be met, to a very large extent, without dooming the parties to pursuit of the s.1782 applications, at least in the circumstances which presently prevail; I elaborate on this point in sub−paragraphs (3) to (7) below.

(3)     On the assumption that the relevant witnesses do give witness statements and attend to give oral evidence, Mr. Kozeny stands to gain no legitimate advantage by the use of pre−trial depositions.

(4)     Mr. Kozeny is not in a position to identify any specific, concrete matter which would be covered by pre−trial depositions that would not be covered by cross−examination at the trial.  Very fairly and accurately but instructively, Mr. Eder's submission was only that the pre−trial depositions would "not necessarily" prove co−extensive with cross−examination at the trial.

(5)     I am satisfied on the evidence which I have seen from very reputable London solicitors and the witnesses themselves that there is, presently, a genuine intention to produce witness statements and to attend the trial to give oral evidence.

(6)      Should, however, any of the relevant witnesses not produce a witness statement, then doubtless, Mr. Kozeny could apply to lift the injunction.  Should the situation with regard to attendance at the trial change, then, provided that Mr. Kozeny (or his legal team) is promptly informed, steps could again rapidly be taken to lift the injunction.  Should a last minute crisis develop which could have been averted by the Claimants, then although the matter would be one for the trial Judge, the Claimants will be manifestly at risk of having the trial aborted or delayed at their cost and the Court is unlikely, in such circumstances, to be powerless to exclude witness statement evidence.

(7)      What remains are last minute crises over which the Claimants have no control or instances of sudden and irreparable ill−health.  I accept that to such extent Mr. Kozeny may be exposed but (i) the Claimants too would be deprived of a witness whom (ex hypothesi) they wish to call; (ii) while a matter for the trial Judge, Mr. Kozeny's predicament would at least be likely to attract sympathetic consideration; (iii) I am simply not satisfied that the risk factor is such as to outweigh the considerations which lead me to conclude that pursuit of the s.1782 applications is unconscionable.

25.    Subject, therefore, to consideration of Mr. Kozeny's suggested "short answer", I am minded to grant an injunction.  Before turning to that "short answer" and to the question of an appropriate undertaking, I mention certain matters for completeness:

(1)      I have no been influenced in my decision in favour of the grant of an injunction by questions of costs.  Such concerns are not unimportant but are outweighed by Mr. Kozeny's need to defend himself.

(2)     I am satisfied, to the extent that it is in dispute, that the Claimants are right to have brought this application to this Court rather than raising it in each individual Court in the United States, seized of a s.1782 application.

(3)     While questions of comity always require careful consideration in connection with injunctions impacting, however indirectly, on the pursuit of legal proceedings in another country, I do not see any particular problem here.  As already mentioned, United States Courts have no selfish interest in s.1782 applications; the s.1782 jurisdiction exists, helpfully, to assist foreign courts and parties to foreign legal proceedings.

## DECISION − MR. KOZENY's "SHORT ANSWER"

26.     While attractive at first blush, I am satisfied that Mr. Kozeny's suggested "short answer" is unsustainable; I am unable to accept Mr. Eder's submission that the Claimants have resiled from any previously held position adopted to obtain a stay of the Colorado proceedings and to resist a stay of the English proceedings.  I do not think that the Claimants have, either in Colorado or here, ever said more than that, in this jurisdiction, Mr. Kozeny will be entitled to make such use of s.1782 as is proper in the circumstances.  I cannot find any agreement or representation to the effect that Mr. Kozeny is to be placed in an identical position to that which he would have been in had the matter proceeded in Colorado (even assuming, without deciding, that, had it done so, he would have been entitled to have pre−trial depositions taken without limit as of right).

27.     So far as concerns the proceedings in Colorado, Babcock, CJ appears, with respect, to have had this very matter in mind in his Memorandum Opinion and Order granting the

Claimants a stay.  Having weighed in the balance the fact that Mr. Kozeny would have less access to discovery in England than in the Federal Court, nonetheless the learned Chief Justice granted a stay.  I am unable to read the reference to s.1782 in that Memorandum Opinion and Order as suggesting that Mr. Kozeny would be placed in a position in London equivalent to that which would or might have prevailed had the Colorado proceedings continued.  Nor am I able to read anything said by the Claimants to the Colorado Court (and to which I have been referred) as going beyond that which I have already suggested; namely, that Mr. Kozeny will be entitled to such use of s.1782 as is proper in all the circumstances.

28.     To my mind, the position in the English proceedings is even plainer.  The evidence from Mr. Kozeny expressly recognised the risk that s.1782 was not a substitute for Mr. Kozeny's rights under the Federal Rules of Civil Procedure.  On the material available to me, nothing said by the Claimants contradicted this assertion.  To the contrary, Mr. Mortimore QC or the Claimants said (according to the relevant transcript) that although the US procedure was different:

> ... there is no reason why we should be required ... to give some sort of undertaking to permit them to adopt US deposition procedures if we are allowed to proceed in England."

29.     I therefore reject Mr. Kozeny's suggested "short answer".  Though it is academic, had I been of the view that the "short answer" was well−founded, I would have agreed with Mr. Eder that, by whichever precise legal route, it would have barred the grant of an injunction.

## AN APPROPRIATE UNDERTAKING

30.     For the reasons given, I am therefore minded to grant the Claimants the injunction sought.  While the precise terms of any order must await a further hearing and the assistance of counsel, it seems right to me and I so hold, that the grant of an injunction is conditional on the Claimants giving an appropriate undertaking, designed to reflect the Claimants' current stance and to protect Mr. Kozeny so far as consistent with the grant of an injunction in principle.  Subject to matter of drafting, this undertaking should require the Claimants:

(1)     To exercise best endeavours (i) to produce witness statements from the relevant witnesses (ii) to call the relevant witnesses at trial to give oral evidence (in the case of Mr. Greenberg, by way of video−link);

(2)     To notify Mr. Kozeny promptly should they have reason to believe that (1)(i) and/or (1)(ii) cannot be achieved.