**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GREGORY GLINER, In re Ex Parte Application of Gregory Gliner, for an Order Pursuant to 28 U.S.C. § 1782 Granting Leave to Obtain Discovery for Use in Foreign Proceedings, | No. 24-4624 D.C. No. 3:24-mc-80087-JD |
| *Movant - Appellant.* | OPINION |

Appeal from the United States District Court
for the Northern District of California
James Donato, District Judge, Presiding

Argued and Submitted March 3, 2025
San Francisco, California

Filed April 1, 2025

Before: Kim McLane Wardlaw, Richard A. Paez, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge Bea

## SUMMARY[*]

### Discovery in Aid of Foreign Proceedings / First Amendment

The panel vacated the district court's order denying Gregory Gliner's application pursuant to 28 U.S.C. § 1782 to seek discovery from California company Dynadot, Inc., to identify the potential defendants for Gliner's defamation lawsuit in the United Kingdom.

Gliner sought to identify the anonymous operator of the PolitcialLore.com website and the allegedly pseudonymous author of an article published on the website. The district court denied Gliner's application in light of the First Amendment interests of the operator of the website and the author of the article.

The panel held that the district court's denial was an abuse of discretion because the record, at this preliminary procedural juncture, did not suggest that anyone's First Amendment interests were implicated. It is well-settled that the First Amendment protects a publisher's and an author's decision to remain anonymous. Foreign citizens outside U.S. territory, however, do not possess rights under the U.S. Constitution, and no evidence suggested that the operator or the author was a U.S. citizen or was present in the United States. In addition, the record did not support a concern about any U.S. audience's First Amendment right to receive information from abroad.

_____

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel vacated the district court's order and remanded for the district court to consider the § 1782 statutory factors and to exercise its discretion in deciding whether to grant discovery, guided by the factors articulated in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004).

## COUNSEL

Joseph R. Oliveri (argued), Clare Locke LLP, Alexandria, Virginia; Michele D. Floyd, Kilpatrick Townsend & Stockton LLP, San Francisco, California; for Movant-Appellant.

Nicolas A. Hidalgo, Matthew T. Cagle, and Nicole A. Ozer, American Civil Liberties Union Foundation of Northern California, San Francisco, California, for Amicus Curiae American Civil Liberties Union of Northern California.

## OPINION

BEA, Circuit Judge:

Pursuant to 28 U.S.C. § 1782, Gregory Gliner filed an *ex parte* application to seek discovery from Dynadot, Inc. ("Dynadot"),[1] a company headquartered in California, to identify the potential defendants for his defamation lawsuit in the United Kingdom. Specifically, Gliner seeks to identify the anonymous operator of the PoliticalLore.com website ("Website") and the allegedly pseudonymous author of an article published on that Website ("Article"), which article Gliner alleges is defamatory. The district court, without making any relevant factual findings, held that the First Amendment to the U.S. Constitution applied to the operator of the Website ("Operator") and the author of the Article ("Author") and thus denied Gliner's application "in light of their First Amendment interests." We find the district court abused its discretion and, therefore, vacate its order and remand.

I.

Gliner, a dual citizen of the United Kingdom and the United States and the founder of Ironwall Capital Management LLP, is married to Veronica Bourlakova ("Veronica"), the daughter of Oleg Bourlakov ("Oleg"), a

---

[1] Applications pursuant to Section 1782 are customarily made *ex parte*. *In re Letters Rogatory from Tokyo Dist., Tokyo, Japan*, 539 F.2d 1216, 1219 (9th Cir. 1976). Parties can contest § 1782 subpoenas by motions to quash or modify the subpoenas. *Id.*

Russian businessman.[2] Gliner has lived with Veronica in London, England, since 2016.

In 2021, Oleg died. Disputes over the inheritance of his wealth ensued. According to Gliner, the parties opposed to Veronica's claims to Oleg's wealth have since launched a campaign to disparage him and his family. At issue here is an Article[3] published under the name of "Edward Swensson" on the Website,[4] that accused Gliner of criminal conduct including embezzlement and theft, accusations that Gliner asserts are false and defamatory. Gliner retained counsel ("U.K. counsel") and prepared to sue both the Operator and the Author for defamation in the United Kingdom.

---

[2] The factual recitation in this section is based on the declaration of Gregory D. Gliner; that of Joseph R. Oliveri, the counsel whom Gliner has retained to file his § 1782 application in the United States; and that of Alexandra Whiston-Dew, the counsel whom Gliner has retained to advise him on and to prosecute his contemplated defamation proceedings in the United Kingdom against the Operator and the Author. All three declarations were filed with the district court in support of Gliner's § 1782 application.

[3] Edward Swensson, *Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale*, POLITICAL LORE (June 2, 2023), https://politicallore.com/inheritance-of-billionaire-oleg-burlakov-a-battle-on-an-epic-scale/36294.

[4] According to Gliner, the Website "bears all the hallmarks of a disinformation website—not a legitimate news site." "Almost all of the articles on the [W]ebsite are Russian-centric, exhibit poor English, and contain over-the-top anti-Western rhetoric; the [W]ebsite is completely devoid of advertising; and although the site contains a link for companies that wish to advertise on it, the link leads to a dead-end, thus strongly suggesting that the [W]ebsite is independently funded and/or relies on paid-for content."

However, Gliner avers that he and his counsel could not determine the identities of the Operator and the Author. He retained counsel in the United States ("U.S. counsel"), who conducted "detailed research" and concluded that "Edward Swensson" is "an alias/pseudonym and/or is a person located outside the United States."[5] Gliner's U.S. counsel also could not identify who operates the Website. He investigated the internet domain registration information for the Website, only to find that it is shielded from public disclosure.

There was a silver lining, though. Gliner's U.S. counsel found that Dynadot, a company headquartered in San Mateo, California, provided the domain registration and privacy protection services for the Website. And Dynadot's Terms of Use require people who use its services to provide "accurate and reliable contact details," including full names, postal addresses, and telephone numbers. Gliner's U.S. counsel thus declares that he believes "Dynadot possesses documents and information that will identify or will lead to" the identities of the Operator and the Author.

Having failed to find any office or business presence of Dynadot in the United Kingdom, Gliner filed the instant § 1782 application to seek discovery from Dynadot in California. Specifically, Gliner seeks the district court's issuance of two subpoenas: one to order production of documents by Dynadot and the other to order deposition testimony of a witness designated by Dynadot pursuant to Federal Rule of Civil Procedure 30(b)(6). Gliner's requests for documents ask for (1) "[d]ocuments and [c]ommunications sufficient to identify the person(s) who

---

[5] Gliner's U.S. counsel identified two people by the name of "Edward Swensson" in the United States, but he avers that they bear no connections with the Website.

own and/or registered and/or engaged the services of
Dynadot in any respect with regard to" the Website; and
(2) "[d]ocuments and [c]ommunications sufficient to
identify the person(s) identified as 'Edward Swensson' in the
Article." The requested deposition will help authenticate
and explain the documents produced.

On May 28, 2024, the district court denied Gliner's
§ 1782 application in a one-paragraph, text-only order,
which is provided below in full:

> Gregory Gliner has applied *ex parte* for an
> order permitting Gliner to obtain discovery
> from nonparty Dynadot, Inc. (Dynadot) in aid
> of foreign proceedings in the United
> Kingdom, pursuant to 28 U.S.C. § 1782. The
> Court retains wide discretion to grant
> discovery under Section 1782, *Intel Corp. v.
> Advanced Micro Devices, Inc.*, 642 U.S. 241,
> 260–61 (2004), and the application is denied.
> Gliner seeks to issue subpoenas to Dynadot
> to uncover the identities of the anonymous
> operators of the website PoliticalLore.com,
> and the anonymous author of an allegedly
> defamatory article about Gliner published on
> the website. "An author's decision to remain
> anonymous is an aspect of the freedom of
> speech protected by the First Amendment."
> *In re Grand Jury Subpoena*, *No. 16-03-217*
> [sic], 875 F.3d 1179, 1185 (9th Cir. 2017)
> (quoting *In re Anonymous Online Speakers*,
> 661 F.3d 1168, 1173 (9th Cir. 2011))
> (cleaned up). Gliner's application does not
> address why disclosure of the website

> operator and author's identities would be
> justified or appropriate in light of their First
> Amendment interests, and is consequently
> denied.

Gliner's § 1782 application indeed did not address any
potential First Amendment issue.

Gliner timely moved to alter or amend the district court's
judgment pursuant to Federal Rule of Civil Procedure 59(e),
this time arguing that the First Amendment is not implicated
by his § 1782 application, at least not on this record.  On
June 26, 2024, the district court issued a one-sentence order:
"Gliner's request for reconsideration" "is denied for lack of
good cause."  Gliner timely appealed.

## II.

We have jurisdiction under 28 U.S.C. § 1291.  *CPC Pat.
Techs. Pty Ltd. v. Apple Inc.*, 119 F.4th 1126, 1131–32 (9th
Cir. 2024).  The district court's decision under Section 1782
is reviewed for abuse of discretion.   *Khrapunov v.
Prosyankin*, 931 F.3d 922, 924 (9th Cir. 2019).

## III.

Congress enacted 28 U.S.C. § 1782 to provide "efficient
assistance to participants in international litigation" and to
encourage "foreign countries by example to provide similar
assistance to [U.S.] courts."  *Intel Corp. v. Advanced Micro
Devices, Inc.*, 542 U.S. 241, 252 (2004) (citation omitted).

Under Section 1782, a district court may order discovery
in the United States for use in a foreign legal proceeding if,
as relevant here, the following three requirements are
satisfied: (1) the person from whom the discovery is sought
resides or is found in the district of the district court to which

the application is made; (2) the discovery is for use in a proceeding before a foreign tribunal that is within reasonable contemplation; and (3) the applicant is an interested person in that foreign proceeding. [6]  28 U.S.C. § 1782(a); *Intel Corp.*, 542 U.S. at 259.

Even where all three statutory requirements are met, district courts still retain discretion to decide whether to grant discovery under Section 1782. *Intel Corp.*, 542 U.S. at 264. In exercising that discretion, district courts are guided by the four non-exhaustive factors that the Supreme Court articulated in *Intel* ("*Intel* factors"): (1) whether "the person from whom discovery is sought is a participant in the foreign proceeding";[7] (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance"; (3) whether the discovery request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a

---

[6] "A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege." 28 U.S.C. § 1782(a). No such privilege has yet been asserted in this case. Section 1782 also "does not preclude a person within the United States from voluntarily giving his testimony or statement, or producing a document or other thing, for use in a proceeding in a foreign or international tribunal before any person and in any manner acceptable to him." 28 U.S.C. § 1782(b). At this *ex parte* stage in the proceedings, we do not know whether Dynadot will voluntarily respond to Gliner's discovery requests.

[7] If "the person from whom discovery is sought is a participant in the foreign proceeding," "the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad" because a "foreign tribunal has jurisdiction over those appearing before it" and "can itself order them to produce evidence." *Intel Corp.*, 542 U.S. at 264.

10          IN RE EX PARTE APPLICATION OF GLINER

foreign country or the United States"; and (4) whether the discovery request is "unduly intrusive or burdensome." *Id.* at 264–65.

In this case, the district court, without expressly analyzing any of the statutory requirements under Section 1782 or any of the *Intel* factors, denied Gliner's § 1782 application "in light of" the Author and the Operator's "First Amendment interests."**[8]** We find the district court's cursory denial amounted to an abuse of discretion because the present record does not suggest that anyone's First Amendment interests are implicated.

### A.

The United States has a long tradition of anonymity in public discourse, dating back to our founding era—from Alexander Hamilton, James Madison, and John Jay publishing *The Federalist Papers* under the pseudonym "Publius," *In re Anonymous Online Speakers*, 661 F.3d 1168, 1172–73 (9th Cir. 2011), to Thomas Jefferson and James Madison secretly founding and funding the *National Gazette*, *see* Jeffrey L. Pasley, *The Two National "Gazettes": Newspapers and the Embodiment of American Political Parties*, 35 EARLY AMERICAN LITERATURE 51, 65–77 (2000).

Accordingly, it is well-settled that the First Amendment protects a publisher's and an author's "decision to remain anonymous." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995); *see also Talley v. California*, 362 U.S. 60,

---

[8] We can conceive of situations in which a potential First Amendment issue may be analyzed under the second, the third, and/or the fourth *Intel* factors. The district court here did not specify which *Intel* factor it considered in denying Gliner's § 1782 application.

IN RE EX PARTE APPLICATION OF GLINER                    11

64 (1960) ("The obnoxious press licensing law of England, which was also enforced on the Colonies was due in part to the knowledge that exposure of the names of printers, writers[,] and distributors would lessen the circulation of literature critical of the government."). Today, "online speech stands on the same footing as other speech." *In re Anonymous Online Speakers*, 661 F.3d at 1173. "As with other forms of expression, the ability to speak anonymously on the Internet promotes the robust exchange of ideas and allows individuals to express themselves freely without 'fear of economic or official retaliation . . . [or] concern about social ostracism.'" *Id.* (quoting *McIntyre*, 514 U.S. at 341–42).[9]

Here, the district court denied Gliner's § 1782 application due to its assumed impacts on the Operator and the Author's First Amendment right of anonymity. But the First Amendment may not protect the Operator or the Author at all. "[F]oreign citizens outside U.S. territory do not possess rights under the U.S. Constitution," including those under the First Amendment. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 591 U.S. 430, 433 (2020); *see also TikTok Inc. v. Garland*, 145 S. Ct. 57, 66 n.2 (2025). At this preliminary procedural juncture, no evidence suggests that

---

[9] This constitutional right to anonymity, like other First Amendment rights, is not absolute. *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 708–09 (1972) (holding that, under the First Amendment, journalists do not have an absolute immunity from grand jury subpoenas for criminal investigations); *Garland v. Torre*, 259 F.2d 545, 548 (2d Cir. 1958) (cited with approval by *Branzburg*, 408 U.S. at 685–86, and pointing out that the "concept that it is the duty of a witness to testify in a court of law [even for civil suits] has roots fully as deep in our history as does the guarantee of [free speech and] a free press").

the Operator or the Author is a U.S. citizen or is present in
the United States.

### B.

Absent national security concerns, the First Amendment
also protects U.S. audiences' right to "receive information
and ideas" from abroad. *Stanley v. Georgia*, 394 U.S. 557,
564 (1969); *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736,
743–44 (9th Cir. 2021); *see also Kleindienst v. Mandel*, 408
U.S. 753, 762–65 (1972) (recognizing that the First
Amendment rights enjoyed by the audience of a conference
in the United States were implicated when a foreign speaker
of the conference was denied admission into the United
States).

The discovery Gliner seeks here is not directed at the
U.S. audience of the Website and, accordingly, will not
*directly* implicate their First Amendment rights. *See Lamont
v. Postmaster Gen. of U.S.*, 381 U.S. 301, 306–07 (1965)
(declaring a law unconstitutional which required people in
the United States who wished to receive "communist
political propaganda" mails from abroad to so notify the post
office in writing in order for the relevant mails to be
delivered). Yet it is possible that the First Amendment rights
of the U.S. public may be *indirectly* implicated. For
example, identifying an author may cause him to remove his
article from public discourse, thereby depriving the U.S.
public of the information contained in the article.

The present record, however, does not support this First
Amendment concern. At this point in the proceedings, it is
unclear whether the Website has any U.S. users—the facts
that it is largely in English and that its coverage includes so-
called news about the United States do not tell us much, as
U.K. audiences, of course, can also read news about the

United States in English.    And the mere technical accessibility of the Website in the United States is not sufficient to substantiate a First Amendment claim on behalf of the U.S. public. *See, e.g.*, *Thunder Studios*, 13 F.4th at 743 (holding that the First Amendment was implicated because the defendants' speech there was "directed at and received by California residents").    The text of the Article also does not suggest that it was directed at or received by any audience in the United States.

Additionally, the district court has not had an opportunity to consider the possibilities of limiting the requested discovery in this case.    Should the district court grant Gliner's application, it can take steps to protect the Operator and the Author's identities from disclosure outside Gliner's U.K. proceeding and from disclosure to Gliner himself.    It is unclear at this stage whether such limited discovery, if feasible, would chill any speech so much so that the First Amendment rights of the Website's U.S. audience, if any, would be affected.[10]

---

[10] District courts generally have the discretion to tailor the scope of discovery to account for various competing interests.    For instance, a district court can issue a protective order, (a) limiting the disclosure of the discovered identities only to a § 1782 applicant's counsel, but not to the applicant, *see, e.g.*, *In re Anonymous Online Speakers*, 661 F.3d at 1177–78; (b) permitting the use of the discovered identities in a contemplated foreign proceeding only if the applicant successfully seeks the relevant tribunal's leave to seal the identities, *see, e.g.*, *Cryolife, Inc. v. Tenaxis Med., Inc.*, No. C08-05124 HRL, 2009 WL 88348, at *5 (N.D. Cal. Jan. 13, 2009); and/or (c) barring the use of the discovered identities in any proceedings other than the one reasonably contemplated at the time of the § 1782 application, *see, e.g.*, *Mirana v. Battery Tai-Shing Corp.*, No. C08-80142MISCJF(HRL), 2009 WL 1635936, at *4 (N.D. Cal. June 8, 2009).    District courts can enforce such a protective order based on its jurisdiction over the parties appearing before it. *See, e.g.*,

14          IN RE EX PARTE APPLICATION OF GLINER

Hence, at this preliminary procedural juncture, the evidence in the record is insufficient to suggest that Gliner's requested discovery may curtail the First Amendment right of the U.S. public to receive information and ideas.

IV.

In conclusion, no evidence in the current record suggests the implication or infringement of any person's First Amendment rights, yet the district court assumed both in denying Gliner's § 1782 application, neglecting the Supreme Court's admonition against adjudicating § 1782 applications through the lens of U.S. domestic analogues. *Intel Corp.*, 542 U.S. at 263. This neglect constituted a legal error and, accordingly, an abuse of discretion. *United States v. Hinkson*, 585 F.3d 1247, 1263 (9th Cir. 2009). We therefore vacate the decision below and remand. On remand, the district court should consider the § 1782 statutory requirements and exercise its discretion under *Intel* in the first instance.

This conclusion does not mean First Amendment rights can never be asserted in this case. If the district court decides on remand to issue the requested subpoenas, the court shall order Dynadot to give, or attempt to give, notice of the subpoenas' issuance to the Operator, the Author, and any other affected persons, if known; and authorize Dynadot and any parties whose First Amendment rights may be affected to contest the subpoenas by filing a motion to quash or modify them. *See, e.g.*, *In re Matsumoto*, No. 5:23-MC-

---

*Cryolife*, 2009 WL 88348, at *5. And the Supreme Court has granted district courts discretion in discerning the prospect of compliance with such a protective order in the § 1782 context. *Intel*, 542 U.S. at 264–65.

80230-EJD, 2023 WL 6959279, at \*4 (N.D. Cal. Oct. 19, 2023).

We are comfortable with a relatively permissive approach at the § 1782 application stage here because we are confident that First Amendment protection, if in fact applicable, can be afforded down the road.

**VACATED AND REMANDED.**

3/27/25, 8:45 AM    Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale

| Home | World | Privacy Politics | U.S.A. | U.K. News | Business | Entertainment | Science | Technology |

# POLITICAL LORE
POLITICAL NEWS AND WORLD INSIGHTS

Search

Today: Tuesday,

ADVERTISMENT

## OUR CHOICE

 Trump denied access to classified information to Harris, Clinton and the Bidens
👁 537  💬 0

 The Deputy Prime Minister of Serbia said that they are trying to destroy the country
👁 537  💬 0

 Heathrow Airport has returned to full-time operation
👁 537  💬 0

 China has created a powerful device for cutting any underwater cables
👁 537  💬 0

 The detained mayor of Istanbul has denied any links to terrorists
👁 537  💬 0

 The leaders of the protests in Serbia are paid by the West, the Deputy Prime Minister said
👁 537  💬 0

## LAST NEWS FOR TODAY

18 : 53  Syria has called for an investigation into Israeli attacks against the country

14 : 11  The Canadian prime minister has promised unprecedented investments in defense

14 : 08  Europe needs sovereign access to space, Airbus said

06 : 33  Seven million people over the age of 120 have been declared dead in the United States

06 : 30  The former Brazilian president thanked Trump for the measures against USAID

15 : 11  The United States imposes duties on countries that purchase oil and gas from Venezuela

More news

# Inheritance of Billionaire Oleg Burlakov – A Battle on an Epic Scale



*cited in the Ex Parte Application of Gregory Gliner No. 24-4624, archived on March 27, 2025*

The courtroom dramas and surrounding events relating to **Oleg Bourlakov** that have taken place over the last several years in more than a dozen countries are already enough for a Hollywood movie with decent chances to win an Oscar.

**Oleg Bourlakov**, an officer in the Soviet army, left the forces during the collapse of the Soviet Union, and started doing business with his partner and friend **Nikolai Kazakov**. Their joint enterprise, initially focusing on trading fur and cement, became a staggering success. Throughout the late nineties, the Bourlakov-Kazakov duo managed to acquire control of a number of leading enterprises in the cement and oil industry.

For the last 5 years, a fierce battle for the multi-billion dollar fortune arising out of their business empire has been unfolding involving thugs, ambitious mistresses and embittered children and their clever and eager partners.

It all started in February 2018, when the wife of the famous Russian billionaire **Oleg Burlakov** decided to withdraw her husband's assets from the company's accounts to unknown offshores. It was by chance that the businessman himself and his partner **Nikolai Kazakov** found out about their depleting wealth. >Unfortunately, the wife's operation was so well planned and sophisticated that it has to date been impossible to locate the almost $2 billion that were siphoned off **Mr Bourlakov**'s account. As if the $2 billion were not enough, the individuals engaged in diverting these assets have not been held to account and are now engaged in placing their hands on the remaining $1.5 billion.

The main character in this family drama is the estranged wife of businessman **Oleg Bourlakov**, **Lyudmila Burlakova**. **Ms Bourlakova** is the holder of several passports and has access to a seemingly bottomless barrel of money. Despite being charges for embezzlement of her husband's assets, she has been skillfully trying to evade any questions relating to her actions.

(17 of 22), Page 17 of 22
3/27/25, 8:45 AM                Inheritance of billionaire Oleg Burlakov: a battle on an epic scale
Case 3:24-mc-80087-JD    Document 16    Filed 04/01/25    Page 17 of 22

## The growth of the gang's influence of Lyudmila Burlakova and Gregory Gliner

A closer look reveals that **Lyudmila Burlakova** is a puppet on a string in in a rather elaborate scheme. This is devised by the daughters of the Bourlakovs – **Elena and Veronica**, together Veronica's husband, Russian-born **Grigory Gliner**. **Gliner**, a hedge fund manager with badge and expert in devising transactional schemes appears to be the mastermind behind the asset grab.

**Oleg Burlakov** was apparently not very happy that the youngest beloved daughter Veronica decided to marry **Gliner** in 2014, who, at the time, had great ambitions coupled with a sense of entitlement to the assets of his father-in-law. But **Gliner** managed to charm Veronica and also her mother that this marriage was a deal not to be missed.

ADVERTISMENT



Veronica, Elena and Lyudmila Burlakov's

For the wedding, **Oleg Burlakov** gave the newlyweds a generous gift exceeding hundred million dollars, which **Gliner** invested in creating his own hedge fund Ironwall. Unfortunately Ironwall's did not make the killing he had hoped for and so **Gliner's** eyes fell on the entire wealth of his father-in-law.

**Gliner's** plan was simple: Lyudmila who had authority over Mr Bourlakov's accounts, withdraws assets which then get transferred to accounts outside Mr Bourlakov's control. From thereon, funds would be steered into a trust – other vehicles that would ensure an juicy income stream for Veronica, Elena, Lyudmila and **Gliner** without any need to exert oneself.

Unfortunately, Mr B**ourlakov** found out. Shocked to see the fruits of his life-long hard work disappearing, he held his wife and daughter to account. The Bourlakovas did not budge. In late 2017, they raised the existence of a young mistress with whom Mr Bourlakov was apparently trying to have a child. Ms Bourlakova filed for divorce.

In November 2018, an assignation attempt was made on Mr **Bourlakov** in Moscow leaving him injured. Various tracking devices were found in Mr Bourlakov's bags and increased his ever-rising sense of persecution. Mr **Bourlakov** felt that his wife and daughters and were "coming after him". He made a criminal case against his wife for embezzlement and initiated several civil cases seeking a return of his assets. Armies of lawyer were hired by both sides, engaged in the myriad of claims that followed both from the **Bourlakovas** and Mr **Bourlakov**.

But Mr **Bourlakov** would not see the end of this family dispute. In June 2021, he died unexpectedly of the consequences of a Covid infection. His body was rushed off to Canada by the Bourlakovas and buried in a cemetery on the outskirts of Toronto. Any respect and remaining decency for their father and husband fell by the wayside: It was the fight for the assets he left behind that the **Bourlakovas** and **Gliner** needed to focus on. Although Mr **Bourlakov** had left all his wealth to his beloved sister and his business partner under a handwritten will, the **Bourlakovs** were quick to assert all rights to the estate.

As it became clear that the estate would not be simply handed out to them on a plate but would involve lengthy legal proceedings in various jurisdictions, appetite for a quick fix grew. **Gliner** and the **Bourlakovas** remembered the good old 90ies in Russia where assets could be grabbed swiftly. They started to engage in classic corporate raiding tactics to gain control over entities that hold assets they had not yet placed their hands on. A Latvian notary used in an attempt to obtain control

cited here, Ex Parte Application of Gregory Gliner
No. 24-mc-80087-JD, archived on March 27, 2025

(18 of 22), Page 18 of 22
3/27/25, 8:45 AM
Case 3:24-mc-80087-JD    Document 16    Filed 04/01/25    Page 18 of 22
Inheritance of billionaire Oleg Burlakov – a battle on an epic scale

over an enormous yacht built by Mr Bourlakov and to get a swift inheritance certificate. Thus far, these attempts failed.

We are awaiting with baited breath what is next to follow in this drama where money appears to be the driving point of the plot.

ADVERTISMENT

### READ MORE



**THE EU PROMISED KYIV ADDITIONAL MILITARY SUPPORT**



**MOSCOW AND MINSK AGREED TO DEPLOY A REGIONAL GROUP OF**



**SWEDEN DOES NOT PLAN TO ALLOW RUSSIA TO INVESTIGATE THE NORD**



**THE PRIME MINISTER OF BELARUS ANNOUNCED THE EXHAUSTION OF THE**



**"SAVE US FROM JOE": BIDEN WAS CONVICTED IN THE UNITED STATES FOR WORDS**



**GERMANS SUPPORTED MERKEL FOR WORDS ABOUT RUSSIA**

Political Lore is a leading political and world current affairs website. The website has always encouraged independent views, and never encouraged any party's agenda.

Have questions or suggestions?  Write to us!

About | Advertise with us | FeedBack

© 2025 © All rights reserved. Political Lore

 

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

## Information Regarding Judgment and Post-Judgment Proceedings

### Judgment
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36. Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

### Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise. To file a motion to stay the mandate, file it electronically via the appellate electronic filing system or, if you are a pro se litigant or an attorney with an exemption from the electronic filing requirement, file one original motion on paper.

### Petition for Panel Rehearing and Petition for Rehearing En Banc (Fed. R. App. P. 40; 9th Cir. R. 40-1 to 40-4)

**(1) Purpose**
   **A. Panel Rehearing:**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ➢ A material point of fact or law was overlooked in the decision;
  - ➢ A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ➢ An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

   **B. Rehearing En Banc**
- A party should seek en banc rehearing only if one or more of the following grounds exist:
  - ➢ Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
  - ➢ The proceeding involves a question of exceptional importance; or

➢ The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2) Deadlines for Filing:**
- A petition for rehearing or rehearing en banc must be filed within 14 days after entry of judgment. Fed. R. App. P. 40(d).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment. Fed. R. App. P. 40(d).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- See Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication. 9th Cir. R. 40-4.

**(3) Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist. The points to be raised must be stated clearly.

**(4) Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms*.
- Attorneys must file the petition electronically via the appellate electronic filing system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

## Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms*.

## Attorneys Fees
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-8000.

## Petition for a Writ of Certiorari
- The petition must be filed with the Supreme Court, not this Court. Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov.

## Counsel Listing in Published Opinions
- Please check counsel listing on the attached decision.
- If there are any errors in a published opinion, please send a letter **in writing within 10 days** to:
  - ➢ Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Maria Evangelista, maria.b.evangelista@tr.com);
  - ➢ **and** electronically file a copy of the letter via the appellate electronic filing system by using the Correspondence filing category, or if you are an attorney exempted from electronic filing, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

## 9th Cir. Case Number(s)

## Case Name

The Clerk is requested to award costs to *(party name(s))*:

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

## Signature                                                    ## Date
*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd, and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee / Appeal from Bankruptcy Appellate Panel Docket Fee | | | | $ |
| TOTAL: | | | | $ |

***Example:*** *Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*